AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   MJ22-129 |
| (1) Information associated with 36 Google accounts that is stored at premises controlled by Google LLC; and (2) Information associated with 2 Apple accounts that is stored at premises controlled by Apple Inc. | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachments A-1 and A-2, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachments B-1 and B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. §§ 1343 and 1349 | Wire Fraud and Wire Fraud Conspiracy |
| 18 U.S.C. §§ 1956 and 1957 | Money Laundering and Money Laundering Conspiracy |

The application is based on these facts:

✔ See Affidavit of Federal Bureau of Investigation Specal Agent Andrew Cropcho continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or ☐ telephonically recorded.

_____
*Applicant's signature*

Andrew Cropcho, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:  April 1, 2022

_____
*Judge's signature*

City and state:  Seattle, Washington

Hon. S. Kate Vaughan, United States Magistrate Judge
*Printed name and title*

USAO: 2019R01037

1                               **AFFIDAVIT**

2 STATE OF WASHINGTON      )

3                                       )     ss

4 COUNTY OF KING          )

5

6        I, Andrew Cropcho, being duly sworn, hereby depose and state as follows:

7             **INTRODUCTION AND AGENT BACKGROUND**

8        1.      I make this affidavit in support of an application for a search warrant for

9 information associated with certain accounts, further described below (collectively the

10 "Accounts"), that are stored at premises owned, maintained, controlled, or operated by

11 (a) Google LLC ("Google"), an electronic communications service and/or remote computing

12 service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California;

13 and (b) Apple Inc. ("Apple"), an electronic communications service and/or remote

14 computing service provider headquartered at One Apple Park Way, Cupertino, California.

15 The information to be searched is described in the following paragraphs and in Attachments

16 A-1 and A-2. This affidavit is made in support of an application for a search warrant under

17 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google and Apple to

18 disclose to the government copies of the information (including the content of

19 communications) further described in Section I of Attachments B-1 and B-2. Upon receipt of

20 the information described in Section I of Attachments B-1 and B-2, government-authorized

21 persons will review that information to locate the items described in Section II of

22 Attachments B-1 and B-2.

23        2.      The Accounts to be searched are as follows:

24          a.  **Google**

25             • ivan@hashcoins.com (**GOOGLE ACCOUNT 1**);

26             • ivan@burfa.com (**GOOGLE ACCOUNT 2**);

27             • ivan.turygin@polybius.io (**GOOGLE ACCOUNT 3**);

28             • turygin@gmail.com (**GOOGLE ACCOUNT 4**);

Affidavit of Special Agent Andrew Cropcho - 1
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       • sergei@hashcoins.com (**GOOGLE ACCOUNT 5**);

2       • sergei@burfa.com (**GOOGLE ACCOUNT 6**);

3       • sergei.potapenko@polybius.io (**GOOGLE ACCOUNT 7**);

4       • sergei.potapenko@gmail.com (**GOOGLE ACCOUNT 8**);

5       • nikolay@hashcoins.com (**GOOGLE ACCOUNT 9**);

6       • nikolay.pavlovskiy@burfa.com (**GOOGLE ACCOUNT 10**);

7       • pavel@hashcoins.com (**GOOGLE ACCOUNT 11**);

8       • pavel.tsihhotski@burfa.com (**GOOGLE ACCOUNT 12**);

9       • pavel.tsihhotski@polybius.io (**GOOGLE ACCOUNT 13**);

10      • stanislav.pavlov@hashcoins.com (**GOOGLE ACCOUNT 14**);

11      • stanislav.pavlov@burfa.com (**GOOGLE ACCOUNT 15**);

12      • vadim.tsvetikov@hashcoins.com (**GOOGLE ACCOUNT 16**);

13      • vadim.tsvetikov@burfa.com (**GOOGLE ACCOUNT 17**);

14      • vitali@hashcoins.com (**GOOGLE ACCOUNT 18**);

15      • vitali@burfa.com (**GOOGLE ACCOUNT 19**);

16      • anton.altement@polybius.io (**GOOGLE ACCOUNT 20**);

17      • edgar.bers@polybius.io (**GOOGLE ACCOUNT 21**);

18      • tatjana@burfa.com (**GOOGLE ACCOUNT 22**);

19      • margarita.burunova@hashcoins.com (**GOOGLE ACCOUNT 23**);

20      • dalmeronprojects@gmail.com (**GOOGLE ACCOUNT 24**);

21      • ecohousenetworks@gmail.com (**GOOGLE ACCOUNT 25**);

22      • admin@hashcoins.com (**GOOGLE ACCOUNT 26**);

23      • info@hashcoins.com (**GOOGLE ACCOUNT 27**);

24      • info@burfa.com (**GOOGLE ACCOUNT 28**);

25      • info@polybius.io (**GOOGLE ACCOUNT 29**);

26      • invoices@hashcoins.com (**GOOGLE ACCOUNT 30**);

27      • invoices@burfa.com (**GOOGLE ACCOUNT 31**);

28      • microsoft@hashcoins.com (**GOOGLE ACCOUNT 32**);

Affidavit of Special Agent Andrew Cropcho - 2
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
- cb@hashcoins.com (**GOOGLE ACCOUNT 33**);

2
- licenses@hashcoins.com (**GOOGLE ACCOUNT 34**);

3
- alerts.mining@burfa.com (**GOOGLE ACCOUNT 35**); and

4
- support@polybius.io (**GOOGLE ACCOUNT 36**);

5
(collectively the "**GOOGLE ACCOUNTS**"); and

6
    b. **Apple**

7
- Sergei.potapenko@gmail.com (DSID 624556209) ("**APPLE**

8
    **ACCOUNT 1**") (believed to be used by SERGEI POTAPENKO); and

9
- Turygin@gmail.com (DSID 1931852295) ("**APPLE ACCOUNT 2**")

10
    (believed to be used by IVAN TURYGIN);

11
(collectively the "**APPLE ACCOUNTS**").

12
    3.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and

13
have been since May of 2018. I am currently assigned to the Seattle Field Office. My

14
primary duties include investigating violations of Federal law, including corporate fraud,

15
securities fraud, government program fraud, and healthcare fraud. Part of those duties

16
include investigating instances of wire fraud being used for financial gain at the expense of

17
others. Before my career as an FBI Special Agent, I was employed by a large public

18
accounting firm for over three years and, as part of my employment, I examined financial

19
information of clients to determine their accuracy, reliability, and sources.

20
    4.    The facts set forth in this Affidavit are based on my own personal knowledge;

21
knowledge obtained from other individuals during my participation in this investigation,

22
including other law enforcement personnel; review of documents and records related to this

23
investigation; communications with others who have personal knowledge of the events and

24
circumstances described herein including, but not limited to, the victims in this investigation;

25
and information gained through my training and experience.

26
    5.    This affidavit is intended to show merely that there is sufficient probable cause

27
for the requested warrant and does not set forth all of my knowledge about this matter.

28

Affidavit of Special Agent Andrew Cropcho - 3
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       6.     Based on my training and experience, and the facts as set forth in this affidavit,

2 there is probable cause to believe that violations of Title 18, United States Code, Sections

3 371 (Conspiracy), 1343 (Wire Fraud), 1349 (Wire Fraud Conspiracy), 1956 (Money

4 Laundering), and 1957 (Money Laundering–transactions over $10,000) have been committed

5 by IVAN TURYGIN and SERGEI POTAPENKO, individually, and by and through the use

6 of their companies HASHCOINS OU, HASHCOINS TRADE OU, HASHCOINS LP

7 (collectively, "HASHCOINS"); HASHFLARE LP ("HASHFLARE"); Burfa Capital OU,

8 Burfa Media OU, Burfa Real Estate OU, Burfa Tech OU, Burfa Trade OU, Burfa Invest OU

9 (collectively, the "BURFA Entities"); Polybius Foundation OU, Polybius Tech OU, Polybius

10 Ventures OU, Polybius Fintech MidCo OU (collectively, "POLYBIUS"); and Dalmeron

11 Projects LP ("DALMERON"), along with other co-conspirators, known and unknown,

12 including identified key employees of the same companies. There is also probable cause to

13 search the information described in Attachments A, for evidence, instrumentalities, or

14 contraband of these crimes, as described in Attachments B.

## JURISDICTION

16       7.     This Court has jurisdiction to issue the requested warrant because it is "a court

17 of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A)

18 & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has

19 jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

20       8.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is

21 not required for the service or execution of this warrant.

22       9.     This warrant application is to be presented electronically pursuant to Local

23 Criminal Rule CrR 41(d)(3).

## PROCEDURAL HISTORY

25       10.    On April 3, 2020, in connection with the pendent investigation, the Honorable

26 Brian A. Tsuchida, United States Magistrate Judge, issued a search warrant pursuant to Title

27 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), requiring

28 Google to disclose to the government copies of certain information and records pertaining to

Affidavit of Special Agent Andrew Cropcho - 4
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

the Google Accounts and authorizing the government to seize specified information and records.[1] *See* MJ20-153. The relevant time period for the information and records subject to disclosure and seizure under the search warrant was the inception of each relevant account through the date of the search warrant.

11. On March 11, 2021, the Honorable John L. Weinberg, United States Magistrate Judge, issued a search warrant pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), requiring Apple to disclose to the government copies of certain information and records pertaining to the Apple Accounts and authorizing the government to seize specified information and records. *See* MJ21-149. The relevant time period for the information and records subject to disclosure and seizure under the search warrant was the inception of each relevant account through the date of the search warrant.

12. The April 3, 2020, and March 11, 2021, search warrants are collectively referred to herein as the "Search Warrants."

13. In support of its applications for the Search Warrants, the United States submitted two affidavits (collectively, the "Affidavits"). I was the affiant for both Affidavits, and I swore to the truth and accuracy of their contents.

14. The Affidavits are incorporated by reference herein and appended to this search warrant application.

## **BACKGROUND ON VIRTUAL CURRENCY AND MINING**

15. Virtual currency (also known as cryptocurrency) is an asset that can be exchanged directly person to person, through a virtual currency exchange, or through other intermediaries. It can be used to buy goods and services, exchanged for "fiat currency" (currency established by government regulation or law) or other virtual currency, or held as an investment, among other applications.

---

[1] The search warrant included four additional accounts not included in the Google Accounts listed above. One of those additional accounts contained a clerical error as written, so Google did not provide any information associated with the account. The other three accounts were not associated with any information or records seized by the FBI. Accordingly, those four additional accounts are not included in this search warrant application.

Affidavit of Special Agent Andrew Cropcho - 5
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

16.     Virtual currency is generally not issued by any government or bank. Rather, it is frequently generated and controlled through software operating on a decentralized, peer-to-peer ("P2P") network of computers across the world. (Some types of virtual currency, however, are generated and controlled through software operating on a centralized network of computers across the world.)

17.     There are thousands of virtual currencies in use, including Bitcoin, Ethereum, Bitcoin Cash, and Monero. Bitcoin,[2] the most popular form of virtual currency, can be generated through mining. According to Bitcoin.org, "Bitcoin mining is the process of making computer hardware do mathematical calculations for the Bitcoin network to confirm transactions and increase security. As a reward for their services, Bitcoin miners can collect transaction fees for the transactions they confirm, along with newly created bitcoins."

18.     Bitcoin mining can be conducted locally on a user's computer or other computer hardware, or it can be conducted on another's system via the cloud. According to the Santa Clara Law School High Technology Journal: "Cloud mining is an economic arrangement whereby a person pays another person or entity to engage in cryptocurrency mining on their behalf and receives the transaction fees, cryptocurrency or a portion thereof that is generated from such mining efforts."

19.     One measure for determining the effectiveness or processing power of a mining operation is to calculate the operation's hash rate. According to Bitcoin.org: "The hash rate is the measuring unit of the processing power of the Bitcoin network. The Bitcoin network must make intensive mathematical operations for security purposes. When the network reached a hash rate of 10 Th/s, it meant it could make 10 trillion calculations per second."

20.     Bitcoin utilizes "public key cryptography," a mathematical algorithm that generates a pair of unique, corresponding keys: the "public key" and the "private key." These

---

[2] Since Bitcoin is both a virtual currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the virtual currency. That practice is adopted here.

Affidavit of Special Agent Andrew Cropcho - 6
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   components form the "public address," which is used to send and receive bitcoins and can be
2   shared. A public address is akin to a bank account number, and a private key is akin to a
3   Personal Identification Number ("PIN") or password. Only the holder of a public address's
4   private key can authorize transfers of virtual currency from that public address to another
5   public address.

6         21.    Many virtual currencies operate via a "blockchain," a record (or ledger) of
7   every transaction ever conducted that is distributed throughout the computer network (as
8   opposed to being maintained by any single administrator or entity). As to bitcoins, although
9   the public addresses of those engaging in virtual currency transactions are recorded on a
10  blockchain, the identities of the individuals or entities behind the public addresses are not
11  recorded on these public ledgers. If, however, an individual or entity is linked to a public
12  address, it may be possible to determine what transactions were conducted by that individual
13  or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous,"
14  meaning that they are partially anonymous.

15        22.    Virtual currency users typically employ a "wallet," a tool that can be used to
16  manage public and private keys, interface with a blockchain, and send or receive virtual
17  currency. Wallets vary widely in terms of their format and technological sophistication.  One
18  variety, known as "hosted" (or "custodial") wallets, are virtual-currency wallets controlled
19  by a third party—often, a company with a cloud-based, encrypted wallet platform that may
20  be hosted on the company's servers. Users of hosted wallets may be able to access the
21  company's platform through various digital devices, much like a traditional online banking
22  experience. Hosted wallet providers include virtual currency exchanges, which allow their
23  customers, for a fee, to exchange virtual currency for other virtual currencies and/or fiat
24  currencies.

25        23.    Virtual currencies are sometimes launched through Initial Coin Offerings
26  ("ICO"). An ICO is a capital raising event in which an entity offers investors a unique "coin"
27  or "token" in exchange for consideration—most commonly in the form of established virtual
28  currencies or fiat currency.  These tokens are issued on a blockchain and are sometimes

Affidavit of Special Agent Andrew Cropcho - 7
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   listed on online platforms, called virtual currency exchanges, where they are tradable for

2   virtual or fiat currencies.  To participate in an ICO, investors are typically required to

3   transfer virtual currencies to the issuer's address, online wallet, or other account.  During an

4   ICO, or after its completion, the issuer would typically distribute its unique "tokens" to the

5   participant's unique address on the related virtual currency's blockchain.  Similar to

6   stockholders in an initial public offering ("IPO"), holders of tokens are entitled to certain

7   rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain

8   services provided by the issuer, and voting rights.

9   **STATEMENT OF PROBABLE CAUSE**

10   **A.**    **Summary of Investigation**

11       24.    There is probable cause to believe that Estonian nationals IVAN

12   TURYGIN and SERGEI POTAPENKO, as well as various corporate entities they owned

13   and/or controlled, and other co-conspirators, carried out a multi-faceted wire-fraud and

14   money-laundering conspiracy, in violation of 18 U.S.C. §§ 371, 1343, 1349, 1956, and 1957.

15   As discussed below, from approximately 2014 through 2018, TURYGIN, POTAPENKO,

16   and other co-conspirators deceived and defrauded others in relation to cryptocurrency and

17   cryptocurrency-related ventures, all for their own personal gain. They further engaged in a

18   series of financial and monetary transactions to obfuscate the true nature and location of the

19   fraudulently obtained funds, and to enrich themselves.

20       25.    This fraud scheme had four distinct stages, which together constitute a scheme

21   or artifice to defraud:

22       a.   ***Sale of Cryptocurrency Mining Hardware and Equipment:*** In 2014, through

23   HASHCOINS, TURYGIN and POTAPENKO sold cryptocurrency mining hardware and

24   equipment they did not have. When the influx of contracts to purchase mining equipment far

25   outpaced HASHCOIN's ability to fulfill the contracts, TURYGIN and POTAPENKO

26   revised the contracts to redirect existing and new customers to a purported cloud-based

27   platform to mine Bitcoin and other cryptocurrencies offered by HASHFLARE, which

28   TURYGIN and POTAPENKO also owned and operated.

Affidavit of Special Agent Andrew Cropcho - 8
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

b. **_Sale of Cryptocurrency Mining Contracts:_** TURYGIN, POTAPENKO, and other co-conspirators operated HASHFLARE as a fraud and Ponzi scheme beginning in or around 2015 and continuing through mid-2018. During this time, they fraudulently induced thousands of individuals, including one or more of whom resided in the Western District of Washington, to invest in contracts that guaranteed the buyer a portion of HASHFLARE's purported cryptocurrency mining power, and thus a portion of the resulting profits. In order to avoid repaying HASHFLARE investors, TURYGIN and POTAPENKO instituted material changes to the HASHFLARE investor agreements, substantially reducing payments to investors and restricting their abilities to withdraw funds. Then, in July 2018, HASHFLARE unilaterally canceled its contracts with investors and stopped paying annual returns, claiming that cryptocurrency mining was no longer profitable.[3] In fact, the vast majority of annual returns HASHFLARE had paid up to that point were sourced from victims' deposits, not from cryptocurrency mining. To date, the FBI has identified at least $175 million that victims transferred to HASHFLARE, most of which TURYGIN and POTAPENKO laundered through various shell companies, bank accounts, and cryptocurrency wallets they controlled, or otherwise used to perpetuate their fraud scheme.

c. **_Polybius Initial Coin Offering:_** In 2017, leveraging the apparent success of their cloud-mining operations, TURYGIN, POTAPENKO, and others perpetuated their wire-fraud scheme by using proceeds from the initial phase of the scheme—i.e., the HASHFLARE Ponzi scheme—to partially fund the launch of POLYBIUS, and the ICO of PLBT, POLYBIUS's newly minted cryptocurrency token. TURYGIN, POTAPENKO, and others induced victims to purchase tens of millions of dollars of PLBT tokens by making numerous misrepresentations about POLYBIUS and PLBT including, without limitation, that POLYBIUS would use the ICO proceeds to develop a digital bank and would pay

---

[3] These material alterations and purported cancellation of mining contracts were the subject of a purported class action lawsuit filed in the Central District of California, _Baylog et al. v. Hashflare LP_, No. 18-CV0343.  In defending that lawsuit, HASHFLARE continued to falsely represent in court filings that it was a legitimate enterprise and investment vehicle for cloud-based cryptocurrency mining.

Affidavit of Special Agent Andrew Cropcho - 9
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  dividends to holders of PLBT tokens. Not long after completion of the ICO in June 2017,

2  POLYBIUS publicly dropped any pretext that it intended to build a digital bank. POLYBIUS

3  transferred much of the estimated $32 million it raised in the ICO to shell companies, bank

4  accounts, and/or cryptocurrency wallets controlled by TURYGIN and POTAPENKO.

5       d. *Laundering Proceeds:* TURYGIN, POTAPENKO, and others funneled the

6  fraudulently obtained victim funds through a convoluted network of domestic and

7  international shell companies—including HASHCOINS, DALMERON, and the BURFA

8  Entities—bank accounts, cryptocurrency exchanges, cryptocurrency wallets, and tangible

9  property, all of which they owned and/or controlled, in order to conceal the nature, location,

10 source, ownership, and control of the funds, and to promote additional fraudulent conduct.

11 Additionally, TURYGIN and POTAPENKO used fraud proceeds to fund their lavish

12 lifestyle, which included extensive travel on private jets, stays at luxurious international

13 villas, and the purchase of real estate and luxury cars in Estonia. Even after ostensibly

14 shuttering HASHFLARE, TURYGIN and POTAPENKO used fraud proceeds to purchase

15 expensive cryptocurrency mining hardware, which they used to mine cryptocurrencies for

16 personal gain.

17      26.    The Accounts, described in more detail below, are believed to be used to

18 facilitate the scheme and/or associated with the individual or individuals behind the scheme.

19 **B.    Evidence Obtained from Previous Search Warrants**

20      27.    The FBI executed the Search Warrants and reviewed the information and

21 records provided by Google and Apple. All of the Google and Apple Accounts were

22 associated with at least some information and records containing evidence of the wire-fraud

23 and money-laundering scheme described above. Representative, non-exclusive examples of

24 the relevant information and records obtained from the Search Warrants are set forth below.

25      28.    Records stored by Google associated with Google Accounts 2 (TURYGIN),

26 16 (Vadim Tsvetikov), 18 (Vitali Pavlov), and 22 (Tatjana Potapova) contained evidence of

27 HASHFLARE's inability to provide cloud-mining services it sold to customers. Specifically,

28 the accounts contained information and records evidencing HASHCOINS' and

Affidavit of Special Agent Andrew Cropcho - 10
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

HASHFLARE's efforts to place a nominal amount of cryptocurrency mining equipment into service toward the end of HASHFLARE's operations in 2018. This was the first instance since HASHFLARE began selling cloud-mining contracts in 2015 in which either HASHCOINS or HASHFLARE was associated with a datacenter housing its own cryptocurrency mining equipment.

29.    Similarly, records stored by Google associated with Google Accounts 2 (TURYGIN), 5 (POTAPENKO), and 22 (Tatjana Potapova), contained bank records for Connectum, Ltd., bank accounts being used by the BURFA and HASHCOINS entities to perpetuate the fraud schemes. Those records show that the Connectum bank accounts received what appear to be victim deposits from purchases of HASHFLARE cloud-mining contracts. Those Connectum bank accounts then sent large sums of funds to Cryptopay, Ltd.—a fiat-cryptocurrency exchange—with notations evidencing the purchase of cryptocurrency. The FBI's independent analyses of the Bitcoin and Ether blockchains trace cryptocurrency from wallets held by Cryptopay to wallets held or controlled by TURYGIN, POTAPENKO, and their various entities, through elaborate peel chains[4], and ultimately on to what appear to be victims' wallets. This suggests that, as part of its Ponzi scheme, HASHFLARE converted victims' funds deposited in its Connectum bank accounts into cryptocurrency, which it then used to pay back other victims.

30.    The Connectum bank records obtained from some of the Google Accounts also show an interconnectedness among HASHCOINS, HASHFLARE, the BURFA Entities, DALMERON, and POLYBIUS, which all claim to be independent entities. The bank records contain millions of dollars of inter-entity transactions, suggesting that TURYGIN,

---

[4] A "peel chain" is a technique often used to launder large amounts of cryptocurrency by using a lengthy "chain" of smaller transactions. In a peel chain, a small portion of the overall amount to be transferred "peels" off from the main address in a relatively low-value transfer. (In this case, TURYGIN and POTAPENKO would "peel" off chunks of 10 bitcoin for transfer into a larger HASHFLARE scam cluster.) The remaining balance of the larger cryptocurrency amount—the "change"—transfers to a new change address, and the process repeats itself until the desired larger transfer is complete. TURYGIN and POTAPENKO's use of a peel chain here appears designed to prevent or disrupt victims from tracing payments they received from HASHFLARE back to the wallets that had received the initial victim deposits.

Affidavit of Special Agent Andrew Cropcho - 11
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 POTAPENKO, and others used the network of companies to move money and to conceal
2 location, nature, source, ownership, and/or control of funds.

3      31.    The Google Accounts searched by the FBI pursuant to the Search Warrants
4 also contained informative records concerning the PLBT ICO. Google Accounts
5 2 (TURGYIN), 24 (DALMERON), and 29 (POLYBIUS), for example, contained marketing
6 e-mails that appear to have been sent to the public and which made representations about
7 Polybius's business goals. Google Account 2 contained POLYBIUS internal business plans
8 and records identifying potential victims of the PLBT ICO.

9      32.    In Apple Account 1, which is associated with POTAPENKO, the FBI found
10 records which appear to show that DALMERON purchased private jet flights to Greece for
11 POTAPENKO and his family. POTAPENKO has previously asserted no connection with
12 DALMERON, which the FBI learned from other records received tens of millions of dollars
13 from HASHFLARE during the time period of the alleged Ponzi scheme, and which sent
14 millions of dollars on to POLYBIUS.

15      33.    In Apple Account 2, which is associated with TURYGIN, the FBI found
16 records providing a summary of bank accounts associated with TURYGIN at the Tallinn
17 Business Bank in Estonia. The summary helped the FBI determine whether it had a full
18 accounting of records from that bank.

19      34.    The FBI also located bank records illustrating how POTAPENKO and
20 TURYGIN appear to be using shell companies to facilitate payments to themselves. For
21 example, in Apple Account 2, the FBI found bank records showing a 30,000 Euro deposit
22 into an Ecohouse Networks LP bank account from HASHCOINS, on July 24, 2015, with a
23 notation that the payment was for "computational power leasing." On July 24, 2015, and
24 August 11, 2015, a total of 29,000 Euros were transferred from the Ecohouse Networks LP
25 bank account to TURYGIN, indicating TURYGIN used a shell company as a conduit for a
26 passthrough payment to him disguised as a payment for computational power leasing.

27      35.    Given that the Accounts contained evidence of the multi-stage fraud and
28 money laundering conspiracy, including numerous bank records, I believe an updated search

Affidavit of Special Agent Andrew Cropcho - 12
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   of Accounts is likely to return additional evidence of the alleged violations under

2   investigation by the FBI. In particular, up-to-date records may help the FBI identify how

3   TURYGIN, POTAPENKO, and others continued to spend and move fraud proceeds from the

4   dates of the earlier search warrants until the present. This may help the FBI identify the

5   current location of any assets that could be returned to or otherwise used to compensate

6   victims for their losses.

7   ### BACKGROUND CONCERNING GOOGLE[5]

8       36.    Google is a United States company that offers to the public through its Google

9   Accounts a variety of online services, including email, cloud storage, digital payments, and

10  productivity applications, which can be accessed through a web browser or mobile

11  applications. Google also offers to anyone, whether or not they have a Google Account, a

12  free web browser called Google Chrome, a free search engine called Google Search, a free

13  video streaming site called YouTube, a free mapping service called Google Maps, and a free

14  traffic tracking service called Waze. Many of these free services offer additional

15  functionality if the user signs into their Google Account.

16      37.    In addition, Google offers an operating system ("OS") for mobile devices,

17  including cellular phones, known as Android. Google also sells devices, including laptops,

18  mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of

19  Android and Google devices are prompted to connect their device to a Google Account when

20  they first turn on the device, and a Google Account is required for certain functionalities on

21  these devices.

22      38.    Signing up for a Google Account automatically generates an email address at

23  the domain gmail.com. That email address will be the log-in username for access to the

24  Google Account.

25

26

27  [5] The information in this section is based on information published by Google on its public websites, including, but not

28  limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement
    at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

Affidavit of Special Agent Andrew Cropcho - 13
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    39.    Google advertises its services as "One Account. All of Google working for

2    you." Once logged into a Google Account, a user can connect to Google's full suite of

3    services offered to the general public, described in further detail below. In addition, Google

4    keeps certain records indicating ownership and usage of the Google Account across services,

5    described further after the description of services below:

6        a.    Email. Google provides email services (called Gmail) to Google Accounts

7               through email addresses at gmail.com or enterprise email addresses hosted by

8               Google.

9        b.    Contacts. Google Contacts stores contacts the user affirmatively adds to the

10              address book, as well as contacts the user has interacted with in Google

11              products. Google Contacts can store up to 25,000 contacts. Users can send

12              messages to more than one contact at a time by manually creating a group

13              within Google Contacts or communicate with an email distribution list called a

14              Google Group. Users have the option to sync their Android mobile phone or

15              device address book with their account so it is stored in Google Contacts.

16              Google preserves contacts indefinitely, unless the user deletes them. Contacts

17              can be accessed from the same browser window as other Google products like

18              Gmail and Calendar.

19        c.    Calendar. Google provides an appointment book for Google Accounts through

20              Google Calendar, which can be accessed through a browser or mobile

21              application. Users can create events or RSVP to events created by others in

22              Google Calendar. Google Calendar can be set to generate reminder emails or

23              alarms about events or tasks, repeat events at specified intervals, track RSVPs,

24              and auto-schedule appointments to complete periodic goals (like running three

25              times a week). A single Google Account can set up multiple calendars. An

26              entire calendar can be shared with other Google Accounts by the user or made

27              public so anyone can access it. Users have the option to sync their mobile

28              phone or device calendar so it is stored in Google Calendar. Google preserves

Affidavit of Special Agent Andrew Cropcho - 14
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    appointments indefinitely, unless the user deletes them. Calendar can be

2    accessed from the same browser window as other Google products like Gmail

3    and Contacts.

4    d.    Maps. Google offers a map service called Google Maps which can be searched

5    for addresses or points of interest. Google Maps can provide users with turn-

6    by-turn directions from one location to another using a range of transportation

7    options (driving, biking, walking, etc.) and real-time traffic updates. Users can

8    share their real-time location with others through Google Maps by using the

9    Location Sharing feature. And users can find and plan an itinerary using

10   Google Trips. A Google Account is not required to use Google Maps, but if

11   users log into their Google Account while using Google Maps, they can save

12   locations to their account, keep a history of their Google Maps searches, and

13   create personalized maps using Google My Maps. Google stores Maps data

14   indefinitely, unless the user deletes it.

15   e.    Messaging. Google provides several messaging services including Duo,

16   Messages, Hangouts, Meet, and Chat. These services enable real-time text,

17   voice, and/or video communications through browsers and mobile applications,

18   and also allow users to send and receive text messages, videos, photos,

19   locations, links, and contacts. Google may retain a user's messages if the user

20   has not disabled that feature or deleted the messages, though other factors may

21   also impact retention.

22   f.    Cloud Storage. Google Drive is a cloud storage service automatically created

23   for each Google Account. Users can store an unlimited number of documents

24   created by Google productivity applications like Google Docs (Google's word

25   processor), Google Sheets (Google's spreadsheet program), Google Forms

26   (Google's web form service), and Google Slides, (Google's presentation

27   program). Users can also upload files to Google Drive, including photos,

28   videos, PDFs, and text documents, until they hit the storage limit. Users can set

Affidavit of Special Agent Andrew Cropcho - 15
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

g. <u>Photos.</u> Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

h. <u>Web Browser.</u> Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

40.   Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat

Affidavit of Special Agent Andrew Cropcho - 16
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   conversations pop up within the same browser window as Gmail. Attachments in Gmail are

2   displayed with a button that allows the user to save the attachment directly to Google Drive.

3   If someone shares a document with a Google Account user in Google Docs, the contact

4   information for that individual will be saved in the user's Google Contacts. Google Voice

5   voicemail transcripts and missed call notifications can be sent to a user's Gmail account.

6   And if a user logs into their Google Account on the Chrome browser, their subsequent

7   Chrome browser and Google Search activity is associated with that Google Account,

8   depending on user settings.

9       41.     When individuals register with Google for a Google Account, Google asks

10  users to provide certain personal identifying information, including the user's full name,

11  telephone number, birthday, and gender. If a user is paying for services, the user must also

12  provide a physical address and means and source of payment.

13      42.     Google typically retains and can provide certain transactional information

14  about the creation and use of each account on its system. Google captures the date on which

15  the account was created, the length of service, log-in times and durations, the types of

16  services utilized by the Google Account, the status of the account (including whether the

17  account is inactive or closed), the methods used to connect to the account (such as logging

18  into the account via Google's website or using a mobile application), details about the

19  devices used to access the account, and other log files that reflect usage of the account. In

20  addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the

21  account and accept Google's terms of service, as well as the IP addresses associated with

22  particular logins to the account. Because every device that connects to the Internet must use

23  an IP address, IP address information can help to identify which computers or other devices

24  were used to access the Google Account.

25      43.     Google maintains the communications, files, and associated records for each

26  service used by a Google Account on servers under its control. Even after a user deletes a

27  communication or file from their Google Account, it may continue to be available on

28  Google's servers for a certain period of time.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.     In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

45.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

46.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

47.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation, such as banking institutions used by the target or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

49.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## BACKGROUND CONCERNING APPLE[6]

50.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

51.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

> a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

---

[6] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

Affidavit of Special Agent Andrew Cropcho - 19
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

Affidavit of Special Agent Andrew Cropcho - 20
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

52. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

53. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the

Affidavit of Special Agent Andrew Cropcho - 21
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

54.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

55.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

56.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers

Affidavit of Special Agent Andrew Cropcho - 22
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

57.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

58.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

59.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the

Affidavit of Special Agent Andrew Cropcho - 23
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

60.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

61.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation, such as banking institutions used to commit money laundering, or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

62.     Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

//
//
//

Affidavit of Special Agent Andrew Cropcho - 24
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**CONCLUSION**

2   63.   Based on the forgoing, I respectfully request that the Court issue the proposed

3   search warrant. Accordingly, by this Affidavit and Warrant, I seek authority for the

4   government to search all of the items specified in Section I of Attachments B (attached

5   hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of

6   the data, documents, and records that are identified in Sections II to the same Attachments.

7

8

9

10   ANDREW CROPCHO, Affiant

11   Special Agent, Federal Bureau of Investigation

12

13   The above-named agent provided a sworn statement attesting to the truth of the

14   foregoing affidavit on the 1st day of April, 2022.

15

16

17   THE HONORABLE S. KATE VAUGHAN

18   United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A-1**

**Accounts to be Searched**

This warrant applies to information associated with the following accounts ("the Google Accounts") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043:

- ivan@hashcoins.com (**GOOGLE ACCOUNT 1**);
- ivan@burfa.com (**GOOGLE ACCOUNT 2**);
- ivan.turygin@polybius.io (**GOOGLE ACCOUNT 3**);
- turygin@gmail.com (**GOOGLE ACCOUNT 4**);
- sergei@hashcoins.com (**GOOGLE ACCOUNT 5**);
- sergei@burfa.com (**GOOGLE ACCOUNT 6**);
- sergei.potapenko@polybius.io (**GOOGLE ACCOUNT 7**);
- sergei.potapenko@gmail.com (**GOOGLE ACCOUNT 8**);
- nikolay@hashcoins.com (**GOOGLE ACCOUNT 9**);
- nikolay.pavlovskiy@burfa.com (**GOOGLE ACCOUNT 10**);
- pavel@hashcoins.com (**GOOGLE ACCOUNT 11**);
- pavel.tsihhotski@burfa.com (**GOOGLE ACCOUNT 12**);
- pavel.tsihhotski@polybius.io (**GOOGLE ACCOUNT 13**);
- stanislav.pavlov@hashcoins.com (**GOOGLE ACCOUNT 14**);
- stanislav.pavlov@burfa.com (**GOOGLE ACCOUNT 15**);
- vadim.tsvetikov@hashcoins.com (**GOOGLE ACCOUNT 16**);
- vadim.tsvetikov@burfa.com (**GOOGLE ACCOUNT 17**);
- vitali@hashcoins.com (**GOOGLE ACCOUNT 18**);
- vitali@burfa.com (**GOOGLE ACCOUNT 19**);
- anton.altement@polybius.io (**GOOGLE ACCOUNT 20**);
- edgar.bers@polybius.io (**GOOGLE ACCOUNT 21**);
- tatjana@burfa.com (**GOOGLE ACCOUNT 22**);

1

- margarita.burunova@hashcoins.com (**GOOGLE ACCOUNT 23**);

2

- dalmeronprojects@gmail.com (**GOOGLE ACCOUNT 24**);

3

- ecohousenetworks@gmail.com (**GOOGLE ACCOUNT 25**);

4

- admin@hashcoins.com (**GOOGLE ACCOUNT 26**);

5

- info@hashcoins.com (**GOOGLE ACCOUNT 27**);

6

- info@burfa.com (**GOOGLE ACCOUNT 28**);

7

- info@polybius.io (**GOOGLE ACCOUNT 29**);

8

- invoices@hashcoins.com (**GOOGLE ACCOUNT 30**);

9

- invoices@burfa.com (**GOOGLE ACCOUNT 31**);

10

- microsoft@hashcoins.com (**GOOGLE ACCOUNT 32**);

11

- cb@hashcoins.com (**GOOGLE ACCOUNT 33**);

12

- licenses@hashcoins.com (**GOOGLE ACCOUNT 34**);

13

- alerts.mining@burfa.com (**GOOGLE ACCOUNT 35**); and

14

- support@polybius.io (**GOOGLE ACCOUNT 36**).

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I. Information to be disclosed by Google, LLC:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose to the government for each account or identifier listed in Attachment A-1 the following information from April 4, 2020, through the present, unless otherwise indicated:

    a.    All business records and subscriber information, in any form kept, pertaining to the Account, including:

        1.    Names (including subscriber names, user names, and screen names);

        2.    Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

        3.    Telephone numbers, including SMS recovery and alternate sign-in numbers;

        4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

        5.    Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

        6.    Length of service (including start date and creation IP) and types of service utilized;

1    7. Means and source of payment (including any credit card or bank

2     account number); and

3    8. Change history.

4  b. All device information associated with the Account, including but not limited

5   to, manufacture names, model numbers, serial number, media access control

6   (MAC) addresses, international mobile equipment identifier (IMEI) numbers,

7   FCC ID numbers, Android IDs, and telephone numbers;

8  c. Records of user activity for each connection made to or from the Account(s),

9   including, for all Google services, the date, time, length, and method of

10   connection, data transfer volume, user names, source and destination IP

11   address, name of accessed Google service, and all activity logs

12  d. The contents of all emails associated with the account, including stored or

13   preserved copies of emails sent to and from the account, draft emails, and

14   deleted emails; attachments; the source and destination addresses associated

15   with each email; the size, length, and timestamp of each email; and true and

16   accurate header information including the actual IP addresses of the sender and

17   recipients of the emails;

18  e. Any records pertaining to the user's contacts, including: address books; contact

19   lists; social network links; groups, including Google Groups to which the user

20   belongs or communicates with; user settings; and all associated logs and

21   change history;

22  f. Any records pertaining to the user's calendar(s), including: Google Calendar

23   events; Google Tasks; reminders; appointments; invites; and goals; the sender

24   and recipients of any event invitation, reminder, appointment, or task; user

25   settings; and all associated logs and change history;

26  g. The contents of all text, audio, and video messages associated with the

27   account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS,

28   MMS, and RCS), in any format and however initially transmitted, including,

Attachment B-1 – Page 2
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

h.  The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses.

i.  All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

j.  All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history; and

k.  All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or

Attachment B-1 – Page 3
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        recorded voice queries and Google Assistant responses; browsing history,

2        including application usage; bookmarks; passwords; autofill information;

3        alerts, subscriptions, and other automated searches, including associated

4        notifications and creation dates; user settings; and all associated logs and

5        change history.

6  Google is hereby ordered to disclose the above information to the government within 14 days

7  of issuance of this warrant.

8  **II.**    **Information to be seized by the government**

9        All information described above in Section I that constitutes fruits, contraband,

10  evidence, and instrumentalities of violations of Title 18, United States Code, Section 1343

11  (Wire Fraud) and Title 18, United States Code, Section 1956, and occurring after April 2015,

12  for each of the Accounts listed on Attachment A, pertaining to the following matters:

13        a.     Items, records, or information related to the operation of a

14  cryptocurrency cloud mining Ponzi scheme;

15        b.     Items, records, or information related to cryptocurrency mining, the

16  advertisement, manufacture and sale of mining equipment, or the advertisement and sale of

17  cloud mining contracts;

18        c.     Items, records, or information related to the termination of mining

19  contracts and the profitability of cloud mining;

20        d.     Items, records, or information related to purchases of cloud mining

21  equipment, including communications with the companies Jeltan Trading, Dalmeron

22  Projects, Dalmeron Invest, Keleta UAB, Bitmain, Bitfury, and Inno3d;

23        e.     Items, records, or information related to the transfer, purchase, sale, or

24  disposition of cryptocurrency;

25        f.     Items, records, or information related to communications with

26  HASHFLARE or HASHCOINS investors, including complaints by investors or requests for

27  return of funds;

28

Attachment B-1 – Page 4
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.     Items, records, or information related to the advertisement of HASHFLARE or HASHCOINS' services;

h.     Items, records, or information related to the owners, operators, employees, locations, assets, and business purpose of the companies HASHCOINS OU, HASHCOINS TRADE OU, HASHCOINS LP, HASHFLARE LP, Burfa Capital OU, Burfa Media OU, Burfa Real Estate OU, Burfa Tech OU, Burfa Trade OU, Burfa Invest OU, Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, Polybius Fintech MidCo OU, Dalmeron Projects LP, Jeltan Trading, Dalmeron Invest, Keleta UAB, and OSOM Finance (collectively, the "SUBJECT ENTITIES");

i.     Items, records, or information related to the use, creation, or operation of the "SUBJECT ENTITIES," including business plans and strategies, and the anticipated success, failure, or general validity thereof;

j.     Items, records, or information related to the operation of hashflare.io, burfa.com, polybius.io, dalmeron.com, or hashcoins.com;

k.     Items, records, or information concerning financial transactions associated with the operation of the SUBJECT ENTITIES, including bank accounts held by the SUBJECT ENTITIES, transfers of funds by the SUBJECT ENTITIES, expenditures of money or wealth, bank statements and other financial statements, and cryptocurrency holdings;

l.     Items, records, or information related to cryptocurrency mining groups, cryptocurrency public keys or addresses, cryptocurrency private keys, representations of cryptocurrency wallets or their constitutive parts, to include "recovery seeds" and "root keys," which may be used to regenerate a wallet.

m.     Items, records, or information related to the salaries or earnings of individuals employed by the SUBJECT ENTITIES.

n.     Items, records, or information related to the payment or calculation of recruitment bonuses paid to HASHFLARE and HASHCOINS investors.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    o. Items, records, or information related to receipt of investor money,

2 including the amount, purpose of the investment, and plans for spending that money.

3    p. Evidence indicating how and when the account was accessed or used, to

4 determine the geographic and chronological context of account access, use, and events

5 relating to the crime under investigation and to the email account owner.

6    q. Evidence indicating the account owner's state of mind as it relates to the

7 crime under investigation.

8    r. The identity of the person(s) who created or used the user ID, including

9 records that help reveal the whereabouts of such person(s).

10

11 This warrant authorizes a review of electronically stored information, communications, other

12 records and information disclosed pursuant to this warrant in order to locate evidence, fruits,

13 and instrumentalities described in this warrant. The review of this electronic data may be

14 conducted by any government personnel assisting in the investigation, who may include, in

15 addition to law enforcement officers and agents, attorneys for the government, attorney

16 support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete

17 copy of the disclosed electronic data to the custody and control of attorneys for the

18 government and their support staff for their independent review.

19

20

21

22

23

24

25

26

27

28

Attachment B-1 – Page 6
USAO#2019R01037

## **ATTACHMENT A-2**

This warrant applies to information associated with the following accounts (collectively, the "Apple Accounts") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California:

- Sergei.potapenko@gmail.com (DSID 624556209) ("**APPLE ACCOUNT 1**") (believed to be used by SERGEI POTAPENKO); and

- Turygin@gmail.com (DSID 1931852295) ("**APPLE ACCOUNT 2**") (believed to be used by IVAN TURYGIN).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B-2**

I.      **Information to be disclosed by Apple Inc. ("Apple")**

        To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose for each account or identifier listed in Attachment A-2 the following information from March 12, 2021, through the present, unless otherwise indicated:

        a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

        b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

        c.      The contents of all emails associated with the account from March 22, 2021, through the present, including stored or preserved copies of emails sent to and from the

1  account (including all draft emails and deleted emails), the source and destination addresses

2  associated with each email, the date and time at which each email was sent, the size and

3  length of each email, and the true and accurate header information including the actual IP

4  addresses of the sender and the recipient of the emails, and all attachments;

5        d.     The contents of all instant messages associated with the account from March

6  22, 2021, through the present, including stored or preserved copies of instant messages

7  (including iMessages, SMS messages, and MMS messages) sent to and from the account

8  (including all draft and deleted messages), the source and destination account or phone

9  number associated with each instant message, the date and time at which each instant

10  message was sent, the size and length of each instant message, the actual IP addresses of the

11  sender and the recipient of each instant message, and the media, if any, attached to each

12  instant message;

13        e.     The contents of all files and other records stored on iCloud, including all iOS

14  device backups, all Apple and third-party app data, all files and other records related to

15  iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive,

16  iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and

17  iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar

18  entries, images, videos, voicemails, device settings, and bookmarks;

19        f.     All activity, connection, and transactional logs for the account (with associated

20  IP addresses including source port numbers), including FaceTime call invitation logs,

21  messaging and query logs (including iMessage, SMS, and MMS messages), mail logs,

22  iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates

23  of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple

24  services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with

25  web-based access of Apple services (including all associated identifiers), and logs associated

26  with iOS device purchase, activation, and upgrades;

27

28

1        g.     All records and information regarding locations where the account or devices

2   associated with the account were accessed, including all data stored in connection with

3   Location Services, Find My iPhone, Find My Friends, and Apple Maps;

4        h.     All records pertaining to the types of service used;

5        i.     All records pertaining to communications between Apple and any person

6   regarding the account, including contacts with support services and records of actions taken;

7   and

8        j.     All files, keys, or other information necessary to decrypt any data produced in

9   an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and

10  fileinfolist.txt files).

11  Apple is hereby ordered to disclose the above information to the government within 14 days

12  of issuance of this warrant.

13  **II.     Information to be seized by the government**

14       All information described above in Section I that constitutes fruits, contraband,

15  evidence, and instrumentalities of violations of Title 18, United States Code, Section 1343

16  (Wire Fraud) and Title 18, United States Code, Section 1956, and occurring after April 2015,

17  for each of the Accounts listed on Attachment A, pertaining to the following matters:

18       a.     Items, records, or information related to the operation of a

19  cryptocurrency cloud mining Ponzi scheme;

20       b.     Items, records, or information related to cryptocurrency mining, the

21  advertisement, manufacture and sale of mining equipment, or the advertisement and sale of

22  cloud mining contracts;

23       c.     Items, records, or information related to the termination of mining

24  contracts and the profitability of cloud mining;

25       d.     Items, records, or information related to purchases of cloud mining

26  equipment, including communications with the companies Jeltan Trading, Dalmeron

27  Projects, Dalmeron Invest, Keleta UAB, Bitmain, Bitfury, and Inno3d;

28

Attachment B-2 -- Page 3
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         e.     Items, records, or information related to the transfer, purchase, sale, or
2 disposition of cryptocurrency;

3         f.     Items, records, or information related to communications with
4 HASHFLARE or HASHCOINS investors, including complaints by investors or requests for
5 return of funds;

6         g.     Items, records, or information related to the advertisement of
7 HASHFLARE or HASHCOINS' services;

8         h.     Items, records, or information related to the owners, operators,
9 employees, locations, assets, and business purpose of the companies HASHCOINS OU,
10 HASHCOINS TRADE OU, HASHCOINS LP, HASHFLARE LP, Burfa Capital OU, Burfa
11 Media OU, Burfa Real Estate OU, Burfa Tech OU, Burfa Trade OU, Burfa Invest OU,
12 Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, Polybius Fintech
13 MidCo OU, Dalmeron Projects LP, Jeltan Trading, Dalmeron Invest, Keleta UAB, and
14 OSOM Finance (collectively, the "SUBJECT ENTITIES");

15         i.     Items, records, or information related to the use, creation, or operation
16 of the "SUBJECT ENTITIES," including business plans and strategies, and the anticipated
17 success, failure, or general validity thereof;

18         j.     Items, records, or information related to the operation of hashflare.io,
19 burfa.com, polybius.io, dalmeron.com, or hashcoins.com;

20         k.     Items, records, or information concerning financial transactions
21 associated with the operation of the SUBJECT ENTITIES, including bank accounts held by
22 the SUBJECT ENTITIES, transfers of funds by the SUBJECT ENTITIES, expenditures of
23 money or wealth, bank statements and other financial statements, and cryptocurrency
24 holdings;

25         l.     Items, records, or information related to cryptocurrency mining groups,
26 cryptocurrency public keys or addresses, cryptocurrency private keys, representations of
27 cryptocurrency wallets or their constitutive parts, to include "recovery seeds" and "root
28 keys," which may be used to regenerate a wallet.

1       m.    Items, records, or information related to the salaries or earnings of

2 individuals employed by the SUBJECT ENTITIES.

3       n.    Items, records, or information related to the payment or calculation of

4 recruitment bonuses paid to HASHFLARE and HASHCOINS investors.

5       o.    Items, records, or information related to receipt of investor money,

6 including the amount, purpose of the investment, and plans for spending that money.

7       p.    Evidence indicating how and when the account was accessed or used, to

8 determine the geographic and chronological context of account access, use, and events

9 relating to the crime under investigation and to the email account owner.

10       q.    Evidence indicating the account owner's state of mind as it relates to the

11 crime under investigation.

12       r.    The identity of the person(s) who created or used the user ID, including

13 records that help reveal the whereabouts of such person(s).

14

15 This warrant authorizes a review of electronically stored information, communications, other

16 records and information disclosed pursuant to this warrant in order to locate evidence, fruits,

17 and instrumentalities described in this warrant. The review of this electronic data may be

18 conducted by any government personnel assisting in the investigation, who may include, in

19 addition to law enforcement officers and agents, attorneys for the government, attorney

20 support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete

21 copy of the disclosed electronic data to the custody and control of attorneys for the

22 government and their support staff for their independent review.

23

24

25

26

27

28

Attachment B-2 -- Page 5
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

# APPENDIX 1

## Affidavit in Support of Search Warrant MJ20-153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**AFFIDAVIT**

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF KING               )

I, Andrew Cropcho, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May of 2018. I am currently assigned to the Seattle Field Office. My primary duties include investigating violations of Federal law, including corporate fraud, securities fraud, government program fraud, and healthcare fraud. Part of those duties include investigating instances of wire fraud being used for financial gain at the expense of others. Before my career as an FBI Special Agent I was employed as a Certified Public Accountant for over three years and, as part of my employment, I examined financial information of clients to determine their accuracy, reliability, and sources.

2.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement personnel; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein including, but not limited to, the victims in this investigation; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

**PURPOSE OF AFFIDAVIT**

3.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google LLC ("**Google**"), located at 1600 Amphitheater Parkway in Mountain View. The

Affidavit of Special Agent Andrew Cropcho - 1
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

information to be searched is described in the following paragraphs and in Attachment A, which is incorporated herein.

4.     This affidavit is made in support of an application for a search warrant pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require **Google** to disclose to the government copies of the information, including the content of communications, further described in Section I of Attachment B, pertaining to the following accounts:

ivan@hashcoins.com (**SUBJECT ACCOUNT 1**)

ivan@burfa.com (**SUBJECT ACCOUNT 2**)

ivan.turygin@polybius.io (**SUBJECT ACCOUNT 3**)

turygin@gmail.com (**SUBJECT ACCOUNT 4**)

scrgci@hashcoins.com (**SUBJECT ACCOUNT 5**)

sergei@burfa.com (**SUBJECT ACCOUNT 6**)

sergei.potapenko@polybius.io (**SUBJECT ACCOUNT 7**)

sergei.potapenko@gmail.com (**SUBJECT ACCOUNT 8**)

nikolay@hashcoins.com (**SUBJECT ACCOUNT 9**)

nikolay.pavlovskiy@burfa.com (**SUBJECT ACCOUNT 10**)

pavel@hashcoins.com (**SUBJECT ACCOUNT 11**)

pavel.tsihhotski@burfa.com (**SUBJECT ACCOUNT 12**)

pavel.tsihhotski@polybius.io (**SUBJECT ACCOUNT 13**)

stanislav.pavlov@hashcoins.com (**SUBJECT ACCOUNT 14**)

stanislav.pavlov@burfa.com (**SUBJECT ACCOUNT 15**)

vadim.tsvetikov@hashcoins.com (**SUBJECT ACCOUNT 16**)

vadim.tsvetikov@burfa.com (**SUBJECT ACCOUNT 17**)

vitali@hashcoins.com (**SUBJECT ACCOUNT 18**)

vitali@burfa.com (**SUBJECT ACCOUNT 19**)

vitali.pavlov@polybius.io (**SUBJECT ACCOUNT 20**)

anton.altement@polybius.io (**SUBJECT ACCOUNT 21**)

edger.bers@burfa.com (**SUBJECT ACCOUNT 22**)

Affidavit of Special Agent Andrew Cropcho - 2
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

edgar.bers@polybius.io (**SUBJECT ACCOUNT 23**)

tatjana@burfa.com (**SUBJECT ACCOUNT 24**)

margarita.burunova@hashcoins.com (**SUBJECT ACCOUNT 25**)

dalmeronprojects@gmail.com (**SUBJECT ACCOUNT 26**)

ecohousenetworks@gmail.com (**SUBJECT ACCOUNT 27**)

admin@hashcoins.com (**SUBJECT ACCOUNT 28**)

admin@burfa.com (**SUBJECT ACCOUNT 29**)

info@hashcoins.com (**SUBJECT ACCOUNT 30**)

info@burfa.com (**SUBJECT ACCOUNT 31**)

info@polybius.io (**SUBJECT ACCOUNT 32**)

invoices@hashcoins.com (**SUBJECT ACCOUNT 33**)

invoices@burfa.com (**SUBJECT ACCOUNT 34**)

azure@hashcoins.com (**SUBJECT ACCOUNT 35**)

microsoft@hashcoins.com (**SUBJECT ACCOUNT 36**)

cb@hashcoins.com (**SUBJECT ACCOUNT 37**)

licenses@hashcoins.com (**SUBJECT ACCOUNT 38**)

alerts.mining@burfa.com (**SUBJECT ACCOUNT 39**)

support@polybius.io (**SUBJECT ACCOUNT 40**)

18
19
20
21
22
23
24
25
26
27
28

5.      (hereinafter, collectively the "**SUBJECT ACCOUNTS**").  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.  This warrant is requested in connection with an on-going investigation in this district by the FBI.

6.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1343 (Wire Fraud) have been committed by IVAN TURYGIN and SERGEI POTAPENKO, individually, and by and through the use of their companies HASHCOINS OU (hereinafter "HASHCOINS"), HASHCOINS TRADE OU, HASHCOINS LP, HASHFLARE LP (hereinafter "HASHFLARE"), Burfa Capital OU, Burfa Media OU, Burfa Real Estate OU,

Affidavit of Special Agent Andrew Cropcho - 3
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Burfa Tech OU, Burfa Trade OU, Burfa Invest OU (collectively, the "BURFA Entities"),

2  Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, Polybius Fintech

3  MidCo OU (collectively, "POLYBIUS"), Dalmeron Projects LP, and Ecohouse Networks

4  LP, along with identified key employees of the same companies. There is also probable

5  cause to search the information described in Attachment A, for evidence, instrumentalities,

6  or contraband of these crimes, as described in Attachment B.

### JURISDICTION

7      7.      This Court has jurisdiction to issue the requested warrant because it is "a court

of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A)

& (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is

not required for the service or execution of this warrant.

9. This warrant application is to be presented electronically pursuant to Local

Criminal Rule CrR 41(d)(3).

### BACKGROUND ON VIRTUAL CURRENCY AND MINING

10.     Virtual currency (also known as cryptocurrency) is an asset that can be

exchanged directly person to person, through a virtual currency exchange, or through other

intermediaries. It can be used to buy goods and services, exchanged for "fiat currency"

(currency established by government regulation or law) or other virtual currency, or held as

an investment, among other applications.

11.     Virtual currency is generally not issued by any government or bank. Rather, it

is frequently generated and controlled through software operating on a decentralized, peer-

to-peer ("P2P") network of computers across the world (some types of virtual currency,

however, are generated and controlled through software operating on a centralized network

of computers across the world).

Affidavit of Special Agent Andrew Cropcho - 4
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

12.     There are thousands of virtual currencies in use, including Bitcoin, Ethereum, Bitcoin Cash, and Monero.  Bitcoin,[1] the most popular form of virtual currency, can be generated through mining.  According to Bitcoin.org, "Bitcoin mining is the process of making computer hardware do mathematical calculations for the Bitcoin network to confirm transactions and increase security. As a reward for their services, Bitcoin miners can collect transaction fees for the transactions they confirm, along with newly created bitcoins."

13.     Bitcoin mining can be conducted locally on a user's computer or other computer hardware, or can be conducted on another's system via the cloud. According to the Santa Clara Law School High Technology Journal: "Cloud mining is an economic arrangement whereby a person pays another person or entity to engage in cryptocurrency mining on their behalf and receives the transaction fees, cryptocurrency or a portion thereof that is generated from such mining efforts."

14.     One measure for determining the effectiveness or processing power of a mining operation is to calculate the operation's hash rate. According to Bitcoin.org: "The hash rate is the measuring unit of the processing power of the Bitcoin network. The Bitcoin network must make intensive mathematical operations for security purposes. When the network reached a hash rate of 10 Th/s, it meant it could make 10 trillion calculations per second."

15.     Bitcoin utilizes "public key cryptography," a mathematical algorithm that generates a pair of unique, corresponding keys:  the "public key" and the "private key." These components form the "public address," which is used to send and receive bitcoins and can be shared. A public address is akin to a bank account number, and a private key is akin to a Personal Identification Number ("PIN") or password. Only the holder of a public address's private key can authorize transfers of virtual currency from that public address to another public address.

---

[1] Since Bitcoin is both a virtual currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the virtual currency. That practice is adopted here.

Affidavit of Special Agent Andrew Cropcho - 5
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

16.     Many virtual currencies operate via a "blockchain," a record (or ledger) of every transaction ever conducted that is distributed throughout the computer network (as opposed to being maintained by any single administrator or entity). As to bitcoins, although the public addresses of those engaging in virtual currency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.

17.     Virtual currency users typically employ a "wallet," a tool that can be used to manage public and private keys, interface with a blockchain, and to send or receive virtual currency. Wallets vary widely in terms of their format and technological sophistication. One variety, known as "hosted" (or "custodial") wallets, are virtual currency wallets controlled by a third-party—often, a company with a cloud-based, encrypted wallet platform that may be hosted on the company's servers. Users of hosted wallets may be able to access the company's platform through various digital devices, much like a traditional online banking experience. Hosted wallet providers include virtual currency exchanges, which allow their customers, for a fee, to exchange virtual currency for other virtual currencies and/or fiat currencies.

18.     A more detailed description of virtual currencies, blockchains, and law enforcement techniques for investigating virtual currency transactions, is included below.

## STATEMENT OF PROBABLE CAUSE

### A.  Summary of Investigation

19.     The FBI is investigating whether two Estonian residents, IVAN TURYGIN[2] and SERGEI POTAPENKO, illegally operated a Ponzi scheme, in violation of 18 U.S.C. § 1343, by fraudulently inducing individuals to invest in cryptocurrency mining.

---

[2] IVAN TURYGIN's name is also spelled Ivan Turögin.

Affidavit of Special Agent Andrew Cropcho - 6
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

20.     Individuals can earn cryptocurrency by engaging in mining, which involves using computing power to solve a complicated algorithm to verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.  Cryptocurrency mining typically involves the use of high-powered computers and the expenditure of large amounts of electricity.

21.     HASHFLARE, incorporated in the UK and based in Estonia, claimed that it was engaged in cloud mining, using a cloud based platform to mine Bitcoin and alternative cryptocurrency coins.  HASHCOINS, incorporated and based in Estonia, assisted HASHFLARE in this endeavor, providing technical support, development and marketing of HASHFLARE and its subdomains.  In exchange for a monetary investment, individuals were told that they would receive a portion of the mining proceeds.

22.     In July 2018, HASHFLARE stopped paying investors annual returns, claiming that cryptocurrency mining was no longer profitable.  According to its terms of service, HASHFLARE informed investors that it would stop cryptocurrency mining "if the Maintenance and Electricity Fees [are] larger than the Payout."  Specifically, according to HASHFLARE's terms, "If mining remains unprofitable for 21 consecutive days the Service is permanently terminated . . . [and] Payouts and Fees will also be temporarily stopped."

23.     Investors contend that, at the time HASHFLARE terminated its services, cryptocurrency mining was, in fact, profitable.  After mining was terminated, investors, including those located in the United States, began identifying red flags which led them to believe that HASHFLARE was a Ponzi scheme that was not engaged in cryptocurrency mining.

24.     In June 2019, Estonia's Cyber Crime Bureau notified the FBI that it was investigating whether IVAN TURYGIN and SERGEI POTAPENKO were operating a Ponzi scheme.  As of June 20, 2019, the Estonian authorities identified approximately $120 million[3] in losses sustained by HASHFLARE investors.

---

[3] In this Affidavit, all references to $ refer to US Dollars.

Affidavit of Special Agent Andrew Cropcho - 7
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

A. **HASHFLARE & HASHCOINS**

    a. **Incorporation and Ownership**

    25.    HASHFLARE and HASHCOINS were incorporated in Estonia and the United Kingdom on the dates listed in the below chart.

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners | Current Name | Prior Names |
|------|----------------|---------|------------|-------------------------------|--------------|-------------|
| 6/13/13 | HASHCOINS OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | Burfa Tech OU | N/A |
| 11/26/14 | HASHCOINS TRADE OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | Burfa Trade OU | N/A |
| 12/14/15 | HASHFLARE LP | UK | Limited Partnership | Datacom Solutions Ltd & Redbone Investments Ltd. | HASHFLARE LP | Fast Consult Trade LP & HASHCOINS LP |

    26.    HASHFLARE maintained the website hashflare.io while HASHCOINS maintained the website www.hashcoins.com. According to HASHCOINS' and HASHFLARE's websites, POTAPENKO is identified as a co-founder and CEO of the entities. According to public reporting, TURYGIN is a co-founder and Business Development Chairman of HASHCOINS. TURYGIN is also identified as a co-founder of HASHFLARE.

    b. **Business Operations**

    27.    Beginning on or before April 18, 2015, HASHFLARE offered cloud mining services on its website. According to its website, HASHFLARE advertised the following: "Our service makes cryptocurrency mining available to every user. You no longer need to buy expensive equipment and spend your time setting up miners. Just select your desired capacity and earn income!" On another portion of its website, HASHFLARE advertised that "Cloud mining offers a unique option for mining with a low cost of entry as well as minimal risk and expense, which is opposite to traditional models of mining that involve procurement, maintenance and configuration of highly specialized software."

Affidavit of Special Agent Andrew Cropcho - 8
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

28.     HASHFLARE advertised that it conducted this mining in collaboration with HASHCOINS.  On its website, HASHFLARE explained that it offered "a new range of cloudmining services brought to you by the HASHCOINS team of cryptomining experts." On its website, HASHCOINS claimed that it was "an Estonian based cryptocurrency mining hardware manufacturer and cloud hosted mining service provider."  HASHCOINS advertised that its users could purchase cloud mining contracts from HASHFLARE, claiming that HASHFLARE users could mine cryptocurrency using HASHCOINS' datacenters.  In its terms of service, HASHFLARE stated that "HASHCOINS OU provides technical support, development and marketing of HASHFLARE and its subdomains."

29.     HASHFLARE sold cloud mining contracts, allowing users to mine cryptocurrency through HASHFLARE in exchange for a return.  On its website HASHFLARE explained that a user could "purchas[e] part of the mining power of hardware hosted and owned by a Cloud Mining services provider," which "configur[es] the hardware, maintain[s] uptime and select[s] the most efficient and reliable [mining] pools."  For example, on April 18, 2015, for $9.95, a user could buy one million hashrate ("one million hash per second" or "1 MH/s") from HASHFLARE.  For this rate, HASHFLARE advertised a "100% Scrypt Miner," automatic accruals in Bitcoin, and a daily maintenance fee of $0.01 per 1/MH/s.

30.     HASHFLARE's website advertised a tool that could be used to calculate the approximate amount of profit a user would get depending on the amount of hashrate they purchased.  The user would then have the option to automatically reinvest that profit or withdraw the profit if their balance was above a certain minimum threshold, which fluctuated between 0.5 bitcoin to 0.01 bitcoin throughout the existence and operation of HASHFLARE.

31.     In addition to earning funds through cloud mining, HASHFLARE users also earned funds by recruiting others to purchase HASHFLARE contracts.  HASHFLARE advertised a referral program, informing users that "as a referrer, you are eligible to receive 10% referral commission bonus for every purchase made by any of your referrals, excluding reinvest and balance purchases."  As a result, HASHFLARE users could make money each

Affidavit of Special Agent Andrew Cropcho - 9
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  time one of their referred friends, family members or acquaintances purchased cloud mining
2  contracts.

3      32.     A number of individuals, including those operating in the Western District of
4  Washington purchased mining contracts from HASHFLARE.  According to financial records
5  obtained from Fedwire, a funds transfer system operated by the United States Federal
6  Reserve Banks, at least $2.5 million was transferred to accounts held by HASHCOINS for
7  what appear to be investments in HASHFLARE (examples of descriptions accompanying the
8  transfer of money were: "HASHFLARE.io Invoice…"; "Investments…"; and "…payment
9  for mining services").

10     33.     According to bank records obtained from Latvia, approximately $11 million
11 was transferred into an account held by HASHFLARE at Latvijas Pasta Banka.  These
12 transfers were made in the names of various individuals, and often referenced the terms
13 "Invoice" and "Hashrate."  As a result, I believe that these payments were made to purchase
14 cloud mining contracts from HASHFLARE.  For example, on January 31, 2017, F.R.E.
15 transferred $1,708 to HASHFLARE's account, referencing "Invoice 593395 Hashflare.io
16 SHA-256 HASHRATE 15."  Similarly, on March 6, 2017, A.K. transferred $5,792.72 to
17 HASHFLARE's account, referencing "Invoice .673156 (60TH/S SHA-256 hashrate)."

18     34.     Additionally, according to information obtained from a group of approximately
19 800 investors, a representative of which contacted law enforcement, between initial
20 investments and re-investments of stated profits, they invested a total of $7.5 million.  It was
21 not readily apparent how much of the $7.5 million was contained within the amounts
22 previously mentioned above.

23         **c.  Collapse of Mining Operations**

24     35.     In or around June of 2018, HASHFLARE made a number of changes to its
25 operations.  For example, HASHFLARE changed its terms of service that shortened the
26 length of all Bitcoin mining contracts from "lifetime" contracts to "one year" contracts.
27 Functionally speaking, under lifetime contracts purchased hashrates did not expire, whereas
28

Affidavit of Special Agent Andrew Cropcho - 10
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  under the new term the purchased hashrates expired after one year, requiring users to buy
2  additional contracts.

3       36.    In or around July 2018, HASHFLARE also required all users to submit "Know
4  Your Customer" identification before they could continue using services offered on the
5  platform.  In effect, these additional procedures reduced the ability of users to withdraw
6  funds earned through mining.  On online forums, users complained that, even after they
7  submitted the necessary documentation, HASHFLARE was taking weeks or months to verify
8  their identities and pay balances.  Other users complained that they never received their
9  requested balances.

10       37.    Finally, on July 20, 2018, HASHFLARE announced that Bitcoin mining had
11  been unprofitable for 28 days as of July 18, 2018 and, per clause 5.5 of its Terms of Service,
12  all Bitcoin mining SHA-256 contracts were suspended.  According to its terms of service,
13  HASHFLARE informed investors that it would stop cryptocurrency mining "if the
14  Maintenance and Electricity Fees [are] larger than the Payout."  Specifically, according to
15  HASHFLARE's terms, "If mining remains unprofitable for 21 consecutive days the Service
16  is permanently terminated . . . [and] Payouts and Fees will also be temporarily stopped."

17       38.    Interviews of three HASHFLARE investors, F.M., B.J., and F.W., revealed
18  that it was not possible to make any withdrawals once the Bitcoin mining contracts were
19  suspended, which held true through the dates of the interviews that took place in or around
20  September of 2019.  Since then, there has been no indication from known victims that any of
21  the money invested was recoverable from HASHFLARE.

22       39.    Since HASHFLARE suspended its contracts, investors, including those located
23  in the United States, began identifying red flags which led them to believe that
24  HASHFLARE was a Ponzi scheme that was not engaged in cryptocurrency mining.  Instead,
25  they believed that HASHFLARE was profiting on fluctuations in cryptocurrency exchange
26  rates, using those gains and new investment proceeds to repay earlier investors.  For
27  example, investors visited HASHFLARE's business address in Estonia, which did not appear
28  to house a server farm or computing equipment consistent with cryptocurrency mining.

Affidavit of Special Agent Andrew Cropcho - 11
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Additionally, according to these investors, the rates charged by HASHFLARE for
2 maintenance and electricity were above market average, and pools that were used to mine
3 did not produce the expected output.

4   40.   Diar, which publishes a digital assets and regulations newsletter, reported that
5 while bitcoin mining was profitable for the first six months of 2018, with 2018 revenues
6 exceeding 2017 revenues by $1.4 billion, as of the end of August and the beginning of
7 September, bitcoin mining was becoming unprofitable.[4]  According to Diar, increases in
8 electricity costs and mining difficulty (increased hashrate) have led to this unprofitability.
9 For example, a chart compiled by Dial is referenced below:



**2018: Miners Paying Retail Electricity Prices Now Unprofitable...**

Notes: Profit Estimates Using S9 Miners & $0.1/kWh, No Pool Fees or Hardware
Costs. **The chart is illustrates profits if all miners paid retail electricity prices.**

---

[4] Diar, *Bitcoin Miner Revenues Near $5 Billion but Profitability Dwindles*, Volume 2, Issue 40, (Oct. 8, 2018), *available at* https://diar.co/volume-2-issue-40/.

Affidavit of Special Agent Andrew Cropcho - 12
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.     While Diar projected that mining did not become unprofitable until late August and early September 2018, HASHFLARE contended that its mining operations became unprofitable in late June 2018.  However, HASHFLARE's operations may be more costly than those profiled by Diar, which did not take pool fees or hardware costs into account. HASHFLARE's terms of service provide that users must pay the following maintenance fees: "hardware setup, data center rent, Mining Pool testing, staff salaries, future planning and proofing, software development, exchange of used and out of order parts and other expenditures required to render the service on a best-effort basis."

42.     The FBI has been investigating whether HASHFLARE and HASHCOINS engaged in sufficient cryptocurrency mining to service the contracts that had been purchased. To do so, I have reviewed analysis conducted by Estonian authorities who analyzed 22,935 transfer chains related to HASHFLARE payout wallets to determine if payouts to investors were coming from mining pools, which would be the expected source of payouts.  Based on their analysis, most of the payouts came from the wallets where Bitcoin deposits were received, and only 0.8% of payouts came from mining pools.  As a result, it appears that HASHFLARE may not have been engaged in substantial cryptocurrency mining, as previously advertised.

43.     The FBI has also been investigating whether HASHFLARE and HASHCOINS possessed sufficient cryptocurrency mining equipment, in light of the number of contracts that had been purchased, and have determined the following.

44.     On its website, HASHFLARE claimed that, when the company began in 2015, it conducted cloud mining using equipment obtained from HASHCOINS.  As referenced above, investors questioned whether HASHCOINS had the capability to mine cryptocurrency, since they did not appear to have a large server location (or at least none was found).  Additionally, in 2014 and 2015, HASHCOINS initially sold mining equipment, to be operated by the purchasing user.  However, during that time frame, HASHCOINS claimed that it experienced supply disruptions frustrating their ability to supply Bitcoin mining equipment.  On online forums, HASHCOINS users complained that purchased

Affidavit of Special Agent Andrew Cropcho - 13
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

mining equipment never arrived or that HASHCOINS claimed that shipments were substantially delayed. And while some users stated they received less powerful equipment produced by HASHCOINS, users complained that orders for more powerful mining equipment were left unfulfilled and unrefunded. In response, HASHCOINS offered its customers the opportunity to invest in HASHFLARE's cloud mining services, instead. Investors questioned whether this transition was intentional, to ensure that additional investors sent funds to HASHFLARE, and whether HASHCOINS ever had the ability to produce the more sophisticated cloud mining equipment advertised on its website.

45. Notably, from at least December 2015 until September 2016, HASHCOINS advertised cryptocurrency mining equipment for sale on its website. However, as of October 2016, despite the above mentioned orders from users, HASHCOINS advertised on its website that "In 2015 we have changed our business model from B2C [sales to customers] to B2B [sales to businesses], working with business customers only as we mostly keep the hardware for the needs of HashFlare."

46. Later in its operations, HASHFLARE claimed that it was purchasing cryptocurrency mining equipment from other companies, instead of sourcing its supply from HASHCOINS.

47. Beginning on or before June 4, 2018, HASHFLARE appears to have advertised on its website, albeit in broken English, that it uses "equipment for mining" obtained from "Bitmain, Bitfury, Inno3d, and others." Bitmain, Bitfury, and Inno3d each manufacture cryptocurrency mining equipment. Because of the broken English, it is difficult to determine when HASHFLARE started using mining equipment supplied by these companies, but it appears that HASHFLARE advertised that it acquired this equipment in 2016.[5]

---

[5] The language states: "HashFlare is a cloud mining service created by the specialists from HashCoins in 2015. In a short time, HashFlare became one of the largest providers of computational power for mining bitcoin, litecoin, ethereum and other cryptocurrencies. From 2016, HashFlare is an independent company. The variety of equipment that is used for mining was significantly increased on the account such companies as Bitmain, Bitfury, Inno3d and others."

Affidavit of Special Agent Andrew Cropcho - 14
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     According to banking records obtained to date,[6] HASHCOINS first transferred funds to Bitfury on August 14, 2017, with another transfer of more than $900,000 in funds occurring on October 4, 2017.  Records from Bitfury show that deliveries were made on October 16, 2017 and November 21, 2017.

49.     Additionally, according to banking records, from January until September 2018, Burfa Media OU (described in further detail below) transferred $12.3 million to Ask Technology Group Limited, which appears to sell Inno3d products, a cryptocurrency mining equipment manufacturer.  The subject lines for each payment listed "Mining Systems" or "P106-090 Systems"—associated with cryptocurrency mining.  Given the timing, it's unclear whether these systems were ever used in connection with HASHFLARE's operations.

50.     Additionally, emails were exchanged between POTAPENKO or TURYGIN and representatives at Bitmain, Bitfury, and Inno3d.  According to information obtained from Google, POTAPENKO and TURYGIN communicated with representatives from these companies during the following time periods using the following email addresses:

| POTAPENKO and TURYGIN Accounts | Communicating With | Time Frame |
|---|---|---|
| sergei@hashcoins.com | Bitmain | 9/15-3/18 |
| | Bitfury | 1/16-2/16 |
| | Inno3d | 12/17-1/19 |
| ivan@hashcoins.com | Bitfury | 6/17-1/19 |
| sergei.potapenko@gmail.com | Bitfury | 3/16-3/16 |
| ivan@burfa.com | Bitfury | 7/18-8/18 |
| | Inno3d | 12/17-1/19 |

51.     However, HASHFLARE was advertising and selling mining contracts well before these equipment purchases from Bitfury and Inno3d.  Based on financial records analyzed to date, users appeared to have begun transferring funds to HASHCOINS' bank account to purchase HASHFLARE mining contracts in 2016 and 2017.  For example, on April 7, 2017, a transfer was made with the accompanying description: "OUR PS1704077754142 Purpose: SHA-256 HASHRATE INVOICE #771551."  Those same

[6] The FBI is continuing to gather financial information related to this case and has, so far, obtained records from Latvia, Estonia, and the United States relating to HASHFLARE and HASHCOINS, among other entities.

Affidavit of Special Agent Andrew Cropcho - 15
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

financial records provide 28 payments made to the same HASHCOINS bank account, totaling approximately $200,000, before any known delivery of mining equipment was made by Bitfury to HASHFLARE. Based on the above, the FBI is investigating whether HASHFLARE was soliciting and collecting investments for services it was not yet able to perform.

52.     Between at least August 2017 and June 2018, HASHFLARE has also transferred more than € 25 million to CryptoPay Ltd., a UK company that sells Bitcoin, purchases Bitcoin in exchange for fiat currency, and sells cards that can be loaded with cryptocurrency. For example, on August 8, 2017, HASHFLARE transferred $250,000 to CryptoPay for "digital assets purchase." Again, on August 17, 2017 HASHFLARE transferred an additional $250,000 for "digital assets purchase." These payments continued through at least June 7, 2018, when HASHFLARE transferred $800,000, also for "digital assets purchase." Based on these purchases, and the payment references, the FBI is investigating whether HASHFLARE was paying its investors using bitcoins purchased from CryptoPay, rather than mining bitcoins as advertised.

53.     Furthermore, based on my training and experience, and information gained during the course of this investigation, I know that Ponzi schemes operate by recruiting others, paying earlier investors with funds transferred by later investors. Ponzi schemes often involve recruitment bonuses, incentivizing earlier investors to recruit friends and family members so that funds are available to pay earlier members. As described above, HASHFLARE advertised a referral program, paying earlier investors 10% bonuses based on cloud mining contracts purchased by those they referred.

54.     HASHFLARE and HASHCOINS have stopped selling any mining contracts and, as described below, its founders and employees appear to have moved to successor companies that continue to operate in the cryptocurrency space. Prior investors have not been able to recoup their funds and many have been unable to transfer funds held in their accounts.

Affidavit of Special Agent Andrew Cropcho - 16
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

55.     I submit there is probable cause to believe HASHFLARE and HASHCOINS operated as a Ponzi scheme for at least the following reasons: (1) before its collapse, HASHFLARE appears to have been in financial distress, as evidenced by its unilateral conversion of mining contracts from lifetime contracts to year-long contracts, its use of KYC requirements to delay users' withdrawal of funds from their accounts, and its termination of mining contracts during a time when industry press considered bitcoin mining to be profitable; (2) HASHCOINS' questionable ability to manufacture cryptocurrency mining equipment, as evidenced by its 2014-15 decision to not fulfill equipment orders and instead convert purchase contracts to HASHFLARE cloud mining contracts; (3) Estonian law enforcement's analysis that HASHFLARE wasn't receiving substantial payouts from mining pools, sufficient to pay its investors; (4) HASHFLARE's purchase of mining equipment only later in its operations, beginning at the earliest in 2016 (according to its website) or 2017 (according to banking information); (5) HASHFLARE's apparent purchase of "digital assets" from CryptoPay, which, among other items, sells Bitcoin, suggesting that HASHFLARE may be purchasing cryptocurrency rather than mining it; (6) HASHFLARE's inherent structure, including its referral program and lack of transparency regarding its mining pools, which is a common structure evidenced in Ponzi schemes; and (7) as described in further detail below, HASHFLARE's dissolution and the subsequent transition of its employees and co-founders, who joined new companies that continue to operate in the cryptocurrency space.

### d. HASHCOINS' Use of Google Services

56.     According to information obtained from Google, HASHCOINS uses the email domain @hashcoins.com, which is hosted by Google.  HASHCOINS is a G Suite client, a Google product that provides cloud computing, productivity, and collaboration tools for business clients.

57.     The domain @hashcoins.com was created on April 27, 2017, listing two contact emails for POTAPENKO—sergei@hashcoins.com and sergei.potapenko@gmail.com.  As of February 2020, HASHCOINS used the Google

Affidavit of Special Agent Andrew Cropcho - 17
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | services Google Calendar, Google Drive, Google Docs, Gmail, Google+, Google Hangouts,

2 | Groups for Business, Hangouts Chat, Jamboard Service, Keep, Sites, and Tasks.

3 |      58.    As of February 2020, there were fifteen email addresses associated with the

4 | domain @hashcoins.com.

| Subscriber Name | Email Account | Admin | Last Login | Known Role[7] |
|---|---|---|---|---|
| HASHCOINS Admin | admin@hashcoins.com | N | 5/15/19 | Administrator of Account |
| Microsoft Azure | azure@hashcoins.com | N | 11/19/18 | HASHFLARE hosts its website at Microsoft |
| Microsoft Azure 2 | microsoft@hashcoins.com | N | 10/12/18 | |
| Chargeback Check | cb@hashcoins.com | N | 12/10/19 | Believed to refer to payments with insufficient funds[8] |
| HASHCOINS Team | info@hashcoins.com | N | 1/27/19 | HASHCOINS Team |
| HASHCOINS Invoices | invoices@hashcoins.com | N | 8/21/19 | HASHCOINS Invoices |
| IVAN TURYGIN | ivan@hashcoins.com | N | 11/12/18 | Co-founder of HASHFLARE and HASHCOINS |
| Licenses HC | licenses@hashcoins.com | N | 12/11/19 | Believed to refer to hosting controller licenses |
| Margarita Burunova | margarita.burunova @hashcoins.com | N | 7/15/19 | Data Center Chief Construction Engineer at Burfa Tech |
| Nikolay Pavlovskiy | nikolay@hashcoins.com | Y | 12/11/19 | Chief Technology Officer of HASHCOINS, Vice President and Head of Business Development at HASHFLARE |
| Pavel Tsihhotski | pavel@hashcoins.com | N | 2/17/20 | Support and Community Manager for HASHCOINS |

---

[7] Obtained from HASHFLARE's or HASHCOINS' website or through public reporting.
[8] A number of investors on public chat forums suggested using chargebacks to recover funds lost through the termination of HASHFLARE cloud mining contracts.

Affidavit of Special Agent Andrew Cropcho - 18
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Subscriber Name | Email Account | Admin | Last Login | Known Role[7] |
|---|---|---|---|---|
| SERGEI POTAPENKO | sergei@hashcoins.com | Y | 2/10/20 | Co-Founder and CEO of HASHFLARE and HASHCOINS |
| Stanislav Pavlov | stanislav.pavlov@hashcoins.com | Y | 2/19/20 | Former Human Resources Manager and Customer Support for Burfa Tech OU |
| Vadim Tsvetikov | vadim.tsvetikov@hashcoins.com | N | 2/20/20 | Data Center Operation Director at BURFA CAPITAL OU |
| Vitali Pavlov | vitali@hashcoins.com | Y | 2/18/20 | Project Manager at HASHFLARE, Chief Product Officer at HASHCOINS |

59.     In order to gather evidence of HASHCOINS' operations, including discussions of mining cryptocurrency and providing returns to investors, the United States is seeking records from all remaining accounts associated with the HASHCOINS entity.  Each account belongs to POTAPENKO, TURYGIN, or an employee that provides an important role for HASHCOINS, including data center operations, project management, and customer support.  Other accounts are outward facing corporate accounts, including invoices@hashflare.com, admin@hashflare.com, or info@hashflare.com, that interact with customers, vendors, or suppliers, each of which are likely to contain evidence of additional victims and that HASHCOINS is operating as a Ponzi scheme.

**B. Other Linked Entities**

**1. BURFA Entities**

60.     After HASHFLARE terminated its mining contracts, HASHCOINS OU changed its legal name to Burfa Tech OU and HASHCOINS TRADE OU changed its name to Burfa Trade OU.  As described below, a number of HASHCOIN and HASHFLARE employees then transferred and started working for these entities.

Affidavit of Special Agent Andrew Cropcho - 19
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     Burfa Tech OU and Burfa Trade OU, are part of a conglomerate formed by TURYGIN and POTAPENKO, under the umbrella company Burfa Capital OU, incorporated in Estonia (collectively called the "BURFA Entities").  These entities are described below:

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners | Prior Names |
|---|---|---|---|---|---|
| 7/12/13 | Burfa Capital OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | Starfix UU |
| 6/27/13 | Burfa Media OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | N/A |
| 7/17/17 | Burfa Real Estate OU | Estonia | Private Limited Company | Pavel Ivanov | Burfa Estate OU |
| 6/13/13 | Burfa Tech OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | HASHCOINS OU, Euro Host UU |
| 11/26/14 | Burfa Trade OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | HASHCOINS Trade OU, Habalink UU |
| 6/27/13 | Burfa Invest OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | N/A |

62.     According to the website for Burfa Capital, burfa.com, the various entities have the following missions:

a.      Burfa Capital OU "is a commercial organization . . . emphasizing collaboration and investment in such priority areas as IT, fintech and data processing." Burfa Capital OU appears to be the parent corporation in the BURFA Entities conglomerate.

b.      Burfa Media OU "provides computing equipment for processing large data arrays and for any operations that require significant computing power."

c.      Burfa Real Estate OU "is engaged in the construction of commercial and residential luxury real estate in Estonia . . . for the subsequent sale or rent."

Affidavit of Special Agent Andrew Cropcho - 20
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.      Burfa Tech OU is reported to be "a leader in the field of data center design and maintenance for the industrial sector . . . specializ[ing] in high-performance computing and turnkey data center solutions."  Like HASHCOINS, Burfa Tech OU is reported publicly to be "an IT company operating in Estonia mainly in the field of equipment for cryptocurrency mining."

e.      Burfa Trade OU "is engaged in the wholesale trade of timber materials."

f.      Burfa Invest OU "is a globally recognized brand with three main vectors of development"—trade, real estate, and construction.

63.     As described in the chart below, a number of the individuals employed by the BURFA Entities appear to have been formerly employed by HASHCOINS or HASHFLARE.

| Name | Role in HASHCOINS or HASHFLARE | Role in BURFA Entities |
|---|---|---|
| SERGEI POTAPENKO | Co-Founder and CEO of HASHFLARE and HASHCOINS | Board Member & Co-Founder of Burfa Capital OU |
| IVAN TURYGIN | Co-founder of HASHFLARE and HASHCOINS | Board Member & Co-Founder of Burfa Capital OU |
| Nikolay Pavlovskiy | Chief Technology Officer of HASHCOINS, Vice President and Head of Business Development at HASHFLARE | Chief Technology Officer for Burfa Capital OU |
| Vitali Pavlov | Project Manager at HASHFLARE, Chief Product Officer at HASHCOINS | Chief Product Officer at Burfa Capital OU |
| Vadim Tsvetikov | Associated with HASHCOINS, as described above | Data Center Operation Director for Burfa Capital OU |
| Pavel Tsihhotski | Support and Community Manager for HASHCOINS | Head of Support for Burfa Capital OU |
| Stanislav Pavlov | Associated with HASHCOINS, as described above | Former Human Resources Manager and Customer Support for Burfa Tech OU |
| Tatjana Potapova | Chief Financial Officer for HASHCOINS | Chief Financial Officer for Burfa Media OU |
| Edger Bers | Public Relations Business Development Manager for HASHCOINS | Associated with BURFA Entities—possesses @burfa.com email address |

64.     Additionally, around the time the Bitcoin mining contracts were suspended, HASHFLARE transferred substantial assets to the BURFA Entities.  For example, according

1   to bank records gathered during the course of this investigation, two different bank accounts

2   held in the name of HASHFLARE transferred approximately $15.5 million to a bank account

3   held in the name of Burfa Media OU throughout the year in 2018.

4        65.    According to information obtained from Google, the BURFA Entities use the

5   email domain @burfa.com, which is hosted by Google. The billing address for this domain

6   is Burfa Media OU, in the care of SERGEI POTAPENKO. Burfa Media OU is a G Suite

7   client, a Google product that provides cloud computing, productivity, and collaboration tools

8   for business clients.

9        66.    The @burfa.com domain was established on August 22, 2017, listing two

10   contact email addresses—admin@burfa.com and sergei@hashcoins.com (associated with

11   POTAPENKO). As of December 2019, the Burfa entities used the Google services Google

12   Calendar, Google Drive, Google Docs, Gmail, Google+, Google Hangouts, Groups for

13   Business, Hangouts Chat, Jamboard Service, Keep, Sites, and Tasks.

14        67.    As of December 2019, there were 42 email addresses associated with the

15   domain @burfa.com. Those identified as most relevant to this investigation are included

16   below:

| Subscriber Name | Email Account | Admin | Last Login | Known Role |
|---|---|---|---|---|
| Admin Burfa | admin@burfa.com | Y | 5/15/19 | Administrator |
| Alerts Mining | alerts.mining@burfa.com | N | 12/14/19 | Mining Alerts |
| Info Burfa | info@burfa.com | N | 10/9/19 | Public Facing Information Email Address |
| Burfa Media | invoices@burfa.com | N | 8/21/19 | Invoices |
| Edger Bers | edger.bers@burfa.com | N | 12/3/19 | Product Development for BURFA Tech OU |
| IVAN TUROGIN | ivan@burfa.com | N | 11/26/19 | Board Member & Co-Founder of BURFA Capital OU |
| Nikolay Pavlovskiy | nikolay.pavlovskiy@burfa.com | N | 12/4/19 | Chief Technology Officer for BURFA Capital OU |
| Pavel Tsihhotski | pavel.tsihhotski@burfa.com | N | 12/4/19 | Head of Support for BURFA Capital OU |

| Subscriber Name | Email Account | Admin | Last Login | Known Role |
|---|---|---|---|---|
| SERGEI POTAPENKO | sergei@burfa.com | N | 12/3/19 | Board Member & Co-Founder of BURFA Capital OU |
| Stanislav Pavlov | stanislav.pavlov@burfa.com | Y | 12/14/19 | Former Human Resources Manager and Customer Support for Burfa Tech OU |
| Tatjana Potapova | tatjana@burfa.com | N | 12/8/19 | Chief Financial Officer for Burfa Media OU |
| Vadim Tsvetikov | vadim.tsvetikov@burfa.com | N | 12/11/19 | Data Center Operation Director for BURFA Capital OU |
| Vitali Pavlov | vitali@burfa.com | N | 12/8/19 | Chief Product Officer at BURFA Capital OU |

68.     In order to gather evidence of the BURFA Entities' operations as successor companies to HASHFLARE and HASHCOINS, including discussions of ongoing cryptocurrency mining, or the location of corporate assets and evidence, the United States is seeking records from the above BURFA accounts associated with the former HASHFLARE or HASHCOINS employees or current BURFA Tech OU employees, which is the successor corporation of HASHCOINS.  The United States also seeks records from the BURFA Entities' outward facing corporate accounts, including invoices@burfa.com, admin@burfa.com, alerts.mining@burfa.com, or info@burfa.com, which interact with customers, vendors, or suppliers, each of which are likely to contain evidence that BURFA is the successor entity to HASHCOINS, and has subsumed its operations and assets.

C. **Polybius Foundation**

69.     In addition to HASHCOINS, HASHFLARE, and the BURFA Entities, TURYGIN and POTAPENKO have also formed a second conglomerate, comprised of four entities—Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, and Polybius Fintech MidCo OU (collectively, referred to as "POLYBIUS").

70.     Each of these entities was incorporated in Estonia, as listed below:

Affidavit of Special Agent Andrew Cropcho - 23
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners |
|------|----------------|---------|------------|-------------------------------|
| 2/13/17 | Polybius Foundation OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO & Anton Altement |
| 2/1/18 | Polybius Tech OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO, Anton Altement & Vadim Gerassimov |
| 2/8/18 | Polybius Ventures OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO & Anton Altement |
| 4/25/18 | Polybius Fintech MidCo OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO, Anton Altement & Mathieu Hardy |

71.     According to the website for POLYBIUS, Polybius.io, and public reporting, the various entities have the following missions:

a.     Polybius Tech OU created a cryptocurrency wallet called OSOM Finance, designed to hold both Bitcoin and alternative coins.

b.     Polybius Ventures OU and Polybius Fintech MidCo OU are not separately described but are both subsidiaries in the POLYBIUS ecosystem.

c.     Polybius Foundation, according to its Prospectus (also known as a "Whitepaper"), is "a team of financial, security, legal and technical experts" who are raising funds to start Polybius Bank.  The intent was for Polybius Bank to be a "fully digital bank accessible everywhere at any time.  It will have all the functions of a classical bank, but will not host any branches, nor any physical front-offices and will rely fully on the latest digital technologies."  The front of the prospectus reads, in part: "Polybius POWERED BY HASHCOINS."

72.     According to an article written by Forbes on October 29, 2018, POLYBIUS raised approximately $32 million dollars during its Initial Coin Offering ("ICO") in the summer of 2017.  The symbol for the POLYBIUS coins is PLBT.  As of the date of the writing of the article, no tangible product had been launched.  In fact, it announced that it abandoned the prospect of opening a bank, and that it would develop a mobile app instead.

73.     A cursory review of the POLYBIUS tokens was discussed in a law review article published by the Columbia Law Review in April of 2019, entitled "Coin-Operated Capitalism."  In the article, the authors note that a "development team can unilaterally change the [POLYBIUS] tokens purchased by investors–or sometimes, propose changes that

Affidavit of Special Agent Andrew Cropcho - 24
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  will not be adopted if a certain percentage of users do not object."  The authors opine that the
2  latter type of proposed changes that may be detrimental to investors may automatically take
3  effect with no knowledge of the investor because (1) the default vote is inherently set to
4  "yes," and (2) the investing public as a whole does not have the technical skills to monitor or
5  understand the proposed changes a development team may make to the POLYBIUS tokens.
6  To date, it is unknown whether any such changes occurred.

7       74.    On November 17, 2018, POLYBIUS released a blog post announcing it was
8  releasing a new personal finance management service called "OSOM."  Later in 2019,
9  POLYBIUS released instructions about how to transfer PLBT tokens from an investor's
10  POLYBIUS Wallet to their OSOM Wallet.  According to POLYBIUS, transfer of the PLBT
11  tokens to the OSOM Wallet was important because the POLYBIUS Wallet would eventually
12  no longer be functioning.

13       75.    A simple search of Apple's "App Store" and Google's "Play Store" for
14  "POLYBIUS" and "OSOM" yields no relevant results.

15       76.    The POLYBIUS coin is still available for purchase as of today, and both the
16  OSOM website and POLYBIUS website are making assertions that a product is being
17  developed.

18       77.    According to banking records, POLYBIUS has received substantial payments
19  from the BURFA Entities.  For example, in June 2018, Burfa Media OU transferred more
20  than € 2 million to accounts held by Polybius Foundation OU.

21       78.    As with the BURFA Entities, some of the individuals employed by
22  POLYBIUS appear to have been formerly employed by HASHCOINS or HASHFLARE or
23  the BURFA entities.  As a result, it appears that POLYBIUS is a successor entity of
24  HASHCOINS and HASHFLARE.

| Name | Role in HASHCOINS, HASHFLARE or BURFA | Role in POLYBIUS |
|------|----------------------------------------|------------------|
| SERGEI POTAPENKO | Co-Founder and CEO of HASHFLARE and HASHCOINS | Co-Founder of POLYBIUS |
| IVAN TURYGIN | Co-founder of HASHFLARE and HASHCOINS | Co-Founder of POLYBIUS |

Affidavit of Special Agent Andrew Cropcho - 25
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Name | Role in HASHCOINS, HASHFLARE or BURFA | Role in POLYBIUS |
|------|----------------------------------------|------------------|
| Edgar Bers | Public Relations Business Development Manager for HASHCOINS | Communications and Media Manager for POLYBIUS |
| Pavel Tsihhotski | Support and Community Manager for HASHCOINS | Associated with POLYBIUS (possesses @polybius.io email address) |
| Anton Altement | Associated with BURFA Entities (possesses @burfa.com email address) | CEO & Co-Founder of POLYBIUS |
| Vitali Pavlov | Project Manager at HASHFLARE, Chief Product Officer at HASHCOINS | Product Manager POLYBIUS |

79. According to information obtained from Google, POLYBIUS uses the email domain @polybius.io, which is hosted by Google. Based on publicly available domain name searches, it appears that POLYBIUS is a G Suite client, a Google product that provides cloud computing, productivity, and collaboration tools for business clients.

80. During the course of this investigation, law enforcement has identified at least seven email addresses associated with the domain @polybius.io. Those identified as most relevant to this investigation are included below:

| Suspected Owner | Email Account | Known Role |
|-----------------|---------------|------------|
| POLYBIUS Support | support@polybius.io | Support |
| POLYBIUS Information | info@polybius.io | Information |
| Anton Altement | anton.altement@polybius.io | CEO & Co-Founder of POLYBIUS |
| Edger Bers | edgar.bers@polybius.io | Communications and Media Manager for POLYBIUS |
| IVAN TURYGIN | ivan.turygin@polybius.io | Co-Founder of POLYBIUS |
| SERGEI POTAPENKO | sergei.potapenko@polybius.io | Co-Founder of POLYBIUS |
| Pavel Tsihhotski | pavel.tsihhotski@polybius.io | Unknown |
| Vitali Pavlov | vitali.pavlov@polybius.io | Product Manager POLYBIUS |

81. In order to gather evidence of POLYBIUS's operations as a successor company to HASHFLARE and HASHCOINS, including discussions of ongoing cryptocurrency management, or the location of corporate assets and evidence, the United

Affidavit of Special Agent Andrew Cropcho - 26
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  States is seeking records from the above POLYBIUS accounts associated with the former

2  HASHFLARE or HASHCOINS employees or current POLYBIUS executives, which

3  continues to operate in the cryptocurrency sphere. The United States also seeks records from

4  POLYBIUS's outward facing corporate accounts, including support@polybius.io and

5  info@polybius.io, which interact with customers and the public, each of which are likely to

6  contain evidence that POLYBIUS is the successor entity to HASHCOINS, and has

7  subsumed its operations and assets.

8     **D. Dalmeron Projects & Ecohouse Networks**

9       82.    During the course of this investigation, law enforcement has learned that an

10  account held by HASHFLARE transferred over € 40 million to an account held by Dalmeron

11  Projects LP in Latvia. Dalmeron Projects LP transferred a significant portion of those funds

12  to accounts held by Burfa Media OU, Polybius Foundation OU, and HASHCOINS.

13       83.    Similarly, law enforcement has learned that HASHCOINS has transferred over

14  € 900,000 to accounts held by Ecohouse Networks LP in Latvia. Ecohouse Networks

15  transferred a portion of those funds to an account held by Burfa Media OU in Estonia.

16       84.    Dalmeron Projects LP was incorporated in Canada, as described below.

17  Ecohouse Networks was incorporated in the United Kingdom. Dalmeron Projects LP appears

18  to operate the website www.dalmeron.com, advertising "cryptocurrency cloud mining

19  solutions for corporate clients." The website explained "we offer hashing power to

20  companies working with cryptocurrencies, hashing algorithms or private blockchain-based

21  networks using the newest ASIC hardware and GPU rigs."

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners |
|---|---|---|---|---|
| 3/8/16 | Dalmeron Projects LP | Canada | Limited Partnership | Unknown |
| 11/17/14 | Ecohouse Networks | UK | Limited Partnership | No persons with Significant Control Listed |

26       85.    As described below, despite their separate corporate forms, both entities appear

27  to be linked to IVAN TURYGIN.

Affidavit of Special Agent Andrew Cropcho - 27
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

86.     According to information obtained from Google, the account dalmeronprojects@gmail.com was created on October 24, 2016, listing the subscriber name as "Dalmeron Projects." The recovery email listed on the account was ecohousenetworks@gmail.com. The services associated with the account were: Web & App Activity, Gmail, Google Hangouts, YouTube, Google Calendar, Android Partner, and Google My Maps.

87.     The dalmeronprojects@gmail.com account is linked by cookies to the ecohousenetworks@gmail.com, ivan.turygin@polybius.com, ivan@burfa.com, and turygin@gmail.com email addresses. A cookie is a text file that a web browser places on a user's computer or machine. Cookies are used for a variety of purposes, including authentication, security, storing website information and preferences, advertising, and analytics. Based on my training and experience, I know if accounts are linked by cookies it suggests that they were accessed and owned by a common user.

88.     According to information obtained from Google, the account ecohousenetworks@gmail.com was created on March 9, 2015, listing the subscriber name as "Ecohouse Networks." The recover email listed on the account was turygin@gmail.com, which as explained below is associated with TURYGIN. The services associated with the account were: Web & App Activity, Gmail, Google Hangouts, YouTube, Google Calendar, Android Partner, and Google My Maps.

89.     The ecohousenetworks@gmail.com account is also linked by cookies to the dalmeronprojects@gmail.com, ivan.turygin@polybius.io, ivan@burfa.com, and turygin@gmail.com accounts.

90.     In order to determine the business purpose of these transfers, or to gather evidence that these transfers were a continuation of the HASHFLARE Ponzi operation or a money laundering transaction, designed to conceal assets stolen from HASHFLARE and HASHCOINS investors, the United States seeks records for both accounts belonging to Ecohouse Networks LP and Dalmeron Projects LP.

**E. Personal Email Addresses**

91.      In addition to corporate email addresses, TURYGIN and POTAPENKO both use personal email addresses hosted at Google.

92.      On May 10, 2006, the email address sergei.potapenko@gmail.com was registered, listing the subscriber name as "Sergei Pt." The recovery email associated with the account was sergei@hashcoins.com. The services associated with the account include: Account Activity, Android, Contacts, Gmail, Google Calendar, Google Chrome Sync, Google Docs, Google Drive, Google Hangouts, Google Keep, Google Maps Engine, Google Mobile, Google My Maps, Google Payments, Google Photos, Google Play, Google Search Console, Google+, Location History, YouTube and iGoogle.

93.      According to Google, the sergei.potapenko@gmail.com account is linked by cookies to sergei@burfa.com and sergei@hashcoins.com.

94.      On February 25, 2005, the email address turygin@gmail.com was registered, listing the subscriber name as IVAN TURYGIN. The recovery email associated with the account was ivan@burfa.com. The services associated with the account include: Android, Google Calendar, Google Chrome Sync, Google Docs, Google Drive, Google Hangouts, Google Maps, Google Maps Engine, Google My Maps, Google Photos, Google Voice, Location History, Web & App Activity, YouTube, and iGoogle.

95.      According to Google, the turygin@gmail.com account is linked by cookies to dalmeronprojects@gmail.com, ecohousenetworks@gmail.com, ivan.turygin@polybius.io, and ivan@burfa.com.

96.      As described below, although these email addresses end with the domain @gmail.com, both POTAPENKO and TURYGIN used them to communicate regarding corporate matters tied to HASHFLARE, HASHCOINS, the BURFA Entities, and POLYBIUS.

**F. Emails Sent and Received**

97.      POTAPENKO and TURYGIN use their @hashcoins.com, @burfa.com, @polybius.io, and @gmail.com email addresses virtually interchangeably to communicate

Affidavit of Special Agent Andrew Cropcho - 29
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  with other employees of their corporations.  For example, POTAPENKO and TURYGIN

2  have used the following accounts to communicate with the following employees:

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| sergei@hashcoins.com | HASHCOINS | vitali@hashcoins.com |
| | | accounts@hashcoins.com |
| | | job@hashcoins.com |
| | | pavel@hashcoins.com |
| | | vadim.tsetikov@hashcoins.com |
| | | invoices@hashcoins.com |
| | | irina.rusakova@hashcoins.com |
| | | ivan@hashcoins.com |
| | | simon.inkin@hashcoins.com |
| | | alexandr@hashcoins.com |
| | | pavel.borozdin@hashcoins.com |
| | | mihkel@hashcoins.com |
| | | hctinvoices@hashcoins.com |
| | | arkadi.zaitzev@hashcoins.com |
| | | dan.but@hashcoins.com |
| | | admin@hashcoins.com |
| | | management@hashcoins.com |
| | | info@hashcoins.com |
| | | stanilov.pavlov@hashcoins.com |
| | | margarita.burunova@hashcoins.com |
| | | job+managers@hashcoins.com |
| | | anna.vesselko@hashcoins.com |
| | | maksim.stadnik@hashcoins.com |
| | | simon@hashcoins.com |
| | | cfbot@hashcoins.com |
| | | nikolay.pavlovskiy@hashcoins.com |
| | | jira@hashcoins.com |
| | | konstantin.kalakauskas@hashcoins.com |
| | | roman.kononov@hashcoins.com |
| | | sales@hashcoins.com |
| | | roman.sadovski@hashcoins.com |
| | | cb@hashcoins.com |
| | | ervin.bazin@hashcoins.com |
| | | renna@hashcoins.com |
| | | support@hashcoins.com |
| | | adim.tsvetikov@hashcoins.com |
| | | aleksandr@hashcoins.com |
| | | allan.rumjantsev@hashcoins.com |

_____
[9] As a to, from, or co-cc'd address.

Affidavit of Special Agent Andrew Cropcho - 30
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | allan.vaino@hashcoins.com |
| | | andrei@hashcoins.com |
| | | anton@hashcoins.com |
| | | artur.kutsenko@hashcoins.com |
| | | christine@hashcoins.com |
| | | it+noreply@hashcoins.com |
| | | julia.dolzenkova@hashcoins.com |
| | | julia.odnodvortseva@hashcoins.com |
| | | kirill.tserjukanov@hashcoins.com |
| | | lev.malinovski@hashcoins.com |
| | | lev.mozhaev@hashcoins.com |
| | | licenses@hashcoins.com |
| | | matt.morozov@hashcoins.com |
| | | natalia.levinzon@hashcoins.com |
| | | nikolai@hashcoins.com |
| | | roman@hashcoins.com |
| | | tatjana@hashcoins.com |
| | | valentin@hashcoins.com |
| | | vitaly@hashcoins.com |
| | | wordpress@hashcoins.com |
| | BURFA Entities | ivan@burfa.com |
| | | tatjana@burfa.com |
| | | pavel@burfa.com |
| | | anton.altement@burfa.com |
| | | julia.karpa@burfa.com |
| | | margarita.burunova@burfa.com |
| | | karmella@burfa.com |
| | | vitali@burfa.com |
| | | info@burfa.com |
| | | vadim.tsvetikov@burfa.com |
| | | sergei@burfa.com |
| | | anton@burfa.com |
| | | admin@burfa.com |
| | | anton.fjodorov@burfa.com |
| | | invoices@burfa.com |
| | | irina.rusakova@burfa.com |
| | | ivan.turygin@burfa.com |
| | POLYBIUS | anton.altement@polybius.io |
| | | edgar.bers@polybius.io |
| | | mathieu.hardy@polybius.io |
| | | ivan.turygin@polybius.io |
| | | sergei.potapenko@polybius.io |
| | | support@polybius.io |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | jerome.dickinson@polybius.io |
| | | info@polybius.io |
| | | vadim.gerassimov@polybius.io |
| | | gunther.debacker@polybius.io |
| | | pavel.tsihhotski@polybius.io |
| | | andrius.verseckas@polybius.io |
| | | dmitri.troskov@polybius.io |
| | | igor.rusovitch@polybius.io |
| | | dilnoza.shaumarova@polybius.io |
| | | etienne.goffin@polybius.io |
| | | mykhailo.riabokon@polybius.io |
| | DALMERON PROJECTS | dalmeronprojects@gmail.com |
| | TURYGIN | turygin@gmail.com |
| | HASHFLARE | alex@hashflare.io |
| | | info@hashflare.io |
| | | support@hashflare.io |
| | | legal@hashflare.io |
| | | alerts@hashflare.io |
| ivan@hashcoins.com | HASHCOINS | job@hashcoins.com |
| | | vitali@hashcoins.com |
| | | sergei@hashcoins.com |
| | | vadim.tsvetikov@hashcoins.com |
| | | nikolay@hashcoins.com |
| | | margarita.burunova@hashcoins.com |
| | | management@hashcoins.com |
| | | job+managers@hashcoins.com |
| | | stanislav.pavlov@hashcoins.com |
| | | arkadi.zaitsev@hashcoins.com |
| | | cfbot@hashcoins.com |
| | | simon.inkin@hashcoins.com |
| | | pavel.borozdin@hashcoins.com |
| | | edgar@hashcoins.com |
| | | pavel@hashcoins.com |
| | | info@hashcoins.com |
| | | alexandr@hashcoins.com |
| | | irina.rusakova@hashcoins.com |
| | | renna@hashcoins.com |
| | | sales@hashcoins.com |
| | | support@hashcoins.com |
| | | aleksandr@hashcoins.com |
| | | andrei@hashcoins.com |
| | | anton@hashcoins.com |

Affidavit of Special Agent Andrew Cropcho - 32
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | invoices@hashcoins.com |
| | | it+noreply@hashcoins.com |
| | | iv.an@hashcoins.com |
| | | konstantin.kalakauskas@hashcoins.com |
| | | nikolay.pavlovskiy@hashcoins.com |
| | | roman@hashcoins.com |
| | | tatjana@hashcoins.com |
| | | valentin@hashcoins.com |
| | | vitaly@hashcoins.com |
| | BURFA Entities | tatjana@burfa.com |
| | | vadim.tsvetikov@burfa.com |
| | | anton.altement@burfa.com |
| | | ivan@burfa.com |
| | | julia.karpa@burfa.com |
| | | margarita.burunova@burfa.com |
| | | sergei@burfa.com |
| | POLYBIUS | support@polybius.io |
| | | anton.altement@polybius.io |
| | | info@polybius.io |
| | | edgar.bers@polybius.io |
| | HASHFLARE | legal@hashflare.io |
| sergei.potapenko@gmail.com | HASHCOINS | dev@hashcoins.com |
| | | edgar@hashcoins.com |
| | | info@hashcoins.com |
| | | invoices@hashcoins.com |
| | | mihkel@hashcoins.com |
| | | nikolay@hashcoins.com |
| | | partners@hashcoins.com |
| | | pavel.borozdin@hashcoins.com |
| | | pavel@hashcoins.com |
| | | sales@hashcoins.com |
| | | sergei@hashcoins.com |
| | | simon.inkin@hashcoins.com |
| | | stanislav.pavlov@hashcoins.com |
| | | support@hashcoins.com |
| | | vadim@hashcoins.com |
| | | vitali@hashcoins.com |
| | BURFA Entities | ivan@burfa.com |
| | | pavel@burfa.com |
| | | info@burfa.com |
| | | tatjana@burfa.com |
| | | karmella@burfa.com |
| | | margarita.burunova@burfa.com |

Affidavit of Special Agent Andrew Cropcho - 33
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | nikolay.pavlovskiy@burfa.com |
| | | sergei@burfa.com |
| | | vitali@burfa.com |
| | POLYBIUS | support@polybius.io |
| | | anton.altement@polybius.io |
| | | info@polybius.io |
| | HASHFLARE | info@hashflare.io |
| | | alex@hashflare.io |
| | | alerts@hashflare.io |
| | | support@hashflare.io |
| | | invoices@hashflare.io |
| turygin@gmail.com | HASHCOINS | invoices@hashcoins.com |
| | | simon.inkin@hashcoins.com |
| | | edgar@hashcoins.com |
| | | info@hashcoins.com |
| | | cloud@hashcoins.com |
| | | ivan@hashcoins.com |
| | | pavel.borozdin@hashcoins.com |
| | BURFA Entities | irina.rusakova@burfa.com |
| | | vitali@burfa.com |
| | POLYBIUS | anton.altement@polybius.io |
| | HASHFLARE | info@hashflare.io |
| | | support@hashflare.io |
| sergei@burfa.com | HASHCOINS | vitali@hashcoins.com |
| | | invoices@hashcoins.com |
| | | irina.rusakova@hashcoins.com |
| | | alexandr@hashcoins.com |
| | | nikolay@hashcoins.com |
| | | arkadi.zaitsev@hashcoins.com |
| | | pavel@hashcoins.com |
| | | vadim.tsvetikov@hashcoins.com |
| | | info@hashcoins.com |
| | | pavel.borozdin@hashcoins.com |
| | | anna.vesselko@hashcoins.com |
| | | ivan.turygin@hashcoins.com |
| | | sergei.potapenko@hashcoins.com |
| | | sergei@hashcoins.com |
| | | margarita.burunova@hashcoins.com |
| | | ivan@hashcoins.com |
| | | nikolay.pavlovskiy@hashcoins.com |
| | BURFA Entities | ivan@burfa.com |
| | | anton.altement@burfa.com |
| | | vitali@burfa.com |

Affidavit of Special Agent Andrew Cropcho - 34
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | nikolay@burfa.com |
| | | tatjana@burfa.com |
| | | sergei.potapenko@burfa.com |
| | | pavel@burfa.com |
| | | irina.rusakova@burfa.com |
| | | alexandr.gromov@burfa.com |
| | | anton@burfa.com |
| | | ivan.turygin@burfa.com |
| | | kiikri@burfa.com |
| | | karmella@burfa.com |
| | | julia.karpa@burfa.com |
| | | margarita.burunova@burfa.com |
| | | andrei.koshmanov@burfa.com |
| | | vadim.tsvetikov@burfa.com |
| | | nikolay.pavlovskiy@burfa.com |
| | | pavel.tsihhotski@burfa.com |
| | | accounts@burfa.com |
| | | anna.vesselko@burfa.com |
| | | info@burfa.com |
| | | dan.but@burfa.com |
| | | stanislav.pavlov@burfa.com |
| | | anton.fjodorov@burfa.com |
| | | ekaterina.gatovskaia@burfa.com |
| | | invoices@burfa.com |
| | | iturygin@burfa.com |
| | | ivan.turogin@burfa.com |
| | | npavlovskiy@burfa.com |
| | | spotapenko@burfa.com |
| | POLYBIUS | mathieu.hardy@polybius.io |
| | | jerome.dickinson@polybius.io |
| | | vadim.gerassimov@polybius.io |
| | | edgar.bers@polybius.io |
| | | maksim.stadnik@polybius.io |
| | HASHFLARE | info@hashflare.io |
| | | ivan.turygin@hashflare.io |
| | | sergei.potapenko@hashflare.io |
| | | support@hashflare.io |
| | | legal@hashflare.io |
| | | nikolay.pavlovskiy@hashflare.io |
| ivan@burfa.com | HASHCOINS | sergei@hashcoins.com |
| | | vitali@hashcoins.com |
| | | nikolay@hashcoins.com |
| | | vadim.tsvetikov@hashcoins.com |

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | irina.rusakova@hashcoins.com |
| | | edgar@hashcoins.com |
| | | alexandr@hashcoins.com |
| | | margarita.burunova@hashcoins.com |
| | | info@hashcoins.com |
| | | invoices@hashcoins.com |
| | | pavel.borozdin@hashcoins.com |
| | | sergei.potapenko@hashcoins.com |
| | | arkadi.zaitsev@hashcoins.com |
| | | ivan.turygin@hashcoins.com |
| | | pavel@hashcoins.com |
| | | vadim@hashcoins.com |
| | | vitali.pavlov@hashcoins.com |
| | | nikolay.pavlovskiy@hashcoins.com |
| | | konstantin.kalakauskas@hashcoins.com |
| | | anna.vesselko@hashcoins.com |
| | | ivan@hashcoins.com |
| | | simon.inkin@hashcoins.com |
| | | stanislav.pavlov@hashcoins.com |
| | | lev.mozhaev@hashcoins.com |
| | | nikolai@hashcoins.com |
| | | adim.tsvetikov@hashcoins.com |
| | | allan.rumjantsev@hashcoins.com |
| | | allan.vaino@hashcoins.com |
| | | artur.kutsenko@hashcoins.com |
| | | cfbot@hashcoins.com |
| | | christine@hashcoins.com |
| | | dan.but@hashcoins.com |
| | | ervin.bazin@hashcoins.com |
| | | julia.dolzenkova@hashcoins.com |
| | | julia.odnodvortseva@hashcoins.com |
| | | kirill.tserjukanov@hashcoins.com |
| | | lev.malinovski@hashcoins.com |
| | | maksim.stadnik@hashcoins.com |
| | | mihkel@hashcoins.com |
| | | natalia.levinzon@hashcoins.com |
| | | roman.sadovski@hashcoins.com |
| | | sales@hashcoins.com |
| | BURFA Entities | tatjana@burfa.com |
| | | sergei@burfa.com |
| | | pavel@burfa.com |
| | | anton.altement@burfa.com |
| | | kiikri@burfa.com |

Affidavit of Special Agent Andrew Cropcho - 36
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | | julia.karpa@burfa.com |
| | | karmella@burfa.com |
| | | vitali@burfa.com |
| | | margarita.burunova@burfa.com |
| | | info@burfa.com |
| | | irina.rusakova@burfa.com |
| | | nikolay@burfa.com |
| | | ivan.turygin@burfa.com |
| | | anton@burfa.com |
| | | nikolay.pavlovskiy@burfa.com |
| | | alexandr.gromov@burfa.com |
| | | vadim.tsvetikov@burfa.com |
| | | sergei.potapenko@burfa.com |
| | | invoices@burfa.com |
| | | andrei.koshmanov@burfa.com |
| | | iturygin@burfa.com |
| | | npavlovskiy@burfa.com |
| | | spotapenko@burfa.com |
| | | anna.vesselko@burfa.com |
| | | anton.fjodorov@burfa.com |
| | | pavel.tsihhotski@burfa.com |
| | | kiikri+managers@burfa.com |
| | | press@burfa.com |
| | | tatjana.potapova@burfa.com |
| | | tech@burfa.com |
| | | vitali.pavlov@burfa.com |
| | POLYBIUS | anton.altement@polybius.io |
| | | support@polybius.io |
| | | edgar.bers@polybius.io |
| | | mathieu.hardy@polybius.io |
| | | sergei.potapenko@polybius.io |
| | | info@polybius.io |
| | | jerome.dickinson@polybius.io |
| | | vadim.gerassimov@polybius.io |
| | | andrius.verseckas@polybius.io |
| | | dmitri.troskov@polybius.io |
| | | emc@polybius.io |
| | | igor.rusovitch@polybius.io |
| | | pavel.tsihhotski@polybius.io |
| | | etienne.goffin@polybius.io |
| | | ivan.turygin@polybius.io |
| | | vitali.pavlov@polybius.io |

Affidavit of Special Agent Andrew Cropcho - 37
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Entity | Communicating With[9] |
|---|---|---|
| | DALMERON PROJECTS | dalmeronprojects@gmail.com |
| | POTAPENKO | sergei.potapenko@gmail.com |
| dalmeronprojects@gmail.com | HASHCOINS | sergei@hashcoins.com |
| | BURFA Entities | ivan@burfa.com<br>sergei@burfa.com |
| | POLYBIUS | support@polybius.io<br>info@polybius.io |
| ecohousenetworks@gmail.com | HASHCOINS | info@hashcoins.com |
| | BURFA Entities | ivan@burfa.com<br>info@burfa.com |
| | POLYBIUS | support@polybius.io<br>info@polybius.io |
| | HASHFLARE | info@hashflare.io |

98.     POTAPENKO and TURYGIN also used their various accounts to communicate with cryptocurrency providers or mining companies, as indicated below:

| POTAPENKO and TURYGIN Accounts | Communicating With |
|---|---|
| sergei@hashcoins.com | marc.taverner@bitfury.com<br>anna@bitmain.com<br>info@bitmaintech.com<br>sharif.allayarov@bitmaintech.com<br>kirill@inno3d.com<br>alexey.s@cryptopay.me<br>dmitry@cryptopay.me<br>george@cryptopay.me<br>nikolai@cryptopay.me<br>nickolay.s@cryptopay.me<br>info@cryptopay.me<br>pavel@cryptopay.me |
| ivan@hashcoins.com | evgeniy.pavlov@bitfury.com<br>marc.taverner@bitfury.com<br>mk@bitfury.com<br>claus.pedersen@bitfury.com<br>aymen.elalfy@bitfury.com<br>daan.mcgrath@bitfury.com<br>bing.feng@bitfury.com<br>auke.russchen@bitfury.com<br>georgy.zabadaev@bitfury.com |

Affidavit of Special Agent Andrew Cropcho - 38
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| POTAPENKO and TURYGIN Accounts | Communicating With |
|---|---|
|  | sales@bitfury.com |
|  | rodrigo.marques@bitfury.com |
|  | george@cryptopay.me |
| sergei.potapenko@gmail.com | marc.taverner@bitfury.com |
|  | george@cryptopay.me |
|  | support@cryptopay.me |
| sergei@burfa.com | nikolai@cryptopay.me |
|  | support@cryptopay.me |
| ivan@burfa.com | georgy.zabadaev@bitfury.com |
|  | kirill@inno3d.com |
|  | support@cryptopay.me |
|  | eric@cryptopay.me |
|  | george@cryptopay.me |
|  | help@cryptopay.me |

99.    Finally, POTAPENKO and TURYGIN used sergei@hashcoins.com, sergei.potapenko@gmail.com, turygin@gmail.com, sergei@burfa.com, ivan@burfa.com, and dalmeronprojects@gmail.com to communicate with financial representatives where HASHFLARE, HASHCOINS, and other entities held accounts.  And POTAPENKO and TURYGIN used sergei@hashcoins.com, sergei.potapenko@gmail.com, turygin@gmail.com, and sergei@burfa.com to communicate with representatives of CloudFlare and/or Microsoft, where HASHFLARE and the BURFA Entities host their websites.

100.    Based on the above, there is probable cause to believe that information contained in the **SUBJECT ACCOUNTS** could reveal, among other things: (1) the plans and strategies formed by the users of the **SUBJECT ACCOUNTS** to defraud investors and customers, (2) the actions taken to execute those plans, (3) the operations and relationship between the various entities, including assets transferred between those entities; (4) the extent and capacity of mining operations at HASHCOINS and HASHFLARE; (5) the location of assets paid by investors to HASHCOINS and HASHFLARE; and (6) information on where HASHFLARE and HASHCOINS store their server data, including data on the identity and investment of each HASHFLARE subscriber.  Therefore, the United States seeks records and information from Google related to each of the **SUBJECT ACCOUNTS**.

Affidavit of Special Agent Andrew Cropcho - 39
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | **BACKGROUND CONCERNING ONLINE ACCOUNTS**

2      101.    As explained herein, information stored in connection with an online account
3 may provide crucial evidence of the "who, what, why, when, where, and how" of the
4 criminal conduct under investigation, thus enabling the United States to establish and prove
5 each element or alternatively, to exclude the innocent from further suspicion.

6      102.    In my training and experience, the information stored in connection with an
7 online account can indicate who has used or controlled the account. This "user attribution"
8 evidence is analogous to the search for "indicia of occupancy" while executing a search
9 warrant at a residence. For example, email communications, contacts lists, and images sent
10 (and the data associated with the foregoing, such as date and time) may indicate who used or
11 controlled the account at a relevant time.

12      103.    Further, information maintained by the email provider can show how and when
13 the account was accessed or used. For example, as described below, email providers
14 typically log the Internet Protocol (IP) addresses from which users access the email account,
15 along with the time and date of that access. By determining the physical location associated
16 with the logged IP addresses, investigators can understand the chronological and geographic
17 context of the email account access and use relating to the crime under investigation. This
18 geographic and timeline information may tend to either inculpate or exculpate the account
19 owner. Additionally, information stored at the user's account may further indicate the
20 geographic location of the account user at a particular time (e.g., location information
21 integrated into an image or video sent via email).

22      104.    Stored electronic data may provide relevant insight into the email account
23 owner's state of mind as it relates to the offense under investigation. For example,
24 information in the email account may indicate the owner's motive and intent to commit a
25 crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting
26 communications in an effort to conceal them from law enforcement).

27

28

Affidavit of Special Agent Andrew Cropcho - 40
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 1. Google's Services

105.   In my training and experience, I have learned that Google provides a variety of online services, including electronic mail ("email") access and instant messaging (otherwise known as "chat" messaging), to the general public.  Google provides subscribers email and chat accounts at the domain name "@gmail.com."  Google also allows subscribers to register a custom domain name and set up Google services such as chat and email using that domain name instead of "@gmail.com."

**A. Subscriber Records and Account Content**

106.   Subscribers obtain an account by registering with Google.  When doing so, email providers like Google ask the subscriber to provide certain personal identifying information.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users, and to help establish who has dominion and control over the account.

107.   Email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's websites), and other log files that reflect usage of the account.  In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

108.   In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing

Affidavit of Special Agent Andrew Cropcho - 41
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  inquiries, or complaints from other users. Email providers typically retain records about

2  such communications, including records of contacts between the user and the provider's

3  support services, as well records of any actions taken by the provider or user as a result of

4  the communications. In my training and experience, such information may constitute

5  evidence of the crimes under investigation because the information can be used to identify

6  the account's user or users.

7      109.   In general, an email that is sent to a Google subscriber is stored in the

8  subscriber's "mail box" on Google's servers until the subscriber deletes the email. When the

9  subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to

10  Google servers, and then transmitted to its end destination. Google often maintains a copy of

11  received and sent emails. Unless the sender specifically deletes an email from the Google

12  server, the email can remain on the system indefinitely. Even if the subscriber deletes the

13  email, it may continue to be available on Google's servers for some period of time.

14      110.   A sent or received email typically includes the content of the message, source

15  and destination addresses, the date and time at which the email was sent, and the size and

16  length of the email. If an email user writes a draft message but does not send it, that message

17  may also be saved by Google but may not include all of these categories of data.

18      111.   In addition to email and chat, Google offers subscribers numerous other

19  services including: Android, Blogger, Google Alerts, Google Calendar, Google Chrome

20  Sync, Google Cloud Print, G-Suite, Google Developers Console, Google Drive, Google

21  Hangouts, Google Maps, Google Payments, Google Photos, Google Search Console, Google

22  Voice, Google+, Google Profile, Location History, Web & Activity, Search, and YouTube,

23  among others. Thus, a subscriber to a Google account can also store files, including address

24  books, contact lists, calendar data, photographs and other files, on servers maintained and/or

25  owned by Google. For example, Google Calendar is a calendar service that users may utilize

26  to organize their schedule and share events with others. Google Drive may be used to store

27  data and documents, including spreadsheets, written documents (such as Word or Word

28  Perfect) and other documents. Google Photos can be used to create photo albums, store

Affidavit of Special Agent Andrew Cropcho - 42
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

photographs, and share photographs with others and "You Tube," allows users to view, store and share videos. Google Search Console records a Google account user's search queries. And Google Web & Activity records certain browsing history depending on whether the account holder is logged into their account. Google Keep is a note-taking service, offering a variety of tools for taking notes, including text, lists, images, and audio. Google Hangouts enables users to communicate with each other using instant messaging (including text, video, and voice), including through an application or within a Gmail browser window. Instant messages sent and received using these services are often saved within a user's account and accessible through Gmail. Google Voice offers a VOIP telephone number and records and transcribes voicemails. Groups for Business allow companies to create group discussions through emails, which are archived by Google. Like many internet service companies (including the companies discussed below), the services Google offers are constantly changing and evolving.

112. Based upon my training and experience, all of these types of information may be evidence of crimes under investigation. Stored communications, documents, and Google account activity not only may contain evidence of the crimes, but also help identify the participants in those crimes. For example, address books and contact lists may help identify both the owner of the account and locate co-conspirators. Similarly, photographs and videos stored in the account may help identify the account owner's true identity or document evidence of the crimes under investigation, including pictures of cryptocurrency mining equipment or screenshots of corporate websites. Documents (such as Google Docs used to store investor information or mining efforts), may identify the scope of the criminal activity, including containing important business documents, profits and loss statements, or communications with investors. And calendar data may reveal the timing and extent of criminal activity, including the timing of establishing corporate entities or the termination of bitcoin mining contracts. Search and browsing history may also constitute direct evidence of the crimes under investigation to the extent the browsing history or search history might

include searches and browsing history related to bitcoin mining, purchasing cryptocurrency, or identifying the victims.

113.    Google is also able to provide information that will assist law enforcement in identifying other accounts associated with the **SUBJECT ACCOUNTS**, namely, information identifying and relating to other accounts used by the same subscriber. This information includes any forwarding or fetching accounts[10]  relating to the **SUBJECT ACCOUNTS**, all other Google accounts linked to the **SUBJECT ACCOUNTS** because they were accessed from the same computer (referred to as "cookie overlap"), all other Google accounts that list the same SMS phone number  as the **SUBJECT ACCOUNTS**, all other Google accounts that list the same recovery email addresses[11]  as do the **SUBJECT ACCOUNTS**, and all other Google accounts that share the same creation IP address  as the **SUBJECT ACCOUNTS**.  Information associated with these associated accounts will assist law enforcement in determining who controls the **SUBJECT ACCOUNTS** and will also help to identify other email accounts relevant to the investigation.

**B. Google Location History and Location Reporting**

114.    According to Google's website, "Location Reporting" allows Google to periodically store and use a device's most recent location data in connection with the Google Account connected to the device. "Location History" allows Google to store a history of location data from all devices where a user is logged into their Google Account and have enabled Location Reporting.  According to Google "[w]hen you turn on Location Reporting for a device like your iPhone or iPad, it lets Google periodically store and use that device's most recent location data in connection with your Google Account."  How often Location Reporting updates location data is not fixed.  Frequency is determined by factors such as

---

[10] A forwarding or fetching account related to one of the **SUBJECT ACCOUNTS** would be a separate e-mail account that can be setup by the user to receive copies of all of the e-mail sent to the Target Account.

[11] The recovery e-mail address is an additional e-mail address supplied by the user that is used by Google to confirm your username after you create an e-mail account, help you if you are having trouble signing into your Google account or have forgotten your password, or alert you to any unusual activity involving user's Google e-mail address.

Affidavit of Special Agent Andrew Cropcho - 44
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  how much battery life the device has, if the device is moving, or how fast the device is
2  moving. Google's location services may use GPS, Wi-Fi hotspots, and cellular network
3  towers to determine an account holder's location.

4      115.   Based on the above, I know that if a user of the **SUBJECT ACCOUNTS**
5  utilizes a mobile device to access the respective account identified in Attachment A-1 and
6  has not disabled location services on his or her device/s or through the Google account
7  settings, Google may have detailed records of the locations at which the account holder(s)
8  utilized the mobile device(s). This type of evidence may further assist in identifying the
9  account holder(s), and lead to the discovery of other evidence of the crimes under
10 investigation. For example, in the present case, HASHFLARE and HASHCOINS own
11 several bank accounts held overseas. Location data could identify countries where additional
12 accounts were opened or accessed.

13     116.   I know that Google's Android service collects and stores identifying
14 information about an Android smart phone used to access the Google account, including the
15 International Mobile Equipment Identifier (IMEI), International Mobile Subscriber Identity
16 (IMSI), telephone number and mobile carrier code. In addition, Google may collect and
17 store certain data related to applications used on Android smart phones, and in certain
18 instances, Google may allow a user to backup settings, app data, communications, and other
19 data stored on an Android device. I know that Google's Location History service
20 periodically queries the physical location of a device that is currently accessing a Google
21 account through the device's GPS, nearby Wi-Fi network IDs and cellular tower information
22 and records a history of device movements in Google's servers. Because of the complicated
23 nature of the successive corporate structures, the overlapping employees at each entity, and
24 the existence of foreign bank accounts, I believe the founders of HASHCOINS,
25 HASHFLARE, the BURFA Entities, and POLYBIUS have made a concerted effort to
26 disguise their assets and corporate structures, I am requesting Google to provide information
27 from the Android service and Location History service from the **SUBJECT ACCOUNTS**.
28

Affidavit of Special Agent Andrew Cropcho - 45
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

117.    Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to require Google, and their agents and employees, to assist agents in the execution of this warrant.  Once issued, the search warrant will be presented to Google with direction that it identifies the accounts described in Attachment A to this affidavit, as well as other subscriber and log records associated with the accounts, as set forth in Section I of Attachment B to this affidavit.

118.    The search warrant will direct Google to create an exact copy of the specified account and records.

119.    I, and/or other law enforcement personnel will thereafter review the copy of the electronically stored data and identify from among that content those items that come within the items identified in Section II to Attachment B for seizure.

120.    Analyzing the data contained in the forensic copy may require special technical skills, equipment, and software.  It could also be very time-consuming.  Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process.  Keywords used originally need to be modified continuously, based on interim results.  Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common email, database and spreadsheet applications do not store data as searchable text.  The data may be saved, instead, in proprietary non-text format.  And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well.  Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachment B to the warrant.

Affidavit of Special Agent Andrew Cropcho - 46
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

121.    Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of e-mail communications, chat logs and documents, that identify any users of the subject account and e-mails sent or received in temporal proximity to incriminating e-mails that provide context to the incriminating communications.

Affidavit of Special Agent Andrew Cropcho - 47
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CONCLUSION**

122.   Based on the forgoing, I respectfully request that the Court issue the proposed search warrant.  Accordingly, by this Affidavit and Warrant I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

Andrew Cropcho, Affiant
Special Agent

The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit on the ⟋3⟍ day of April, 2020.

THE HONORABLE BRIAN A. TSUCHIDA
United States Magistrate Judge

Affidavit of Special Agent Andrew Cropcho - 48
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## ATTACHMENT A

2

### Google Accounts to be Searched

3        The electronically stored data, information and communications contained in,

4    related to, and associated with, including all preserved data associated with Google

5    accounts:

6                          ivan@hashcoins.com (**SUBJECT ACCOUNT 1**)

7                              ivan@burfa.com (**SUBJECT ACCOUNT 2**)

8                      ivan.turygin@polybius.io (**SUBJECT ACCOUNT 3**)

9                          turygin@gmail.com (**SUBJECT ACCOUNT 4**)

10                        sergei@hashcoins.com (**SUBJECT ACCOUNT 5**)

11                          sergei@burfa.com (**SUBJECT ACCOUNT 6**)

12                  sergei.potapenko@polybius.io (**SUBJECT ACCOUNT 7**)

13                  sergei.potapenko@gmail.com (**SUBJECT ACCOUNT 8**)

14                        nikolay@hashcoins.com (**SUBJECT ACCOUNT 9**)

15                  nikolay.pavlovskiy@burfa.com (**SUBJECT ACCOUNT 10**)

16                          pavel@hashcoins.com (**SUBJECT ACCOUNT 11**)

17                    pavel.tsihhotski@burfa.com (**SUBJECT ACCOUNT 12**)

18                  pavel.tsihhotski@polybius.io (**SUBJECT ACCOUNT 13**)

19                stanislav.pavlov@hashcoins.com (**SUBJECT ACCOUNT 14**)

20                  stanislav.pavlov@burfa.com (**SUBJECT ACCOUNT 15**)

21              vadim.tsvetikov@hashcoins.com (**SUBJECT ACCOUNT 16**)

22                  vadim.tsvetikov@burfa.com (**SUBJECT ACCOUNT 17**)

23                    vitali@hashcoins.com (**SUBJECT ACCOUNT 18**)

24                        vitali@burfa.com (**SUBJECT ACCOUNT 19**)

25                  vitali.pavlov@polybius.io (**SUBJECT ACCOUNT 20**)

26                  anton.altement@polybius.io (**SUBJECT ACCOUNT 21**)

27                  edger.bers@burfa.com (**SUBJECT ACCOUNT 22**)

28                  edgar.bers@polybius.io (**SUBJECT ACCOUNT 23**)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1                  tatjana@burfa.com (**SUBJECT ACCOUNT 24**)

2          margarita.burunova@hashcoins.com (**SUBJECT ACCOUNT 25**)

3           dalmeronprojects@gmail.com (**SUBJECT ACCOUNT 26**)

4         ecohousenetworks@gmail.com (**SUBJECT ACCOUNT 27**)

5             admin@hashcoins.com (**SUBJECT ACCOUNT 28**)

6                admin@burfa.com (**SUBJECT ACCOUNT 29**)

7              info@hashcoins.com (**SUBJECT ACCOUNT 30**)

8                 info@burfa.com (**SUBJECT ACCOUNT 31**)

9                info@polybius.io (**SUBJECT ACCOUNT 32**)

10          invoices@hashcoins.com (**SUBJECT ACCOUNT 33**)

11             invoices@burfa.com (**SUBJECT ACCOUNT 34**)

12            azure@hashcoins.com (**SUBJECT ACCOUNT 35**)

13         microsoft@hashcoins.com (**SUBJECT ACCOUNT 36**)

14               cb@hashcoins.com (**SUBJECT ACCOUNT 37**)

15           licenses@hashcoins.com (**SUBJECT ACCOUNT 38**)

16           alerts.mining@burfa.com (**SUBJECT ACCOUNT 39**)

17            support@polybius.io (**SUBJECT ACCOUNT 40**)

18

19 (the "Accounts") that are stored at a premises controlled by Google LLC, a company

20 that accepts service of legal process at 1600 Amphitheatre Parkway in Mountain

21 View, California.

22

23

24

25

26

27

28

1

**ATTACHMENT B**

2

**Particular Things to be Seized**

3 **I. Information to be disclosed by Google, LLC:**

4        To the extent that the information described in Attachment A is within the possession,

5 custody, or control of Google, LLC ("Google"), including any data, messages, records, files,

6 logs, or information that has been deleted but is still available to Google, or has been

7 preserved pursuant to a request made under Title 18, United States Code, Section 2703(f),

8 Google is required to disclose the following information to the government for each Account

9 or identifier listed in Attachment A, from Account inception to the present:

10        a.        The contents of all emails associated with the account from April 2015

11 to the present, including stored or preserved copies of emails sent to and from the account,

12 draft emails, the source and destination addresses associated with each email, the date and

13 time at which each email was sent, and the size and length of each email;

14        b.        All records or other information regarding the identification of the

15 account, to include full name, physical address, telephone numbers and other identifiers,

16 records of session times and durations, the date on which the account was created, the length

17 of service, the IP address used to register the account, log-in IP addresses associated with

18 session times and dates, account status, alternative email addresses provided during

19 registration, methods of connecting, log files, and means and source of payment (including

20 any credit or bank account number);

21        c.        all contact lists;

22        d.        all Google Calendar content;

23        e.        all Google Drive content (including backups of any apps stored on

24 Google Drive);

25        f.        all Google Docs content;

26        g.        all Google Maps content;

27        h.        all Google Photos content;

28        i.        all Google Keep content;

1      j.      all Google Search Console content;

2      k.      all Google Web & Activity content;

3      l.      all Google Chrome Sync content;

4      m.      all Google Location History content;

5      n.      all Google Voice content;

6      o.      all Android content, including, but not limited to active content and

7 backups;

8      p.      all Android Device console content;

9      q.      all Android Market content;

10      r.      all Google Hangouts content;

11      s.      all Groups for Business content;

12      t.      all Google Profile content, including all Google+ content;

13      u.      all account history, including any records of communications between

14 Google and any other person about issues relating to the accounts, such as technical

15 problems, billing inquiries, or complaints from other users about the specified account.  This

16 to include records of contacts between the subscriber and the provider's support services, as

17 well as records of any actions taken by the provider or subscriber in connection with the

18 service.

19      Google is hereby ordered to disclose the above information to the government within

20 **14 days** of service of this warrant.

21

22 **II.    Information to be seized by the government**

23      All information described above in Section I that constitutes fruits, contraband,

24 evidence, and instrumentalities of violations of Title 18, United States Code, Section 1343

25 (Wire Fraud), and occurring after April 2015, for each of the Accounts listed on Attachment

26 A, pertaining to the following matters:

27      a.      Items, records, or information related to the operation of a

28 cryptocurrency cloud mining Ponzi scheme;

Attachment B -- Page 2
USAO#

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          b.     Items, records, or information related to cryptocurrency mining, the
2  advertisement, manufacture and sale of mining equipment, or the advertisement and sale of
3  cloud mining contracts;

4          c.     Items, records, or information related to the termination of mining
5  contracts and the profitability of cloud mining;

6          d.     Items, records, or information related to purchases of cloud mining
7  equipment, including communications with the companies Bitmain, Bitfury, and Inno3d;

8          e.     Items, records, or information related to the transfer, purchase, sale, or
9  disposition of cryptocurrency;

10         f.     Items, records, or information related to communications with
11  HASHFLARE or HASHCOINS investors, including complaints by investors or requests for
12  return of funds;

13         g.     Items, records, or information related to the advertisement of
14  HASHFLARE or HASHCOINS' services;

15         h.     Items, records, or information related to the owners, operators,
16  employees, locations, assets, and business purpose of the companies HASHCOINS OU,
17  HASHCOINS TRADE OU, HASHCOINS LP, HASHFLARE LP, Burfa Capital OU, Burfa
18  Media OU, Burfa Real Estate OU, Burfa Tech OU, Burfa Trade OU, Burfa Invest OU,
19  Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, Polybius Fintech
20  MidCo OU, Dalmeron Projects LP, and Ecohouse Networks LP (collectively, the
21  "SUBJECT ENTITIES");

22         i.     Items, records, or information related to the use, creation, or operation
23  of the "SUBJECT ENTITIES," including business plans and strategies, and the anticipated
24  success, failure, or general validity thereof;

25         j.     Items, records, or information related to the operation of hashflare.io,
26  burfa.com, polybius.io, or hashcoins.com;

27         k.     Items, records, or information concerning financial transactions
28  associated with the operation of the SUBJECT ENTITIES, including bank accounts held by

Attachment B -- Page 3
USAO#

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

the SUBJECT ENTITIES, transfers of funds by the SUBJECT ENTITIES, expenditures of money or wealth, bank statements and other financial statements, and cryptocurrency holdings;

l.      Items, records, or information related to cryptocurrency mining groups, cryptocurrency public keys or addresses, cryptocurrency private keys, representations of cryptocurrency wallets or their constitutive parts, to include "recovery seeds" and "root keys," which may be used to regenerate a wallet.

m.      Items, records, or information related to the salaries or earnings of individuals employed by the SUBJECT ENTITIES.

n.      Items, records, or information related to the payment or calculation of recruitment bonuses paid to HASHFLARE and HASHCOINS investors.

o.      Items, records, or information related to receipt of investor money, including the amount, purpose of the investment, and plans for spending that money.

p.      Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner.

q.      Evidence indicating the email account owner's state of mind as it relates to the crime under investigation.

r.      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Attachment B -- Page 4
USAO#

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## APPENDIX 2

**Affidavit in Support of Search Warrant MJ21-149**

Appendix 2 -- Page 1
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**AFFIDAVIT**

STATE OF WASHINGTON     )
                              )     ss
COUNTY OF KING           )

I, Andrew Cropcho, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May of 2018. I am currently assigned to the Seattle Field Office. My primary duties include investigating violations of Federal law, including corporate fraud, securities fraud, government program fraud, and healthcare fraud. Part of those duties include investigating instances of wire fraud being used for financial gain at the expense of others. Before my career as an FBI Special Agent I was employed as a Certified Public Accountant for over three years and, as part of my employment, I examined financial information of clients to determine their accuracy, reliability, and sources.

2.     The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement personnel; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein including, but not limited to, the victims in this investigation; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

**PURPOSE OF AFFIDAVIT**

3.     I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Apple, Inc. ("Apple"), located at One Apple Park Way, Cupertino, California 95014. The

Affidavit of Special Agent Andrew Cropcho - 1
USAO#2019R01037

information to be searched is described in the following paragraphs and in Attachment A, which is incorporated herein.

4.     This affidavit is made in support of an application for a search warrant pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information, including the content of communications, further described in Section I of Attachment B, pertaining to the following accounts:

a.     Sergei.potapenko@gmail.com (DSID 624556209) ("**SUBJECT ACCOUNT 1**") (believed to be used by SERGEI POTAPENKO); and

b.     Turygin@gmail.com (DSID 1931852295) ("**SUBJECT ACCOUNT 2**") (believed to be used by IVAN TURYGIN);

(hereinafter, collectively the "**SUBJECT ACCOUNTS**").  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.  This warrant is requested in connection with an ongoing investigation in this district by the FBI.

5.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1343 (Wire Fraud) have been committed by IVAN TURYGIN and SERGEI POTAPENKO, individually, and by and through the use of their companies HASHCOINS OU (hereinafter "HASHCOINS"), HASHCOINS TRADE OU, HASHCOINS LP, HASHFLARE LP (hereinafter "HASHFLARE"), Burfa Capital OU, Burfa Media OU, Burfa Real Estate OU, Burfa Tech OU, Burfa Trade OU, Burfa Invest OU (collectively, the "BURFA Entities"), Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, Polybius Fintech MidCo OU (collectively, "POLYBIUS"), and Dalmeron Projects LP, along with identified key employees of the same companies.  There is also probable cause to search the information described in Attachment A, for evidence, instrumentalities, or contraband of these crimes, as described in Attachment B.

Affidavit of Special Agent Andrew Cropcho - 2
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**JURISDICTION**

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

8.     This warrant application is to be presented electronically pursuant to Local Criminal Rule CrR 41(d)(3).

**BACKGROUND ON VIRTUAL CURRENCY AND MINING**

9.     Virtual currency (also known as cryptocurrency) is an asset that can be exchanged directly person to person, through a virtual currency exchange, or through other intermediaries.  It can be used to buy goods and services, exchanged for "fiat currency" (currency established by government regulation or law) or other virtual currency, or held as an investment, among other applications.

10.     Virtual currency is generally not issued by any government or bank.  Rather, it is frequently generated and controlled through software operating on a decentralized, peer-to-peer ("P2P") network of computers across the world (some types of virtual currency, however, are generated and controlled through software operating on a centralized network of computers across the world).

11.     There are thousands of virtual currencies in use, including Bitcoin, Ethereum, Bitcoin Cash, and Monero.  Bitcoin,[1] the most popular form of virtual currency, can be generated through mining.  According to Bitcoin.org, "Bitcoin mining is the process of making computer hardware do mathematical calculations for the Bitcoin network to confirm

_____

[1] Since Bitcoin is both a virtual currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the virtual currency. That practice is adopted here.

Affidavit of Special Agent Andrew Cropcho - 3
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  transactions and increase security.  As a reward for their services, Bitcoin miners can collect
2  transaction fees for the transactions they confirm, along with newly created bitcoins."

3      12.    Bitcoin mining can be conducted locally on a user's computer or other
4  computer hardware, or can be conducted on another's system via the cloud.  According to
5  the Santa Clara Law School High Technology Journal: "Cloud mining is an economic
6  arrangement whereby a person pays another person or entity to engage in cryptocurrency
7  mining on their behalf and receives the transaction fees, cryptocurrency or a portion thereof
8  that is generated from such mining efforts."

9      13.    One measure for determining the effectiveness or processing power of a
10  mining operation is to calculate the operation's hash rate.  According to Bitcoin.org: "The
11  hash rate is the measuring unit of the processing power of the Bitcoin network. The Bitcoin
12  network must make intensive mathematical operations for security purposes.  When the
13  network reached a hash rate of 10 Th/s, it meant it could make 10 trillion calculations per
14  second."

15      14.    Bitcoin utilizes "public key cryptography," a mathematical algorithm that
16  generates a pair of unique, corresponding keys:  the "public key" and the "private key."
17  These components form the "public address," which is used to send and receive bitcoins and
18  can be shared.  A public address is akin to a bank account number, and a private key is akin
19  to a Personal Identification Number ("PIN") or password.  Only the holder of a public
20  address's private key can authorize transfers of virtual currency from that public address to
21  another public address.

22      15.    Many virtual currencies operate via a "blockchain," a record (or ledger) of
23  every transaction ever conducted that is distributed throughout the computer network (as
24  opposed to being maintained by any single administrator or entity).  As to bitcoins, although
25  the public addresses of those engaging in virtual currency transactions are recorded on a
26  blockchain, the identities of the individuals or entities behind the public addresses are not
27  recorded on these public ledgers.  If, however, an individual or entity is linked to a public
28  address, it may be possible to determine what transactions were conducted by that individual

Affidavit of Special Agent Andrew Cropcho - 4
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous,"
2 | meaning that they are partially anonymous.

3 |      16.    Virtual currency users typically employ a "wallet," a tool that can be used to
4 | manage public and private keys, interface with a blockchain, and to send or receive virtual
5 | currency.  Wallets vary widely in terms of their format and technological sophistication.
6 | One variety, known as "hosted" (or "custodial") wallets, are virtual currency wallets
7 | controlled by a third-party—often, a company with a cloud-based, encrypted wallet platform
8 | that may be hosted on the company's servers.  Users of hosted wallets may be able to access
9 | the company's platform through various digital devices, much like a traditional online
10 | banking experience.  Hosted wallet providers include virtual currency exchanges, which
11 | allow their customers, for a fee, to exchange virtual currency for other virtual currencies
12 | and/or fiat currencies.

13 |      17.    A more detailed description of virtual currencies, blockchains, and law
14 | enforcement techniques for investigating virtual currency transactions, is included below.

15 | **STATEMENT OF PROBABLE CAUSE**

16 | **A.  Summary of Investigation**

17 |      18.    The FBI is investigating whether two Estonian residents, IVAN TURYGIN[2]
18 | and SERGEI POTAPENKO, illegally operated a Ponzi scheme, in violation of 18 U.S.C. §
19 | 1343, by fraudulently inducing individuals to invest in cryptocurrency mining.

20 |      19.    Individuals can earn cryptocurrency by engaging in mining, which involves
21 | using computing power to solve a complicated algorithm to verify and record payments on
22 | the blockchain.  Individuals are rewarded for this task by receiving newly created units of a
23 | cryptocurrency.  Cryptocurrency mining typically involves the use of high-powered
24 | computers and the expenditure of large amounts of electricity.

25 |      20.    HASHFLARE LP ("HASHFLARE"), incorporated in the UK and based in
26 | Estonia, claimed that it was engaged in cloud mining, using a cloud-based platform to mine
27 |
28 |

---

[2] IVAN TURYGIN's name is also spelled Ivan Turögin.

Affidavit of Special Agent Andrew Cropcho - 5
USAO#2019R01037

Bitcoin and alternative cryptocurrency coins.  HASHCOINS OU ("HASHCOINS"), incorporated and based in Estonia, assisted HASHFLARE in this endeavor, providing technical support, development and marketing of HASHFLARE and its subdomains.  In exchange for a monetary investment, individuals were told that they would receive a portion of the mining proceeds.

21.     In July 2018, HASHFLARE stopped paying investors annual returns, claiming that cryptocurrency mining was no longer profitable.  According to its terms of service, HASHFLARE informed investors that it would stop cryptocurrency mining "if the Maintenance and Electricity Fees [are] larger than the Payout."  Specifically, according to HASHFLARE's terms, "If mining remains unprofitable for 21 consecutive days the Service is permanently terminated . . . [and] Payouts and Fees will also be temporarily stopped."

22.     Investors contend that, at the time HASHFLARE terminated its services, cryptocurrency mining was, in fact, profitable.  After mining was terminated, investors, including those located in the United States, began identifying red flags which led them to believe that HASHFLARE was a Ponzi scheme that was not engaged in cryptocurrency mining.

23.     In June 2019, Estonia's Cyber Crime Bureau notified the FBI that it was investigating whether IVAN TURYGIN and SERGEI POTAPENKO were operating a Ponzi scheme.  As of June 20, 2019, the Estonian authorities identified approximately $120 million[3] in losses sustained by HASHFLARE investors.

**B.  HASHFLARE & HASHCOINS**

**a.  Incorporation and Ownership**

24.     HASHFLARE and HASHCOINS were incorporated in Estonia and the United Kingdom on the dates listed in the below chart.

---

[3] In this Affidavit, all references to $ refer to US Dollars.

Affidavit of Special Agent Andrew Cropcho - 6
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners | Current Name | Prior Names |
|------|----------------|---------|------------|-------------------------------|--------------|-------------|
| 6/13/13 | HASHCOINS OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | Burfa Tech OU | N/A |
| 11/26/14 | HASHCOINS TRADE OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | Burfa Trade OU | N/A |
| 12/14/15 | HASHFLARE LP | UK | Limited Partnership | Malter Capital LTD & MS-Proxy Services LTD | HASHFLARE LP | Fast Consult Trade LP & HASHCOINS LP |

25.     HASHFLARE maintained the website hashflare.io, while HASHCOINS maintained the website www.hashcoins.com. According to HASHCOINS' and HASHFLARE's websites, POTAPENKO was identified as a co-founder and CEO of the entities. According to public reporting, TURYGIN was a co-founder and Business Development Chairman of HASHCOINS. TURYGIN was also identified as a co-founder of HASHFLARE.

**b.  Business Operations**

26.     Beginning on or before April 18, 2015, HASHFLARE offered cloud mining services on its website. According to its website, HASHFLARE advertised the following: "Our service makes cryptocurrency mining available to every user. You no longer need to buy expensive equipment and spend your time setting up miners. Just select your desired capacity and earn income!" On another portion of its website, HASHFLARE advertised that "Cloud mining offers a unique option for mining with a low cost of entry as well as minimal risk and expense, which is opposite to traditional models of mining that involve procurement, maintenance and configuration of highly specialized software."

27.     HASHFLARE advertised that it conducted this mining in collaboration with HASHCOINS. On its website, HASHFLARE explained that it offered "a new range of cloudmining services brought to you by the HASHCOINS team of cryptomining experts." In turn, on its website, HASHCOINS claimed that it was "an Estonian based cryptocurrency

Affidavit of Special Agent Andrew Cropcho - 7
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  mining hardware manufacturer and cloud hosted mining service provider."  HASHCOINS

2  advertised that its users could purchase cloud mining contracts from HASHFLARE, claiming

3  that HASHFLARE users could mine cryptocurrency using HASHCOINS' datacenters.  In its

4  terms of service, HASHFLARE stated that "HASHCOINS OU provides technical support,

5  development and marketing of HASHFLARE and its subdomains."

6         28.     HASHFLARE sold cloud mining contracts, allowing users to mine

7  cryptocurrency through HASHFLARE in exchange for a return.  On its website,

8  HASHFLARE explained that a user could "purchas[e] part of the mining power of hardware

9  hosted and owned by a Cloud Mining services provider," which "configur[es] the hardware,

10  maintain[s] uptime and select[s] the most efficient and reliable [mining] pools."  For

11  example, on April 18, 2015, for $9.95, a user could buy one million hashrate ("one million

12  hash per second" or "1 MH/s") from HASHFLARE.  For this rate, HASHFLARE advertised

13  a "100% Scrypt Miner," automatic accruals in Bitcoin, and a daily maintenance fee of $0.01

14  per 1/MH/s.

15         29.     HASHFLARE's website advertised a tool that could be used to calculate the

16  approximate amount of profit a user would get depending on the amount of hashrate the user

17  purchased.  The user would then have the option to automatically reinvest that profit or

18  withdraw the profit if their balance was above a certain minimum threshold, which fluctuated

19  between 0.5 bitcoin to 0.01 bitcoin throughout the existence and operation of HASHFLARE.

20         30.     In addition to earning funds through cloud mining, HASHFLARE users also

21  earned funds by recruiting others to purchase HASHFLARE contracts.  HASHFLARE

22  advertised a referral program, informing users that "as a referrer, you are eligible to receive

23  10% referral commission bonus for every purchase made by any of your referrals, excluding

24  reinvest and balance purchases."  As a result, HASHFLARE users could make money each

25  time one of their referred friends, family members or acquaintances purchased cloud mining

26  contracts.

27         31.     A number of individuals, including those operating in the Western District of

28  Washington purchased mining contracts from HASHFLARE.  According to financial records

Affidavit of Special Agent Andrew Cropcho - 8
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  obtained from Fedwire, a funds transfer system operated by the United States Federal
2  Reserve Banks, at least $2.5 million was transferred to accounts held by HASHCOINS for
3  what appear to be investments in HASHFLARE (examples of descriptions accompanying the
4  transfer of money were: "HASHFLARE.io Invoice…"; "Investments…"; and "…payment
5  for mining services").

6      32.     According to bank records obtained from Latvia, approximately $11 million
7  was transferred into an account held by HASHFLARE at Latvijas Pasta Banka.  These
8  transfers were made in the names of various individuals, and often referenced the terms
9  "Invoice" and "Hashrate."  As a result, I believe that these payments were also made to
10 purchase cloud mining contracts from HASHFLARE.  For example, on January 31, 2017,
11 F.R.E. transferred $1,708 to HASHFLARE's account, referencing "Invoice 593395
12 Hashflare.io SHA-256 HASHRATE 15."  Similarly, on March 6, 2017, A.K. transferred
13 $5,792.72 to HASHFLARE's account, referencing "Invoice .673156 (60TH/S SHA-256
14 hashrate).

15     33.     Additionally, according to information obtained from a group of approximately
16 800 investors, a representative of which contacted law enforcement, between initial
17 investments and re-investments of stated profits, they invested a total of $7.5 million.  It was
18 not readily apparent how much of the $7.5 million was contained within the amounts
19 previously mentioned above.

20     34.     A search of email accounts affiliated with HASHFLARE and HASHCOINS
21 revealed a bank statement, with a date range from January 1, 2017 through September 21,
22 2018, showing approximately $120 million of deposits into a bank account with the account
23 owner name of "Hashflare LP".  The description of most of the deposits was: "Payment from
24 VISA/Mastercard, card processing dd…."  A substantial amount of the deposits stopped in or
25 around June of 2018.  Based on the same email account review, I know the statements
26 related to a main bank account that received deposits from users of the mining services.

27
28

Affidavit of Special Agent Andrew Cropcho - 9
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**c. Collapse of Mining Operations**

35.     In or around August of 2017, HASHFLARE made a number of changes to its operations.  For example, HASHFLARE changed its terms of service that shortened the length of all Bitcoin mining contracts from "lifetime" contracts to "one year" contracts. Functionally speaking, under lifetime contracts purchased hashrates did not expire, whereas under the new term the purchased hashrates expired after one year, requiring users to buy additional contracts.

36.     In or around July 2018, HASHFLARE also required all users to submit "Know Your Customer" identification before they could continue using services offered on the platform.  In effect, these additional procedures reduced the ability of users to withdraw funds earned through mining.  On online forums, users complained that, even after they submitted the necessary documentation, HASHFLARE was taking weeks or months to verify their identities and pay balances.  Other users complained that they never received their requested balances.

37.     Finally, on July 20, 2018, HASHFLARE announced that Bitcoin mining had been unprofitable for 28 days as of July 18, 2018 and, per clause 5.5 of its Terms of Service, all Bitcoin mining SHA-256 contracts were suspended.  According to its terms of service, HASHFLARE informed investors that it would stop cryptocurrency mining "if the Maintenance and Electricity Fees [are] larger than the Payout."  Specifically, according to HASHFLARE's terms, "If mining remains unprofitable for 21 consecutive days the Service is permanently terminated . . . [and] Payouts and Fees will also be temporarily stopped."

38.     One week later, on July 27, 2018, HASHFLARE informed the public that SHA-256 would resume on July 28, 2018.  However, a review of archived copies of the HASHFLARE website showed SHA-256 mining contract remained "Out of Stock" over a year later.

39.     Furthermore, interviews of three HASHFLARE investors, F.M., B.J., and F.W., revealed that it was not possible to make any withdrawals once the Bitcoin mining contracts were suspended, which held true through the dates of the interviews that took place

Affidavit of Special Agent Andrew Cropcho - 10
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | in or around September of 2019.  Since then, there has been no indication from known

2 | victims that any of the money invested was recoverable from HASHFLARE.

3 |     40.    Since HASHFLARE suspended its contracts, investors, including those located

4 | in the United States, began identifying red flags which led them to believe that

5 | HASHFLARE was a Ponzi scheme that was not engaged in cryptocurrency mining.  Instead,

6 | they believed that HASHFLARE was profiting on fluctuations in cryptocurrency exchange

7 | rates, using those gains and new investment proceeds to repay earlier investors.  For

8 | example, investors visited HASHFLARE's business address in Estonia, which did not appear

9 | to house a server farm or computing equipment consistent with cryptocurrency mining.

10 | Additionally, according to these investors, the rates charged by HASHFLARE for

11 | maintenance and electricity were above market average, and pools that were used to mine

12 | did not produce the expected output.

13 |     41.    Diar, which publishes a digital assets and regulations newsletter, reported that

14 | while bitcoin mining was profitable for the first six months of 2018, with 2018 revenues

15 | exceeding 2017 revenues by $1.4 billion, as of the end of August and the beginning of

16 | September, bitcoin mining was becoming unprofitable.[4]  According to Diar, increases in

17 | electricity costs and mining difficulty (increased hashrate) have led to this unprofitability.

18 | For example, a chart compiled by Dial is referenced below:

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 | [4] Diar, *Bitcoin Miner Revenues Near $5 Billion but Profitability Dwindles*, Volume 2, Issue 40, (Oct. 8, 2018), *available at* https://diar.co/volume-2-issue-40/.

Affidavit of Special Agent Andrew Cropcho - 11
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



**2018: Miners Paying Retail Electricity Prices Now Unprofitable...**

Notes: Profit Estimates Using S9 Miners & $0.1/kWh, No Pool Fees or Hardware
Costs. **The chart is illustrates profits if all miners paid retail electricity prices.**

17    42.     While Diar projected that mining did not become unprofitable until late August
18  and early September 2018, HASHFLARE contended that its mining operations became
19  unprofitable in late June 2018.  However, HASHFLARE's operations may be more costly
20  than those profiled by Diar, which did not take pool fees or hardware costs into account.
21  HASHFLARE's terms of service provide that users must pay the following maintenance
22  fees: "hardware setup, data center rent, Mining Pool testing, staff salaries, future planning
23  and proofing, software development, exchange of used and out of order parts and
24  other expenditures required to render the service on a best-effort basis."

25    43.     Estonian authorities analyzed 22,935 transfer chains related to HASHFLARE
26  payout wallets to determine if payouts to investors were coming from mining pools, which
27  would be the expected source of payouts.  Based on their analysis, most of the payouts came
28  from the wallets where Bitcoin deposits were received, and only 0.8% of payouts came from

Affidavit of Special Agent Andrew Cropcho - 12
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  mining pools. As a result, it appears that HASHFLARE may not have been engaged in
2  substantial cryptocurrency mining, as previously advertised.

3  **d.  HASHFLARE's and HASHCOINS' Cloud Mining Capabilities**

4  44.  The FBI has been investigating whether HASHFLARE and HASHCOINS
5  possessed sufficient mining equipment to service the contracts that had been purchased. On
6  its website, HASHFLARE claims that, when the company began in 2015, it conducted cloud
7  mining using equipment obtained from HASHCOINS. As referenced above, investors
8  questioned whether HASHCOINS had the capability to mine cryptocurrency, since they did
9  not appear to have a large server location (or at least none was found).

10  45.  Additionally, in 2014, HASHCOINS initially sold mining equipment, to be
11  operated by the purchasing user. However, during that time frame, HASHCOINS claimed
12  that it experienced supply disruptions, frustrating its ability to supply Bitcoin mining
13  equipment. As a result, HASHCOINS offered its customers the opportunity to invest in
14  HASHFLARE's cloud mining services, instead. Investors questioned whether this transition
15  was intentional, to ensure that additional investors sent funds to HASHFLARE, and whether
16  HASHCOINS had the ability to produce cloud mining equipment.

17  46.  Law enforcement has reviewed various financial records, along with email
18  records, to determine what cloud mining resources were purchased by HASHFLARE. Based
19  on these records, it appears that, at various times, HASHCOINS or HASHFLARE contracted
20  with Keleta UAB, Bitmain, Bitfury, and Inno3d vendors to provide cloud mining services.
21  These services at described below and depicted in the following visual chart.

22
23
24
25
26
27
28

Affidavit of Special Agent Andrew Cropcho - 13
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | April 2015: HASHFLARE Began Advertising Cloud Mining | | September 2017: HASHCOINS rented Bitmain Miners from Jeltan | | October 2017- September 2018: Inno3d Servers Purchased |
| --- | --- | --- | --- | --- | --- |
| | November 2015: HASHCOINS Contracted with Keleta | | October & November 2017: Bitfury Servers Delivered | | July 2018: HASHFLARE Suspended Bitcoin Mining |

47.     In 2015, it appears that HASHCOINS entered into a Mining Hardware Rent Agreement with a Lithuanian company named Keleta UAB. Specifically, on October 31, 2015, HASHCOINS entered into a contract with Keleta UAB for the purpose of renting SHA-256 Protocol cryptocurrency mining hardware. Pursuant to the terms of this contract, over the course of one year, HASHCOINS obtained € 600,000 worth of hashrate. The service was set to start on November 1, 2015. A further search of the email accounts provided a HASHCOINS bank statement, with a date range of January 1, 2015 through February 24, 2017, showing that HASHCOINS transferred $575,000 to Keleta UAB. Attached to certain email were six invoices, issued from Keleta UAB to HASHCOINS, which totaled € 575,000.

48.     Of note, there is no publicly available information regarding Keleta UAB that confirms that this company actually provides mining hardware. According to public databases, the address listed on the cryptocurrency mining contract for Keleta UAB also serves as the registered address for numerous other Lithuanian companies. Based on my training and experience, and information gained during the course of this investigation, I know that incorporation companies often register multiple companies, including shell companies, using the same business address.

49.     In 2017, HASHFLARE and HASHCOINS entered into contracts with Bitmain, Bitfury, and Inno3d cloud mining vendors. This is consistent with HASHFLARE's website, where beginning on or before June 4, 2018, HASHFLARE advertised, albeit in broken

Affidavit of Special Agent Andrew Cropcho - 14
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  English, that it uses "equipment for mining" obtained from "Bitmain, Bitfury, Inno3d, and

2  others." Bitmain, Bitfury, and Inno3d each manufacture cryptocurrency mining equipment.

3  Because of the broken English, it is difficult to determine when HASHFLARE started using

4  mining equipment supplied by these companies, but it appears that HASHFLARE advertised

5  that it acquired this equipment in 2016.[5]

6      50.    While law enforcement has not identified evidence that HASHFLARE

7  purchased mining equipment from Bitmain, Bitfury, or Inno3d in 2016, it has located

8  evidence that a limited amount of funds was transferred to these vendors in 2017, during the

9  final months of HASHCOINS' and HASHFLARE's operations.

10     51.    First, according to an email sent to TURYGIN, on September 1, 2017,

11 HASHCOINS entered into a contract with a UK company named Jeltan Trading LP for the

12 purpose of renting Bitmain Antminer L3+ hardware. Pursuant to the terms of this contract,

13 HASHCOINS purchased $1,000,000 worth of hashrate over the course of a year. According

14 to bank records HASHCOINS transferred € 918,000 to Jeltan Trading LP between

15 September 19, 2017, and November 13, 2017.

16     52.    Of note, there is no publicly available information regarding Jeltan Trading LP

17 that confirms that this company actually owns or rents mining hardware. According to

18 public databases, the address listed on the cryptocurrency mining contract for Jeltan Trading

19 LP also serves as the registered address for numerous other UK companies. Based on my

20 training and experience, and information gained during the course of this investigation, I

21 know that incorporation companies often register multiple companies, including shell

22 companies, using the same business address.

23     53.    Second, according to information obtained from Bitfury, on August 3, 2017,

24 Bitfury entered into an agreement to sell HASHCOINS ten "Bitfury B8 server[s] with

25 proprietary BitFury hardware (16 nm) capable of producing up to 43 TH/s (±5%) of SHA

26

27 [5] The language states: "HashFlare is a cloud mining service created by the specialists from HashCoins in 2015. In a short
   time, HashFlare became one of the largest providers of computational power for mining bitcoin, litecoin, ethereum and
28 other cryptocurrencies. From 2016, HashFlare is an independent company. The variety of equipment that is used for
   mining was significantly increased on the account such companies as Bitmain, Bitfury, Inno3d and others."

Affidavit of Special Agent Andrew Cropcho - 15
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   256 hashing power ('Hashing Power') and consuming 6.4 KW (±5%) of electricity" for

2   $52,000.  Additionally, on September 25, 2017, Bitfury entered into a contract to sell

3   HASHCOINS 462 "Bitfury Europe configured B8 server[s] with proprietary Bitfury

4   hardware (16 nm) capable of producing up to 43 TH/s (±5%) of SHA 256 hashing power

5   ('Hashing Power') and consuming 6.4 KW (±5%) of electricity."  In exchange for these

6   servers, HASHCOINS paid Bitfury $984,984.[6]  Records from Bitfury show that shipments

7   of these servers were made on October 16, 2017 and November 21, 2017.  A review of

8   emails between HASHCOINS and a representative of the Borealis Data Center (the final

9   destination of the equipment), showed that the equipment was still in transit as of December

10   4, 2017.

11       54.    Furthermore, on October 12, 2017, TURYGIN and a HASHCOINS

12   representative exchanged emails with a Bitfury representative, discussing a "4M order next

13   week right after 1M."  The HASHCOINS representative explained that "the 4M order is . . .

14   not yet confirmed."  Based on the context of this email, I believe 4M to refer to 4 Megawatts.

15   I have seen no evidence suggesting that such a large purchase was completed, which would

16   likely amount to nearly $4 million (the first round of purchases from BitFury resulted in 1

17   Megawatt of equipment being purchased for approximately $1 million).  Rather, according to

18   banking records obtained to date,[7] HASHCOINS first transferred funds to Bitfury on August

19   14, 2017, with another transfer of funds occurring on October 4, 2017.  These funds transfers

20   were consistent with the amounts identified in the above-mentioned contracts.

21       55.    Thirdly, bank statements for both HASHCOINS and Burfa Media show that,

22   between October of 2017 and September of 2018, approximately $13 million was transferred

23   to ASK Technology, which sells Inno3d-branded products.  A search of email accounts

24   belonging to Burfa Media personnel contained a summary of 23 invoices due to ASK

25   Technology Group Limited, which totaled approximately € 16 million.  Based on the

26

27   [6] Bitfury also entered into subsequent agreements, in 2018, to sell equipment to HASHCOINS' successor, BURFA MEDIA OU.

28   [7] The FBI is continuing to gather financial information related to this case and has, so far, obtained records from Latvia, Estonia, and the United States relating to HASHFLARE and HASHCOINS, among other entities.

Affidavit of Special Agent Andrew Cropcho - 16
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    discrepancy between payments made to ASK Technology and the invoice totals that were

2    compiled by Burfa Media, the amount of product purchased from ASK Technology was

3    unclear.

4         56.    In addition to Bitfury, Bitmain, and Inno3d, law enforcement has identified

5    evidence suggesting that payments were made to other cryptocurrency mining providers.

6         57.    For example, in January 2018, HASHCOINS transferred € 79,415.87 to BDC

7    Mining EHF.  According to publicly available information, BDC Mining EHF is based in

8    Iceland.

9         58.    Additionally, HASHFLARE transferred funds to Dalmeron Projects for "SHA-

10   256" and "According to a Computational Power Rent Agreement from 16.02.2018."

11   According to documents located in email accounts used by HASHFLARE and HASHCOINS

12   personnel, Anatoli Sheipak serves as the "ultimate beneficial owner" of Dalmeron Projects.

13   However, for the following reasons, it appears that the owners of HASHFLARE and

14   HASHCOINS are the true beneficial owners of Dalmeron Projects.  First, on August 1, 2017,

15   TURYGIN emailed an incorporation company, requesting that a related company, Dalmeron

16   Invest, be incorporated, listing Anatoli Sheipak as the director and owner of the entity.

17   Additionally, on a document dated August 31, 2017 and entitled "MINING HARDWARE

18   RENT AGREEMENT – AMENDMENT 1," between HASHCOINS and Dalmeron Projects,

19   LP, the signatory for Dalmeron Projects was TURYGIN.  Also, on October 26, 2017,

20   GoDaddy sent POTAPENKO an email recommending that he renew the domain registration

21   for dalmeron.com.  Anatoli Sheipak was also listed as the sole subscriber for

22   HASHFLARE's Microsoft account, suggesting that he is affiliated with HASHFLARE.

23   And, finally, TURYGIN's email account, turygin@gmail.com, is linked by cookies to

24   dalmeronprojects@gmail.com.  Accordingly, based on my training and experience, and

25   information gained during the course of this investigation, I believe that Dalmeron Projects is

26   a subsidiary or is otherwise associated with HASHFLARE and HASHCOINS, rather than an

27   independent company providing cloud mining services.

28

Affidavit of Special Agent Andrew Cropcho - 17
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

59.     Similar to Dalmeron Projects, HASHCOINS transferred funds to another company named Ecohouse Networks LP, for "Computation power rent SHA-256(GH/s)", according to invoices dated as early as January of 2016, which were located in email accounts used by HASHFLARE and HASHCOINS personnel.  However, on January 18, 2017, a bank application was sent via email by the representative of a payment processing company to TURYGIN, asking TURYGIN to see if the attached application was accurate. The bank application named Ecohouse Networks LP as the customer and named TURYGIN as the payment card user and sole beneficial owner.  Additionally, a "HARDWARE LEASE CONTRACT" contract dated July 15, 2015, named HASHCOINS as the Tenant, represented by POTAPENKO, and Ecohouse Networks LP as the Lessor, represented by TURYGIN; the contract was not executed by either party.  Accordingly, based on my training and experience, and information gained during the course of this investigation, I believe that Ecohouse Networks LP is a subsidiary or is otherwise associated with HASHFLARE and HASHCOINS, rather than an independent company providing cloud mining services.

60.     As described above, HASHCOINS and HASHFLARE began purchasing or renting cryptocurrency mining equipment from third parties in November 2015, with the bulk of their purchases occurring in the final months of their operations (September 2017 through June 2018).  Based on financial records analyzed to date, users appeared to have begun transferring funds to HASHCOINS' bank accounts to purchase HASHFLARE mining contracts in or before November 2015.  For example, on November 29, 2015, a transfer was made to an account held by HASHCOINS TRADE OU with the accompanying description: "Invoice #32789 ivanovdmi3i@list.ru HashFlare.io SHA-256 hashrate 300GH/s."  These transfers were made before any known delivery of mining equipment was made by these vendors to HASHFLARE or HASHCOINS.  Based on the above, the FBI is investigating whether HASHFLARE was soliciting and collecting investments for services it was not yet able to sufficiently perform.

Affidavit of Special Agent Andrew Cropcho - 18
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     Additionally, since neither Jeltan Trading LP nor Keleta UAB have any appreciable public presence online, the FBI is also investigating whether those entities are legitimate, providing actual services to HASHFLARE or HASHCOINS.

62.     Between at least August 2017 through June 2018, HASHFLARE and HASHCOINS had collectively transferred more than € 74 million to CryptoPay Ltd., a UK company that sells Bitcoin, purchases Bitcoin in exchange for fiat currency, and sells cards that can be loaded with cryptocurrency.  For example, on August 7, 2017, HASHFLARE transferred € 250,000 to CryptoPay Ltd. for "digital assets purchase."  Again, on August 14, 2017, HASHFLARE transferred an additional € 250,000 for "digital assets purchase."  These payments continued through at least June 15, 2018, when HASHFLARE transferred € 2,000,000, also for "digital assets purchase."  Based on these purchases, and the payment references, the FBI is investigating whether HASHFLARE was paying its investors using bitcoins purchased from CryptoPay, rather than mining bitcoins as advertised.

63.     Furthermore, based on my training and experience, and information gained during the course of this investigation, I know that Ponzi schemes operate by recruiting others, paying earlier investors with funds transferred by later investors.  Ponzi schemes often involve recruitment bonuses, incentivizing earlier investors to recruit friends and family members so that funds are available to pay earlier members.  As described above, HASHFLARE advertised a referral program, paying earlier investors 10% bonuses based on cloud mining contracts purchased by those they referred.

64.     HASHFLARE and HASHCOINS have stopped selling any mining contracts and, as described below, its founders and employees appear to have moved to successor companies that continue to operate in the cryptocurrency space.  Prior investors have not been able to recoup their funds and many have been unable to transfer funds held in their accounts.

65.     On December 29, 2020, an Estonian news company "DV" published an article describing a police investigation of POTAPENKO and TURYGIN.  The article provided, in

Affidavit of Special Agent Andrew Cropcho - 19
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  part, that POTAPENKO and TURYGIN were being investigated for fraud that was
2  facilitated through HASHFLARE's purported cloud-mining operations.

3      66.    As part of this article, TURYGIN wrote to DV asserting that a Scottish firm,
4  Fast Consult LP, bought the HASHFLARE cloud-mining operations in March 2016.
5  According to TURYGIN, Fast Consult LP renamed itself to HASHCOINS LP, and later
6  HASHFLARE.  TURYGIN explained that HASHCOINS, a company he and POTAPENKO
7  own, but which was distinguishable from HASHCOINS LP, which TURYGIN and
8  POTAPENKO did not own, provided IT services and technical support to HASHFLARE for
9  two years after its sale.

10     67.    On December 31, 2020, TURYGIN published his own article in DV in
11 response to the December 29, 2020, article, further claiming that HASHCOINS TRADE OU
12 assisted HASHCOINS LP with accepting funds until the Fall of 2016, but after that
13 HASHCOINS LP began to independently accept its own funds into their own accounts.

14     68.    TURYGIN's assertions are not supported by the evidence gathered to date in
15 this investigation.  For example, an E-shop Agreement for payment card acceptance was
16 signed by TURYGIN on or around May 24, 2017, which named IVAN TUROGIN as the
17 authorized representative of HASHCOINS LP.  According to the terms of the agreement,
18 reports would be sent to the email address sergei@hashcoins.com, associated with
19 POTAPENKO.  The E-shop Agreement also provided that, while the legal address for
20 HASHCOINS LP was listed as 44/46 Morningside Road, Suite 3, Edinburgh, EH10 4BF,
21 Scotland, United Kingdom, the actual address provided was Tartu Mnt 43, 10128 Estonia –
22 the address utilized by Burfa, HASHCOINS, and Polybius, as well as TURYGIN's own
23 Apple registration address.  Furthermore, in an email dated January 30, 2017, POTAPENKO
24 explained to the representative of a payment processing company that HASHCOINS LP
25 operates in Estonia and not the United Kingdom.

26     69.    I submit there is probable cause to believe HASHFLARE and HASHCOINS
27 operated as a Ponzi scheme for at least the following reasons: (1) before its collapse,
28 HASHFLARE appears to have been in financial distress, as evidenced by its unilateral

1  conversion of mining contracts from lifetime contracts to year-long contracts, its use of KYC
2  requirements to delay users' withdrawal of funds from their accounts, and its termination of
3  mining contracts during a time when industry press considered bitcoin mining to be
4  profitable; (2) HASHCOINS' questionable ability to manufacture cryptocurrency mining
5  equipment, as evidenced by its 2014 decision to not fulfill equipment orders and instead
6  convert purchase contracts to HASHFLARE cloud mining contracts; (3) Estonian law
7  enforcement's analysis that HASHFLARE wasn't receiving substantial payouts from mining
8  pools, sufficient to pay its investors; (4) HASHFLARE's apparent purchase of "digital
9  assets" from CryptoPay, which, among other items, sells Bitcoin, suggesting that
10  HASHFLARE may be purchasing cryptocurrency rather than mining it; (5) HASHFLARE's
11  inherent structure, including its referral program and lack of transparency regarding its
12  mining pools, which is a common structure evidenced in Ponzi schemes; (6) TURYGIN's
13  public attempt to mask true ownership of the now-defunct cloud-mining company; and (7) as
14  described in further detail below, HASHFLARE's dissolution and the subsequent transition
15  of its employees and co-founders, who joined new companies that continue to operate in the
16  cryptocurrency space.

17  **C. Other Linked Entities**

18      **a.**    **BURFA Entities**

19      70.    After HASHFLARE terminated its mining contracts, HASHCOINS OU
20  changed its legal name to Burfa Tech OU and HASHCOINS TRADE OU changed its name
21  to Burfa Trade OU. As described below, a number of HASHCOINS and HASHFLARE
22  employees then transferred and started working for these entities.

23      71.    Burfa Tech OU and Burfa Trade OU are part of a conglomerate formed by
24  TURYGIN and POTAPENKO, under the umbrella company Burfa Capital OU, incorporated
25  in Estonia (collectively called the "BURFA Entities"). These entities are described below:

26
27
28

Affidavit of Special Agent Andrew Cropcho - 21
USAO#2019R01037

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners | Prior Names |
|---|---|---|---|---|---|
| 7/12/13 | Burfa Capital OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | Starfix UU |
| 6/27/13 | Burfa Media OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | N/A |
| 7/17/17 | Burfa Real Estate OU | Estonia | Private Limited Company | Pavel Ivanov | Burfa Estate OU |
| 6/13/13 | Burfa Tech OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | HASHCOINS OU, Euro Host UU |
| 11/26/14 | Burfa Trade OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | HASHCOINS Trade OU, Habalink UU |
| 6/27/13 | Burfa Invest OU | Estonia | Private Limited Company | TURYGIN & POTAPENKO | N/A |

72.     According to the website for Burfa Capital, burfa.com, the various entities have the following missions:

a.     Burfa Capital OU "is a commercial organization . . . emphasizing collaboration and investment in such priority areas as IT, fintech and data processing." Burfa Capital OU appears to be the parent corporation in the BURFA Entities conglomerate.

b.     Burfa Media OU "provides computing equipment for processing large data arrays and for any operations that require significant computing power."

c.     Burfa Real Estate OU "is engaged in the construction of commercial and residential luxury real estate in Estonia . . . for the subsequent sale or rent."

d.     Burfa Tech OU is reported to be "a leader in the field of data center design and maintenance for the industrial sector . . . specializ[ing] in high-performance computing and turnkey data center solutions."  Like HASHCOINS, Burfa Tech OU is reported publicly to be "an IT company operating in Estonia mainly in the field of equipment for cryptocurrency mining."

e.     Burfa Trade OU "is engaged in the wholesale trade of timber materials."

1          f.     Burfa Invest OU "is a globally recognized brand with three main vectors

2   of development"—trade, real estate, and construction.

3          73.     As described in the chart below, a number of the individuals employed by the

4   BURFA Entities appear to have been formerly employed by HASHCOINS or

5   HASHFLARE.

6

| Name | Role in HASHCOINS or HASHFLARE | Role in BURFA Entities |
|------|-------------------------------|------------------------|
| SERGEI POTAPENKO | Co-Founder and CEO of HASHFLARE and HASHCOINS | Board Member & Co-Founder of Burfa Capital OU |
| IVAN TURYGIN | Co-founder of HASHFLARE and HASHCOINS | Board Member & Co-Founder of Burfa Capital OU |
| Nikolay Pavlovskiy | Chief Technology Officer of HASHCOINS, Vice President and Head of Business Development at HASHFLARE | Chief Technology Officer for Burfa Capital OU |
| Vitali Pavlov | Project Manager at HASHFLARE, Chief Product Officer at HASHCOINS | Chief Product Officer at Burfa Tech OU |
| Vadim Tsvetikov | Associated with HASHCOINS, as described above | Data Center Operation Director for Burfa Tech OU |
| Pavel Tsihhotski | Support and Community Manager for HASHCOINS | Former Head of Support for Burfa Capital OU |
| Stanislav Pavlov | Associated with HASHCOINS, as described above | Former Human Resources Manager and Customer Support for Burfa Tech OU |
| Tatjana Potapova | Chief Financial Officer for HASHCOINS | Chief Financial Officer for Burfa Media OU |
| Edger Bers | Public Relations Business Development Manager for HASHCOINS | Associated with BURFA Entities—possesses @burfa.com email address |

20

21          74.     Additionally, around the time the Bitcoin mining contracts were suspended,

22   HASHFLARE transferred substantial assets to the BURFA Entities.  For example, according

23   to bank records gathered during the course of this investigation, two different bank accounts

24   held in the name of HASHFLARE transferred approximately $15.5 million to a bank account

25   in the name of Burfa Media OU throughout the year in 2018.

26          75.     The @burfa.com domain was established on August 22, 2017, listing two

27   contact email addresses—admin@burfa.com and sergei@hashcoins.com (associated with

28   POTAPENKO).

Affidavit of Special Agent Andrew Cropcho - 23
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**b.    POLYBIUS**

76.    In addition to HASHCOINS, HASHFLARE, and the BURFA Entities, TURYGIN and POTAPENKO have also formed a second conglomerate, comprised of four entities—Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, and Polybius Fintech MidCo OU (collectively, referred to as "POLYBIUS").

77.    Each of these entities was incorporated in Estonia, as listed below:

| Date | Corporate Name | Country | Legal Form | Directors or Beneficial Owners |
|------|---------------|---------|-----------|-------------------------------|
| 2/13/17 | Polybius Foundation OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO & Anton Altement |
| 2/1/18 | Polybius Tech OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO, Anton Altement & Vadim Gerassimov |
| 2/8/18 | Polybius Ventures OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO & Anton Altement |
| 4/25/18 | Polybius Fintech MidCo OU | Estonia | Private Limited Company | TURYGIN, POTAPENKO, Anton Altement & Mathieu Hardy |

78.    According to the website for POLYBIUS, Polybius.io, and public reporting, the various entities have the following missions:

a.    Polybius Tech OU created a cryptocurrency wallet called OSOM Finance, designed to hold both Bitcoin and alternative coins.

b.    Polybius Ventures OU and Polybius Fintech MidCo OU are not separately described but are both subsidiaries in the POLYBIUS ecosystem.

c.    Polybius Foundation, according to its Prospectus (also known as a "Whitepaper"), is "a team of financial, security, legal and technical experts" who are raising funds to start Polybius Bank.  The intent was for Polybius Bank to be a "fully digital bank accessible everywhere at any time.  It will have all the functions of a classical bank, but will not host any branches, nor any physical front-offices and will rely fully on the latest digital technologies."  The front of the prospectus reads, in part: "Polybius POWERED BY HASHCOINS."

79.    According to an article written by Forbes on October 29, 2018, POLYBIUS raised approximately $32 million dollars during its Initial Coin Offering ("ICO") in the summer of 2017.  The symbol for the POLYBIUS coins is PLBT.  As of the date of the

Affidavit of Special Agent Andrew Cropcho - 24
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 writing of the article, no tangible product had been launched.  In fact, it announced that it

2 abandoned the prospect of opening a bank, and that it would develop a mobile app instead.

3      80.     A cursory review of the POLYBIUS tokens was discussed in a law review

4 article published by the Columbia Law Review in April of 2019, entitled "Coin-Operated

5 Capitalism."  In the article, the authors note that a "development team can unilaterally

6 change the [POLYBIUS] tokens purchased by investors–or sometimes, propose changes that

7 will not be adopted if a certain percentage of users do not object."  The authors opine that the

8 latter type of proposed changes that may be detrimental to investors may automatically take

9 effect with no knowledge of the investor because (1) the default vote is inherently set to

10 "yes," and (2) the investing public as a whole does not have the technical skills to monitor or

11 understand the proposed changes a development team may make to the POLYBIUS tokens.

12 To date, it is unknown whether any such changes occurred.

13      81.     On November 17, 2018, POLYBIUS released a blog post announcing it was

14 releasing a new personal finance management service called "OSOM."  Later in 2019,

15 POLYBIUS released instructions about how to transfer PLBT tokens from an investor's

16 POLYBIUS Wallet to their OSOM Wallet.  According to POLYBIUS, transfer of the PLBT

17 tokens to the OSOM Wallet was important because the POLYBIUS Wallet would eventually

18 no longer be functioning.

19      82.     While the American versions of Apple's "App Store" and Google's "Play

20 Store" have no results when searching for "POLYBIUS" and "OSOM," the same search on

21 the United Kingdom versions shows that Polybius Tech Launched OSOM Finance in or

22 around October of 2019.  The App Store's version of OSOM Finance has about five reviews,

23 and the Play Store's version of OSOM Finance has about 74 reviews.  According to a

24 description of OSOM Finance, the app is advertised as an "all-in-one crypto portfolio

25 management app."

26      83.     The POLYBIUS coin is still available for purchase as of today, and both the

27 OSOM website and POLYBIUS website are still in existence.

28

Affidavit of Special Agent Andrew Cropcho - 25
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

84.     As with the BURFA Entities, some of the individuals employed by POLYBIUS appear to have been formerly employed by HASHCOINS or HASHFLARE or the BURFA entities.  As a result, it appears that POLYBIUS is a successor entity of HASHCOINS and HASHFLARE.

| Name | Role in HASHCOINS, HASHFLARE or BURFA | Role in POLYBIUS |
|---|---|---|
| SERGEI POTAPENKO | Co-Founder and CEO of HASHFLARE and HASHCOINS | Co-Founder of POLYBIUS |
| IVAN TURYGIN | Co-founder of HASHFLARE and HASHCOINS | Co-founder of POLYBIUS |
| Edgar Bers | Public Relations Business Development Manager for HASHCOINS | Product Manager for POLYBIUS |
| Pavel Tsihhotski | Support and Community Manager for HASHCOINS | Associated with POLYBIUS (possesses @polybius.io email address) |
| Anton Altement | Associated with BURFA Entities (possesses @burfa.com email address) | CEO & Co-Founder of POLYBIUS |
| Vitali Pavlov | Project Manager at HASHFLARE, Chief Product Officer at HASHCOINS | Former Product Manager POLYBIUS |

## D.  **TURYGIN and POTAPENKO's Use of Apple Services**

85.     According to records obtained from Apple, POTAPENKO registered for an iCloud account on January 22, 2012.  The Apple ID for this account was sergei.potapenko@gmail.com and the account is assigned DSID 624556209.  The login alias for this account is sergei.potapenko@icloud.com.  According to Apple, as of May 2020, POTAPENKO backed up his bookmarks, contacts, iOS Devices, iCloud Photos, Mail, Messages, and Notes using this account.[8]  Between 2017 and 2020, POTAPENKO registered three MacBook Pros, and Apple TV, and an iPhone to this account.

86.     According to records obtained from Apple, TURYGIN registered for an iCloud account on June 24, 2012.  The Apple ID for this account was turygin@gmail.com and the account is assigned DSID 1931852295.  According to Apple, as of May 2020, TURYGIN

---

[8] According to Apple, as of May 2020, for this account, there were no logs associated with FaceTime, iCloud, IDS Queries or Mail during the prior 25 days.

1  backed up his bookmarks, contacts, Find My Friends, iOS Devices, iCloud Drive, iCloud

2  Photos, Notes, and Photo Stream using this account.[9]  Between 2012 and 2018, TURYGIN

3  registered two iPhones, two MacBook Pros, and one MacBook Air to this account.

4      87.  I submit there is probable cause to search the **SUBJECT ACCOUNTS** for

5  evidence of the HASHFLARE and HASHCOINS fraud.  Specifically, there is probable

6  cause to believe that the following types of records are maintained in these accounts.

7      88.  **Stored Chat Communications:**  Stored chats, including in Apple Messages,

8  not only may contain communications related to the fraud perpetrated by HASHCOINS and

9  HASHFLARE, but also help identify participants in those crimes, including HASHCOINS'

10  and HASHFLARE's founders, employees, and investors.  For example, HASHFLARE used

11  group chat mechanisms, including Telegram, to recruit investors and to communicate

12  amongst members.  On December 22, 2017, HASHFLARE sent an email stating "Dear

13  friends, . . . So how was this year with HashFlare?  It was a year of exploding growth and

14  related challenges . . . Thousands of HashFlare users already chat in our Telegram groups."

15  HASHFLARE then provided links to English and Russian language Telegram groups.

16  Based on my training and experience, along with information learned during the course of

17  this investigation, I know that a user can elect to backup encrypted communications, like

18  Telegram, onto their iCloud account.  These communications may contain fraudulent

19  statements, made to solicit investments in HASHFLARE, or may identify additional victims

20  of HASHFLARE or HASHCOINS' fraud.  Notably, POTAPENKO also had iMessages

21  backed up to his account.

22      89.  **Contacts:**  Address books and contact lists may help identify both the owner

23  of the account and locate co-conspirators, including other individuals who exercise control

24  and influence over HASHFLARE or HASHCOINS.  Additionally, these address books may

25  identify HASHFLARE or HASHCOINS' employees, providing further evidence of these

26  entities' internal structure.  They may also identify the owners and representatives of Jeltan

27

28  [9] According to Apple, as of May 2020, for this account, there were no logs associated with FaceTime, iCloud, IDS Queries or Mail during the prior 25 days.

1 | Trading LP, Keleta UAB, and Dalmeron Projects, which would assist law enforcement in
2 | determining whether these companies are legitimate entities.

3 |     90.   **Photos and Videos**:  Similarly, HASHFLARE and HASHCOINS'
4 | representatives generated a number of videos and promotional materials.  For example,
5 | HASHFLARE maintained a website, Twitter feed, YouTube account, and Facebook account,
6 | where representatives posted these photographs and videos.  According to its Twitter feed,
7 | on April 19, 2018, HASHFLARE published a "trailer for a documentary about the
8 | construction of the new HashCoins computing centers in Iceland," linking to a video on
9 | YouTube.  Similarly, on July 26, 2016, HASHFLARE posted the following photograph to its
10 | Twitter account, depicting a purported data center:





23 | Accordingly, photographs and videos stored in the **SUBJECT ACCOUNTS** may be
24 | evidence of HASHFLARE and HASHCOINS' solicitation of investors and presentation of
25 | fraudulent statements.  These photographs and videos may be stored in iCloud Photos or
26 | PhotoStream.  Furthermore, cryptocurrency addresses, private keys, recovery seeds, PGP
27 | keys, and passwords are often comprised of long and complex character strings, and in my
28 | training and experience, I know that many cryptocurrency users write down or otherwise

Affidavit of Special Agent Andrew Cropcho - 28
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   record and store such items because they are too long to commit to memory. These items

2   may be recorded in the user's photographs, in emails, in cloud document storage, in chat

3   applications, or in other applications on electronic devices.

4   91. **Documents:** Documents stored in the **SUBJECT ACCOUNTS** may identify

5   the scope of HASHFLARE and HASHCOINS' criminal activity, including by recording lists

6   of investors or identifying investment accounts. In my training and experience, I know that

7   the commission of offenses in the manner set forth above necessarily requires the use of

8   computers, smart phones, tablets, or other computer devices and storage media to access

9   HASHFLARE's website, cryptocurrency exchanges and wallets, connect with and recruit

10   investors, and engage in transfers of digital currency. I have learned, through training and

11   experience, that individuals who engage in these types of offenses in this way also

12   commonly use such electronic devices to keep track of investors and co-conspirators; keep

13   records of transactions and criminal proceeds, including funds deposited at cryptocurrency

14   exchanges; and store copies of online chats, emails, and other promotional data in cloud-

15   based accounts. For example, documents were located in Google accounts belonging to

16   TURYGIN and POTAPENKO, including invoices, contracts, bank statements, and other

17   documents relevant to the fraudulent scheme under investigation. These documents may be

18   stored in iCloud Drives or Notes.

19   92. **Calendar Data:** Calendar data may reveal the timing and extent of criminal

20   activity, including meetings attended by HASHFLARE and HASHCOINS' founders and

21   travel to attend TCC promotional events. For example, according to information saved in

22   TURYGIN and POTAPENKO's Google accounts, POTAPENKO and TURYGIN attended

23   meetings regarding HASHFLARE, including a meeting held on November 20, 2019 to

24   discuss HASHFLARE 2.0's Terms of Service.

25   93. **Web History and Search Data**: Web history and search data may show when

26   users accessed websites, HASHFLARE's social media sites, HASHFLARE's YouTube

27   videos, or other online locations associated with HASHFLARE and HASHCOINS.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Additionally, web searching may identify the wallet providers used by each user to hold their
2  cryptocurrency.

3       94.    **iCloud Storage and Backup:** I know that Apple's iCloud services collect and
4  stores information about Apple devices registered to an iCloud account. If enabled, a user
5  may backup settings, app data, communications, documents, and other data stored on Apple
6  devices. If a device is backed up, encrypted communications, such as Telegram chats, may
7  be stored in an iCloud backup. For the reasons outlined above, each of these categories of
8  information are relevant to the crimes under investigation, and, therefore, iCloud data is also
9  requested. In addition, I know, based on training and experience that perpetrators maintain
10  copies of software programs and other applications, including, but not limited to,
11  cryptocurrency client and wallet files, digital signature software and related authentication
12  keys, as well as encryption software and related encryption keys. This data may also be
13  reflected in an iCloud backup. Based on my training and experience, and information gained
14  during the course of this investigation, I know that multiple backups, spanning a lengthy time
15  period, may be saved in a user's iCloud account. Accordingly, although HASHFLARE and
16  HASHCOINS ceased selling mining contracts in 2018, information related to this time
17  period may still be stored on Apple's servers. This is particularly true because electronic
18  devices, including computers and iPhones, purchased from 2012 until 2018 remain registered
19  to TURYGIN's iCloud account. Additionally, electronic devices, including computers and
20  an iPhone, purchased from 2017 until 2018 remain registered to POTAPENKO's iCloud
21  account. Additionally, more recent information may uncover the proceeds of HASHFLARE
22  and HASHCOINS' fraud, the beneficial ownership of successor and associated corporations,
23  and efforts by POTAPENKO and TURYGIN to conceal their ownership in these entities—as
24  evidence by the December 31, 2020 article, referenced above.

25       95.    In order to gather evidence of operations of HASHCOINS, HASHFLARE, and
26  other affiliated entities, including discussions of mining cryptocurrency and providing
27  returns to investors, the United States is seeking records from the identified Apple accounts
28  associated with POTAPENKO and TURYGIN.

Affidavit of Special Agent Andrew Cropcho - 30
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

96.     Based on the above, there is probable cause to believe that information contained in the **SUBJECT ACCOUNTS** could reveal, among other things: (1) the plans and strategies formed by the users of the **SUBJECT ACCOUNTS** to defraud investors and customers, (2) the actions taken to execute those plans, (3) the operations and relationship between the various entities, including assets transferred between those entities; (4) the extent and capacity of mining operations at HASHCOINS and HASHFLARE; (5) the location of assets paid by investors to HASHCOINS and HASHFLARE; and (6) information on where HASHFLARE and HASHCOINS store their server data, including data on the identity and investment of each HASHFLARE subscriber.  Therefore, the United States seeks records and information from Apple related to each of the **SUBJECT ACCOUNTS**.

## **BACKGROUND CONCERNING ONLINE ACCOUNTS**

97.     As explained herein, information stored in connection with an online account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

98.     In my training and experience, the information stored in connection with an online account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

99.     Further, information maintained by the provider can show how and when the account was accessed or used.  For example, as described below, providers typically log the Internet Protocol (IP) addresses from which users access the account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.

Affidavit of Special Agent Andrew Cropcho - 31
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Additionally, information stored at the user's account may further indicate the geographic

2  location of the account user at a particular time (e.g., location information integrated into an

3  image or video).

4      100.   Stored electronic data may provide relevant insight into the account owner's

5  state of mind as it relates to the offense under investigation.  For example, information in the

6  account may indicate the owner's motive and intent to commit a crime (e.g., communications

7  relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to

8  conceal them from law enforcement).

9                    **1.   Apple's Services**

10     101.   Apple is a United States company that produces the iPhone, iPad, and iPod

11  Touch, all of which use the iOS operating system, and desktop and laptop computers based

12  on the Mac OS operating system.  Apple provides a variety of services that can be accessed

13  from Apple devices or, in some cases, other devices via web browsers or mobile and desktop

14  applications ("apps").  As described in further detail below, the services include email,

15  instant messaging, and file storage:

16     102.   Apple provides email service to its users through email addresses at the domain

17  names mac.com, me.com, and icloud.com.

18     103.   iMessage and FaceTime allow users of Apple devices to communicate in real-

19  time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages")

20  containing text, photos, videos, locations, and contacts, while FaceTime enables those users

21  to conduct video calls.

22     104.   iCloud is a file hosting, storage, and sharing service provided by Apple.

23  iCloud can be utilized through numerous iCloud-connected services, and can also be used to

24  store iOS device backups and data associated with third-party apps.  iCloud can be utilized to

25  transfer data from an old device to a new device, including data derived from device backups

26  and third-party applications.

27     105.   iCloud-connected services allow users to create, store, access, share, and

28  synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For

Affidavit of Special Agent Andrew Cropcho - 32
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices. iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

106. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

107. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

108. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive

Affidavit of Special Agent Andrew Cropcho - 33
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  or closed), the methods used to connect to and utilize the account, the Internet Protocol
2  address ("IP address") used to register and access the account, and other log files that reflect
3  usage of the account.

4        109.   Additional information is captured by Apple in connection with the use of an
5  Apple ID to access certain services.  For example, Apple maintains connection logs with IP
6  addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and
7  App Store, iCloud, and the My Apple ID and iForgot pages on Apple's website.  Apple also
8  maintains records reflecting a user's app purchases from App Store and iTunes Store, "call
9  invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided
10 email account.  Records relating to the use of the Find My iPhone service, including
11 connection logs and requests to remotely lock or erase a device, are also maintained by
12 Apple.

13       110.   Apple also maintains information about the devices associated with an Apple
14 ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's
15 IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is
16 the serial number of the device's SIM card.  Similarly, the telephone number of a user's
17 iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also
18 may maintain records of other device identifiers, including the Media Access Control
19 address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In
20 addition, information about a user's computer is captured when iTunes is used on that
21 computer to play content associated with an Apple ID, and information about a user's web
22 browser may be captured when used to access services through icloud.com and apple.com.
23 Apple also retains records related to communications between users and Apple customer
24 service, including communications regarding a particular Apple device or service, and the
25 repair history for a device.

26       111.   Apple provides users with five gigabytes of free electronic space on iCloud,
27 and users can purchase additional storage space.  That storage space, located on servers
28 controlled by Apple, may contain data associated with the use of iCloud-connected services,

Affidavit of Special Agent Andrew Cropcho - 34
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream,
2 and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks
3 and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs
4 and iCloud Keychain). iCloud can also be used to store iOS device backups, which can
5 contain a user's photos and videos, iMessages, Short Message Service ("SMS") and
6 Multimedia Messaging Service ("MMS") messages, voicemail messages, call history,
7 contacts, calendar events, reminders, notes, app data and settings, and other data. Records
8 and data associated with third-party apps may also be stored on iCloud; for example, the iOS
9 app for Telegram, an instant messaging service, can be configured to regularly back up a
10 user's instant messages on iCloud. Some of this data is stored on Apple's servers in an
11 encrypted form but can nonetheless be decrypted by Apple.

12     112. In this case, I am investigating, among other things, TURYGIN and
13 POTAPENKO's use of Apple accounts. In my training and experience, evidence of who
14 was using an Apple ID and from where, and evidence related to criminal activity of the kind
15 described above, may be found in the files and records described above. As previously
16 described, stored emails, chats, and other files may not only contain communications relating
17 to the crimes under investigation, but also help identify the participants in those crimes.
18 Address books and contact lists may help identify others involved in HASHFLARE and
19 HASHCOINS, including victim investors. Similarly, photographs and videos may help
20 identify additional promotion materials created by HASHFLARE and HASHCOINS, or
21 identify cryptocurrency wallet addresses. Documents may identify the scope of the criminal
22 activity, including transactional information related to victims and the ultimate disposition of
23 fraud proceeds. And calendar data may reveal the timing and extent of criminal activity and
24 other information, including the formation of HASHFLARE and HASHCOINS and
25 solicitation of investors. Search and browsing history may also constitute direct evidence of
26 the crimes under investigation to the extent the browsing history or search history might
27 include searches and browsing history related to HASHFLARE, HASHCOINS, or
28 cryptocurrency mining, and other evidence of the crimes under investigation. In my training

1 | and experience, as already described above, I also know that the commission of the
2 | violations in the manner set forth above necessarily requires the use of computers, smart
3 | phones, tablets, or other computer devices.

4 |     113.   In addition, the user's account activity, logs, stored electronic communications,
5 | and other data retained by Apple can indicate who has used or controlled the account.  For
6 | example, subscriber information, email and messaging logs, documents, and photos and
7 | videos (and the data associated with the foregoing, such as geo-location, date and time) may
8 | be evidence of who used or controlled the account at a relevant time.  As an example,
9 | because every device has unique hardware and software identifiers, and because every
10 | device that connects to the Internet must use an IP address, IP address and device identifier
11 | information can help to identify which computers or other devices were used to access the
12 | account.  Such information also allows investigators to understand the geographic and
13 | chronological context of access, use, and events relating to the crime under investigation.

14 |     114.   Other information connected to an Apple ID may lead to the discovery of
15 | additional evidence.  For example, the identification of apps downloaded from App Store
16 | and iTunes Store may reveal additional services used to communicate with the victims or
17 | deposit cryptocurrency.  In addition, I know that encrypted applications, including Telegram,
18 | which was used by the founders and members of HASHFLARE and HASHCOINS, can be
19 | backed up in a user's iCloud data.  Therefore, Apple's servers are likely to contain stored
20 | electronic communications and information concerning subscribers and their use of Apple's
21 | services.  Additionally, a successor entity to HASHFLARE and HASHCOINS, POLYBIUS,
22 | advertised that it was creating an Apple application as part of its operations.

23 | **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

24 |     115.   Pursuant to Title 18, United States Code, Section 2703(g), this application and
25 | affidavit for a search warrant seeks authorization to require Apple, and their agents and
26 | employees, to assist agents in the execution of this warrant.  Once issued, the search warrant
27 | will be presented to Apple with direction that it identifies the accounts described in
28 |

Affidavit of Special Agent Andrew Cropcho - 36
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Attachment A to this affidavit, as well as other subscriber and log records associated with the
2 accounts, as set forth in Section I of Attachment B to this affidavit.

3       116.    The search warrant will direct Apple to create an exact copy of the specified
4 account and records.

5       117.    I, and/or other law enforcement personnel will thereafter review the copy of
6 the electronically stored data and identify from among that content those items that come
7 within the items identified in Section II to Attachment B for seizure.

8       118.    Analyzing the data contained in the forensic copy may require special technical
9 skills, equipment, and software.  It could also be very time-consuming.  Searching by
10 keywords, for example, can yield thousands of "hits," each of which must then be reviewed
11 in context by the examiner to determine whether the data is within the scope of the warrant.
12 Merely finding a relevant "hit" does not end the review process.  Keywords used originally
13 need to be modified continuously, based on interim results.  Certain file formats, moreover,
14 do not lend themselves to keyword searches, as keywords, search text, and many common
15 email, database and spreadsheet applications do not store data as searchable text.  The data
16 may be saved, instead, in proprietary non-text format.  And, as the volume of storage allotted
17 by service providers increases, the time it takes to properly analyze recovered data increases,
18 as well.  Consistent with the foregoing, searching the recovered data for the information
19 subject to seizure pursuant to this warrant may require a range of data analysis techniques
20 and may take weeks or even months.  All forensic analysis of the data will employ only those
21 search protocols and methodologies reasonably designed to identify and seize the items
22 identified in Section II of Attachment B to the warrant.

23      119.    Based on my experience and training, and the experience and training of other
24 agents with whom I have communicated, it is necessary to review and seize a variety of
25 communications, chat logs and documents, that identify any users of the subject account and
26 communications sent or received in temporal proximity to incriminating communications
27 that provide context to the incriminating communications.

28

Affidavit of Special Agent Andrew Cropcho - 37
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CONCLUSION

120.    Based on the forgoing, I respectfully request that the Court issue the proposed search warrant.  Accordingly, by this Affidavit and Warrant I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

Andrew Cropcho, Affiant
Special Agent


The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit on the __11th__ day of March, 2021.

THE HONORABLE JOHN L. WEINBERG
United States Magistrate Judge

Affidavit of Special Agent Andrew Cropcho - 38
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A

### Apple Accounts to be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Apple accounts:

        a.     Sergei.potapenko@gmail.com (DSID 624556209) ("**SUBJECT ACCOUNT 1**"); and

        b.     Turygin@gmail.com (DSID 1931852295) ("**SUBJECT ACCOUNT 2**");

(collectively, the "Accounts") that are stored at a premises controlled by Apple, Inc., a company that accepts service of legal process at One Apple Park Way, Cupertino, California 95014.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

**I. Information to be disclosed by Apple, Inc.:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, Inc. ("Apple"), including any data, messages, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Apple is required to disclose the following information to the government for each Account or identifier listed in Attachment A, from Account inception to the present:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account from April 2015 to the present, including stored or preserved copies of emails sent to and from the account

Attachment B -- Page 1
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 (including all draft emails and deleted emails), the source and destination addresses
2 associated with each email, the date and time at which each email was sent, the size and
3 length of each email, and the true and accurate header information including the actual IP
4 addresses of the sender and the recipient of the emails, and all attachments;

5         d.    The contents of all instant messages associated with the account from
6 April 2015 to the present, including stored or preserved copies of instant messages (including
7 iMessages, SMS messages, and MMS messages) sent to and from the account (including all
8 draft and deleted messages), the source and destination account or phone number associated
9 with each instant message, the date and time at which each instant message was sent, the size
10 and length of each instant message, the actual IP addresses of the sender and the recipient of
11 each instant message, and the media, if any, attached to each instant message;

12         e.    The contents of all files and other records stored on iCloud, including all
13 iOS device backups, all Apple and third-party app data, all files and other records related to
14 iCloud Photo Library, Photo Stream, iCloud Drive, Safari Browsing History, and all address
15 books, contact and buddy lists, notes, reminders, calendar entries, images, videos,
16 voicemails, device settings, and bookmarks;

17         f.    All activity, connection, and transactional logs for the account (with
18 associated IP addresses including source port numbers), including FaceTime call invitation
19 logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs,
20 iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates
21 of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple
22 services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with
23 web-based access of Apple services (including all associated identifiers), and logs associated
24 with iOS device purchase, activation, and upgrades;

25         g.    All records pertaining to the types of service used;

26         h.    Records identifying the location of the subscriber.

27         i.    All records pertaining to communications between Apple and any
28 person regarding the account, including contacts with support services and records of actions

Attachment B -- Page 2
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  taken; and

2          j.      All files, keys, or other information necessary to decrypt any data

3  produced in an encrypted form, when available to Apple (including, but not limited to, the

4  keybag.txt and fileinfolist.txt files).

5          Apple is hereby ordered to disclose the above information to the government within

6  **14 days** of service of this warrant.

7

8  **II.     Information to be seized by the government**

9          All information described above in Section I that constitutes fruits, contraband,

10  evidence, and instrumentalities of violations of Title 18, United States Code, Section 1343

11  (Wire Fraud), and occurring after April 2015, for each of the Accounts listed on Attachment

12  A, pertaining to the following matters:

13          a.      Items, records, or information related to the operation of a

14  cryptocurrency cloud mining Ponzi scheme;

15          b.      Items, records, or information related to cryptocurrency mining, the

16  advertisement, manufacture and sale of mining equipment, or the advertisement and sale of

17  cloud mining contracts;

18          c.      Items, records, or information related to the termination of mining

19  contracts and the profitability of cloud mining;

20          d.      Items, records, or information related to purchases of cloud mining

21  equipment, including communications with the companies Jeltan Trading, Dalmeron

22  Projects, Ecohouse Networks LP, Dalmeron Invest, Keleta UAB, Bitmain, Bitfury, and

23  Inno3d;

24          e.      Items, records, or information related to the transfer, purchase, sale, or

25  disposition of cryptocurrency;

26          f.      Items, records, or information related to communications with

27  HASHFLARE or HASHCOINS investors, including complaints by investors or requests for

28  return of funds;

1         g.     Items, records, or information related to the advertisement of
2 HASHFLARE or HASHCOINS' services;

3         h.     Items, records, or information related to the owners, operators,
4 employees, locations, assets, and business purpose of the companies HASHCOINS OU,
5 HASHCOINS TRADE OU, HASHCOINS LP, HASHFLARE LP, Burfa Capital OU, Burfa
6 Media OU, Burfa Real Estate OU, Burfa Tech OU, Burfa Trade OU, Burfa Invest OU,
7 Polybius Foundation OU, Polybius Tech OU, Polybius Ventures OU, Polybius Fintech
8 MidCo OU, Dalmeron Projects LP, Jeltan Trading, Dalmeron Invest, Ecohouse Networks
9 LP, and Keleta UAB (collectively, the "SUBJECT ENTITIES");

10         i.     Items, records, or information related to the use, creation, or operation
11 of the "SUBJECT ENTITIES," including business plans and strategies, and the anticipated
12 success, failure, or general validity thereof;

13         j.     Items, records, or information related to the operation of hashflare.io,
14 burfa.com, polybius.io, dalmeron.com, or hashcoins.com;

15         k.     Items, records, or information concerning financial transactions
16 associated with the operation of the SUBJECT ENTITIES, including bank accounts held by
17 the SUBJECT ENTITIES, transfers of funds by the SUBJECT ENTITIES, expenditures of
18 money or wealth, bank statements and other financial statements, and cryptocurrency
19 holdings;

20         l.     Items, records, or information related to cryptocurrency mining groups,
21 cryptocurrency public keys or addresses, cryptocurrency private keys, representations of
22 cryptocurrency wallets or their constitutive parts, to include "recovery seeds" and "root
23 keys," which may be used to regenerate a wallet.

24         m.     Items, records, or information related to the salaries or earnings of
25 individuals employed by the SUBJECT ENTITIES.

26         n.     Items, records, or information related to the payment or calculation of
27 recruitment bonuses paid to HASHFLARE and HASHCOINS investors.

28

Attachment B -- Page 4
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        o.    Items, records, or information related to receipt of investor money,

2 including the amount, purpose of the investment, and plans for spending that money.

3        p.    Evidence indicating how and when the email account was accessed or

4 used, to determine the geographic and chronological context of account access, use, and

5 events relating to the crime under investigation and to the email account owner.

6        q.    Evidence indicating the email account owner's state of mind as it relates

7 to the crime under investigation.

8        r.    The identity of the person(s) who created or used the user ID, including

9 records that help reveal the whereabouts of such person(s).

10

11 This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be

12

13 conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney

14 support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the

15 government and their support staff for their independent review.

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

b.      such records were generated by _____'s electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                          Signature

Certificate of Authenticity -- Page 1
USAO#2019R01037